IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BEFORE THE HONORABLE JOHN A. MENDEZ

UNITED STATES OF AMERICA,

            Plaintiff,

vs.

GUSTAVO ARAUJO LERMA,
aka Hiram Enrique Velez,

            Defendant.
_____/

Sacramento, California
No. 2:17-CR-00195
Wednesday, August 21, 2019
9:24 a.m.

--oOo--

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
Volume 3, Pages 1 - 144

--oOo--

APPEARANCES:

For the Government:
UNITED STATES ATTORNEY'S OFFICE
KATHERINE T. LYDON
Assistant U.S. Attorney
SHEA J. KENNY
Assistant U.S. Attorney
501 I Street, Suite 10-100
Sacramento, CA  95814

For the Defendant:
OFFICE OF THE FEDERAL DEFENDER
DOUGLAS J. BEEVERS
Assistant Federal Defender
801 I Street, Third Floor
Sacramento, CA  95814

Official Reporter:
KACY PARKER BARAJAS
UNITED STATES DISTRICT COURT
CSR No. 10915, RMR, CRR, CRC
501 I Street
Sacramento, CA  95814
kbarajas.csr@gmail.com

*Proceedings recorded by mechanical stenography.  Transcript produced by computer-aided transcription.*

INDEX OF WITNESSES

--oOo--

DEFENDANT'S                                                    PAGE

GUSTAVO ARAUJO, JR.

    Direct Examination by Mr. Beevers                        5
    Cross-Examination by Mr. Kenny                           7

HIRAM ENRIQUE VELEZ

    Direct Examination by Mr. Beevers                        9
    Cross-Examination by Ms. Lydon                          31
    Cross-Examination by Mr. Beevers                        64

--oOo--

INDEX OF PROCEEDINGS

--oOo--

                                                               PAGE

Closing Argument by Mr. Kenny                               95

Closing Argument by Mr. Beevers                            111

Rebuttal Closing Argument by Ms. Lydon                     121

--oOo--

KACY PARKER BARAJAS
OFFICIAL COURT REPORTER, USDC - (916) 426-7640

                              INDEX OF EXHIBITS

     GOVERNMENT'S                                          IN EVIDENCE

     617                                                        58


     DEFENDANT'S                                           IN EVIDENCE

     A                                                          17

     N                                                          18

                              --oOo--

SACRAMENTO, CALIFORNIA, WEDNESDAY, AUGUST 21, 2019, 9:24 AM

--oOo--

THE COURT:  Ready to go?

MR. BEEVERS:  One moment, your Honor, to excuse our other witnesses.  We have one other witness before the defendant, real brief.

All right.  We're ready to bring in the jury.

Your Honor, we did have one issue.  The defendant said that he's not getting his medication.  I wanted to make sure he was clear headed enough to testify.

Are you feeling clear headed enough?

THE COURT:  Don't address me.  This is between you and your client, Mr. Beevers.  I have nothing to do with this.

Stop, stop.  For the record, we're outside the presence of the jury.  This is a conversation between you and your client and the interpreter.  The Court does not get involved in this.

MR. BEEVERS:  I understand.

(Off-the-record discussion between Mr. Beevers and the defendant.)

MR. BEEVERS:  Okay.  He's okay to testify.

THE COURT:  That's between you and him.  I have nothing to do with this.  You don't need my permission.

MR. BEEVERS:  Well, just for scheduling, we're going to be ready.  We're ready to go.

THE COURT:  Okay.  I can bring in the jury?

MR. BEEVERS:  Yes.

THE COURT:  All right.  Let's bring in the jury.

(Jury seated.)

THE COURT:  Good morning, jury.  Did you have a good night's sleep.

All jurors present.  All parties are present.

Mr. Beevers, you may call your next witness.

MR. BEEVERS:  Defense calls Gustavo Araujo, Jr.

THE CLERK:  Go ahead and we'll have you take your seat, if you would, please, sir.

(Whereupon the oath was administered.)

GUSTAVO ARAUJO, JR.

was called as a witness, and having been duly sworn, was examined and testified as follows:

THE WITNESS:  I do.

THE CLERK:  Okay.  I need you to state your full name and spell your names for us, please.

THE WITNESS:  Gustavo Araujo, G-u-s-t-a-v-o, A-r-a-u-j-o.

THE CLERK:  Thank you.

THE COURT:  Okay.

DIRECT EXAMINATION

BY MR. BEEVERS:

Q.   Good morning.

A.   Good morning.

Q.   Do you know the gentleman in the white shirt?

A.   I do.

Q.   What name do you know him by?

A.   Hiram Enrique Velez.

Q.   And based on your knowledge of family history -- do you know -- you obviously don't have any personal knowledge of who your father was, right?

A.   I don't.  Never seen my real father.

Q.   Okay.  The family history that you've heard over the years, who is your father, as far as you know?

A.   Well, my father's real name is Gustavo Araujo Lerma.

Q.   And is that this gentleman?

A.   No.  That's Hiram.

Q.   Okay.  And how long have you lived with this defendant?

A.   Um, we came here since like -- be '92, I think '92.

Q.   Okay.  And where did you grow up as a child?

A.   As a child Mexico, then L.A., and then Sacramento.

Q.   Okay.  And where do you work?

A.   I work in Oakland for Union Pacific Railroad.

Q.   And what do you do?

A.   A TCL clerk.

Q.   Okay.  And are you a U.S. citizen?

A.   Yes, I am.

Q.   And have you ever introduced this man to any of your

friends or family?

A.   Oh, yeah, everybody, I mean, when we came around.

Q.   Have you ever seen him socialize over the years?

A.   Yeah.

Q.   And what name did he use while he was socializing?

A.   They always called him Enrique.

Q.   Okay.  And have you ever seen this person use the name Gustavo Araujo?

A.   No, never.

          MR. BEEVERS:  That's all I have, your Honor.

          THE COURT:  Cross-examination.

          MR. KENNY:  Just a few questions here, your Honor.

                    CROSS-EXAMINATION

BY MR. KENNY:

Q.   So you're named after your father, correct?

A.   Correct, I'm a Jr.

Q.   Where is your dad?

A.   My real dad?  Never knew him.

          THE COURT:  What was your answer?

          THE WITNESS:  Never knew, never knew where he is.

          THE COURT:  Okay.

BY MR. KENNY:

Q.   You've never met him?

A.   Never.

Q.   And how long have you been raised by the defendant here?

A.   Since '92 when we met him.

Q.   You met him for the first time in 1992?

A.   For the first time.

Q.   You have no memories of your -- of Gustavo Araujo Lerma?

A.   None, none.

MR. KENNY:  Nothing further, your Honor.

THE COURT:  Anything further, Mr. Beevers?

MR. BEEVERS:  One moment.  No questions, your Honor.

THE COURT:  Thank you for being here.  You may step down.

You may call your next witness.

MR. BEEVERS:  Call the defendant.

THE COURT:  We're going to give you a handheld mic.

THE INTERPRETER:  Oh, thank you.

THE COURT:  Hang on.  Mr. Vine has to swear him in.

THE CLERK:  Your right hand, sir.

(Whereupon the oath was administered.)

HIRAM ENRIQUE VELEZ

was called as a witness, and having been duly sworn, was examined and testified as follows through the Spanish language interpreter:

THE WITNESS:  Exactly, exactly.  I swear to God.

THE CLERK:  Thank you.  Please state your full name.

THE WITNESS:  Hiram Enrique Velez.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MR. BEEVERS:

Q.   Good morning.  You heard the testimony in this case so far.  I will start -- let me start from the end of the story. Do you remember November 8th, 2016, the election where Donald Trump was against Hillary Clinton?

A.   Yes.

Q.   And you saw evidence that showed a person named Hiram E. Velez signed in to vote on that day?

A.   Yes.  I signed up to vote and I voted.

Q.   Okay.  And you are -- for the other dates, June 7, 2016, do you remember voting?

A.   Yes, sir.  I voted.

Q.   Okay.  And you heard that the ballots for the November 2016 election are all destroyed?

A.   I didn't know that.

Q.   Okay.  But you admit that you voted?

A.   I'm a republican too.

Q.   Okay.

A.   And I voted for Donald Trump too.

Q.   Okay.  So you know that the ballot, if it existed, would show you actually voted for Donald Trump?

A.   Exactly.

Q.   Do you remember all the other candidates you voted for over the past 20 years?

A.   No.

Q.   Wait for the interpreter.

A.   No.  But I've always voted for my Republican Party, and I have observed the behavior of all the candidates.

Q.   Do you ever remember submitting a blank voter ballot?

A.   No.  That wouldn't be funny.

Q.   Okay.  And now when you signed in to vote, you saw on the paper that was presented a declaration that you were a U.S. citizen?

A.   Uh-huh.

Q.   Did you read that carefully as you signed it?

A.   Yes.

Q.   And by signing, did you mean to say you were a U.S. citizen?

A.   Exactly, and I am Hiram Velez.

Q.   Okay.

A.   Okay.

Q.   Wait for the interpreter.

Do you know -- do you have -- obviously you don't have personal knowledge of where you were born, right?

A.   No, no.

Q.   Do you have any reason to think you might have been born in the United States?

A.   No.  Because when I was five years old I was found abandoned and I remember very vaguely in San Antonio, Texas I

was crying and a woman took me in.  This woman did not turn me in to the authorities apparently because she was undocumented, but a man, Pedro Garza, a Texan, he was born in Brownsville, he raised me to the age of 12.

Q.   And what do you remember --

THE COURT:  Stop.

BY MR. BEEVERS:

Q.   Okay.  You have to answer questions as we go.

A.   Yes.

Q.   Okay.  So at age 12, did you move somewhere else?

A.   Yes.

Q.   Where?

A.   I ran away because he liked to drink a lot, and he hit me quite a bit.

Q.   So where did you go next?

A.   With some friends.  There were a lot of immigrants there who spoke Spanish like I did.  I stayed in their homes.  I always turned to them, and they always helped me.

Q.   Now did any of the people you lived with when you were very little tell you anything about your parents?

A.   No.  But they said that your parents must have been drug dealers or used drugs because, otherwise, they wouldn't have left you on the streets.  And I don't think it was anyone from Mexico because we don't do that.

Q.   Okay.  Because?  I don't follow.  Because Mexicans don't

do something?

A.   No.  They don't do that as far as I know.  Recently a little girl was killed with her father.  They don't do that.

Q.   Okay.  And so did you come to believe that you were a U.S. citizen?

A.   Yes.  But where is my birth certificate?

Q.   Okay.  Did you have any way to find a birth certificate for yourself?

A.   No, not until the '90s.

Q.   Okay.  And how did you live prior to the 1990s?

A.   No.  I liked mechanics.  I put cars back together.

Q.   Where did you live?

A.   In several places.  In various places.  Sometimes I would stay somewhere for three days.  Sometimes I would stay where the homeless stayed on the streets.  I had the vice of drinking, and I would sometimes stay in the parks.  I had that problem.  I was an alcoholic for a long time.

THE COURT:  Mr. Beevers, wait until the interpreter finishes interpreting.

MR. BEEVERS:  Sorry.

THE COURT:  Thank you.

BY MR. BEEVERS:

Q.   So was that in Texas?

A.   In Texas and then I moved to Dallas and Houston.

Q.   Did you eventually go to Chicago?

A.    Oh, yes, Chicago.  I also lived in Little Rock, Arkansas for a while.  I would swim in the Arkansas River.

Q.    Okay.  You have to -- if you just answer my questions.  Now you heard evidence that you wrote a letter to the -- to a woman in Puerto Rico.  Okay.  And in that letter you talked about a birth certificate?

A.    Yes.

Q.    Is it true that you bought a birth certificate that was for a Hiram Velez Seda from Puerto Rico?

A.    (In English) Yeah, yeah.  I want to talk some in English.  Do you want to know why I am Hiram Velez?

THE COURT:  Stop, stop.  You cannot answer a question in English.  You need to answer the question in Spanish, and it will be interpreted.  So stop.  Try the question again, and then answer in Spanish.

BY MR. BEEVERS:

Q.    Okay.  Did you in Chicago buy a birth certificate for Hiram Velez Seda?

A.    Hiram Velez sold it to a woman.

Q.    Okay.  And did you buy it?

A.    Yes.

Q.    And was that the first birth certificate that you used?

A.    Yes.  And a social security card unsigned and the numeric information for the Illinois driver's license.

Q.    Okay.  And so did you use the birth certificate from Hiram

Velez Seda to get an Illinois ID?  Just that --

THE COURT:  Mr. Beevers, stop.  Quit interrupting your client.  You asked the question, then the interpreter has to interpret it, okay?  You can't stop them.

MR. BEEVERS:  Okay.

THE COURT:  The question was, did you use -- why is my microphone doing this, Mr. Vine?

The question was:  Did you use the birth certificate from Hiram Velez Seda to get an Illinois ID?

THE WITNESS:  Yes.

BY MR. BEEVERS:

Q.   Showing you what's marked Defendant's Exhibit B that's in evidence.

A.   (In English) I want to talk in English something.

THE COURT:  No.  You're not permitted to do that.

BY MR. BEEVERS:

Q.   Are you better at Spanish than English?

A.   Yes.  But certain things I can say very well in English.

Q.   If I could ask you if you could answer in Spanish so the record's clear.

Okay.  Showing you what's in evidence as Defendant's Exhibit B, is that the ID card that you first got from Illinois?

A.   Yes.

Q.   Okay.  And what's the agency that -- the government agency

that gives out ID cards in Illinois?

A.   In Illinois, the Secretary of State of Illinois.

Q.   Okay.  And is that also the agency that gives out driver's licenses?

A.   Yes, the same.

Q.   And after you received that ID card, did you also start using a social security number?

A.   Yes.  It's on those very IDs, the social security number is and my social security card, which was authentic.

Q.   And how did you come to use that social security number?

A.   For working.

Q.   Okay.  And the -- where did you get the social security card?

A.   It was given to me.  The woman who sold me the birth certificate gave it to me.

Q.   And why did you use a social security number?

A.   Easily the Secretary of State of Illinois accepted it.

Q.   And why did you need a social security number?

A.   You can't work in this country, otherwise, in a legal way.

Q.   Did you pay your taxes with that social security number?

A.   Always, I've always been an honest person.

Q.   Okay.  And did you, for the past 25 years, did you work?

A.   Yes.  Very hard working for the social security, and social security never told me that's not you.

Q.   Okay.  So did you think you were the only one putting into that social security account?

A.   Yes, yes.  I didn't have a report -- well, I had a report of other people working but they stopped.  They stopped.

Q.   Okay.  Now what about the Puerto Rican-born Hiram Velez Seda, did you think he was paying into that same account?

A.   I never met him.  His identifications are -- were subsequent to mine.  After this one, he got his IDs in Puerto Rico, and he doesn't have an ID.  I don't know how he got his licenses.  They gave a license to someone without an ID because a license is a privilege.  It's not a right.  And this is a right, an identification, always.

Q.   After you got this ID card, did you ever use any other names?

A.   No, never, never.  It was not necessary.

Q.   Did you ever use the name Hiram Velez Seda?

A.   Very few times.  I've always used Hiram Velez in the U.S. the second last name is not important.

Q.   Did you ever go to Puerto Rico?

A.   No.  But I had the chance.  I've had the chance to watch many videos about after the hurricane and the situation that the government's in.

Q.   Okay.

A.   Because I felt Puerto Rican.

Q.   Okay.  Why did you feel Puerto Rican?

A.   (In English) Because --

Q.   Could you answer in Spanish, please.

A.   Because the Secretary of State of Illinois, he erased Hiram Velez, and he put me in his place.

Q.   Okay.  If I could approach showing you what's marked Defendant's Exhibit A.  What is that?

A.   This is mine.  It's the public Chicago library.

Q.   When did you get that?

A.   In the '90s.

     MR. BEEVERS:  Move Defense Exhibit A into evidence.

     THE COURT:  Any objection?

     MS. LYDON:  No.

     THE COURT:  It's admitted.

     (Defendant's Exhibit A was admitted into evidence.)

     THE COURT:  You might need to keep your mic away from the other mics.  Thanks.

BY MR. BEEVERS:

Q.   Showing you what's been marked Defendant's Exhibit N, what is that?

A.   South Land Park Drive, yes, yes.  This is for movies, for movies, yeah, and it looks like that's my writing.  Yes, that's my writing.

     THE COURT:  What exhibit is that?

     MR. BEEVERS:  Exhibit N, physical exhibit --

     THE COURT:  You've got to use the microphone.  You

said Exhibit N?

MR. BEEVERS:  Exhibit N.

THE COURT:  I don't know what's going on with the sound system.

THE CLERK:  It's the combination of the microphones here.

THE COURT:  Okay.  It's not listed on my exhibit list. What is that?

MR. BEEVERS:  Physical exhibit, a Hollywood Video card.

THE COURT:  Has the government seen that?

MS. LYDON:  Yes.  No objection.

THE COURT:  Okay.  We'll add it to your list.  It's admitted.

(Defendant's Exhibit N was admitted into evidence.)

MR. BEEVERS:  Ask to publish A and N.

THE COURT:  Could you show it to the jury, sure.

BY MR. BEEVERS:

Q.  When your house was searched, were any of your tax records found in the house?

A.  Yes.  They were there.

Q.  Did all your tax records have your name as Hiram E. Velez?

A.  Yes, Hiram Velez.

Q.  Showing you what's in evidence as Defendant's Exhibit I,

these party identification cards, what were they for?

A.   Yes.  Because I liked to -- well, I was a member of my party, and I sent in a little bit of help, a little bit of money to the Republican Party.  And so they sent me these cards, and I kept them in my wallet.

Q.   Okay.  And would you talk politics to other people?

A.   Yes.  A lot, yes.

Q.   Why do you have multiple copies of the same card?

A.   Yes.  I liked it.  I liked to be someone who supported Trump because my hope, that he was going to fight hard against terrorism.

Q.   And the letters that you received from Donald Trump, what was that in response to?

MS. LYDON:  Objection.  Relevance.

THE COURT:  Sustained.

BY MR. BEEVERS:

Q.   Okay.  Did you write any other -- did you use the name "Hiram Velez" to correspond with other people?

A.   Yes.  With everyone because it's the only ID that I have because my ID would not be expiring until 2022, my California ID.  I am Hiram Velez.

Q.   Okay.

A.   And my social security as well, accepted by Social Security.

Q.   Did you believe that the social security number that you

used on your passport applications was yours?

A.   Yes.   Because Social Security always accepted it, and they never said it's not you.

Q.   So did you know whether or not Hiram Velez Seda had used that social security number before you did?

A.   Okay.   A friend of mine gave me some information when I was living in the apartments.   He told me that Hiram Velez didn't use one social security number.   He used many social security numbers.

MS. LYDON:   Objection.   Hearsay.

THE COURT:   Sustained.   The answer will be stricken. The jury will disregard that answer.

Try the question again.

MR. BEEVERS:   Your Honor, for state of mind.

Q.   Without giving what you heard, did you have some reason to think that the social security number you were using had never been used before you?

MS. LYDON:   Objection.   Relevance.

THE COURT:   Sustained.

BY MR. BEEVERS:

Q.   When you applied for a passport renewal in 2009, did you believe your name was Hiram Enrique Velez at that time?

A.   Yes.   And the expired passport, I put that in the envelope to send it to the governmental agencies to get my new passport.

Q.    Okay.

A.    And my birth certificate too.

Q.    Okay.  And by "my birth certificate," do you mean the birth certificate from Puerto Rico?

A.    Yeah.

Q.    Okay.  And on -- when you applied for the passport renewal in 2009, did you believe that your place of birth was Mayaguez, Puerto Rico?

A.    Yes.  Because that is what the Secretary of State of Illinois established.

Q.    Okay.  So did you believe that the Secretary of State of Illinois had the authority to permit you to say that Puerto Rico was your place of birth?

A.    Yes.  And I paid $3,000 for it.  It was not free.

Q.    Who did you pay the money to?

          MS. LYDON:  Objection.  Relevance.

          THE COURT:  Sustained.

BY MR. BEEVERS:

Q.    Okay.  And when you filled out the passport application renewal in 2009, did you believe that you were actually born on September 16, 1956?

A.    The 16th.

          THE COURT:  Stop.  What did he say before he started speaking in English again?

          THE WITNESS:  September 16th, 1956.

THE COURT: Stop. You can't talk over each other. Once you answer the question, let the interpreter interpret.

Let's start all over again. Try the question again, Mr. Beevers.

MR. BEEVERS: Okay.

THE COURT: I think your question was: When you filled out the passport application renewal in 2009, did you believe that you were actually born on September 16th, 1956? It's a yes-or-no question.

THE WITNESS: September 16.

THE COURT: 1956?

THE WITNESS: 1956.

BY MR. BEEVERS:

Q.   Yes or no?

A.   (In English) The Secretary of State told me.

THE COURT: You answered that in English. The answer will be stricken. You have to answer it in Spanish, and it's a yes -- I'm going to start over again. Listen, I'm going to read the question to you again. It's a yes-or-no question. The question was: Did you believe when you filled out that passport application renewal in 2009, did you believe that you were actually born on September 16th, 1956?

THE WITNESS: Yes.

THE COURT: Okay. Go.

BY MR. BEEVERS:

Q.   Why?  Why did you think that?

A.   I do not know my birth date.

Q.   Okay.

A.   (In English) I don't remember.

Q.   Okay.  Spanish.

A.   I don't know where I was born or what date I was born.  I don't know.  So my only information is September 16th, 1956, and from there, everything comes from there.

Q.   Okay.  Did you apply for a legal permanent resident status for Blanca Araujo?

A.   Yes.

Q.   What is your relation to Blanca Araujo?

A.   (In English) My stepdaughter.

Q.   In Spanish, please.

A.   My -- how do you call it, my stepdaughter.  I don't know if that's right in Spanish.  She's my stepdaughter, not my daughter.  I'm sorry.  My stepdaughter.

Q.   Okay.  So she's not your biological daughter; is that right, as far as you know?

A.   No.  Not that I know.  But you never know with a man.  You never know about the man, if that's his son.

Q.   Okay.  And so did -- but when you filled out the application for permanent resident status for Blanca, you saw the form where there was a check box as daughter, not stepdaughter.  Did you check that box on purpose?

A.   No.  I put -- I wrote stepdaughter.

Q.   Okay.  And when you said you wrote it, did somebody help you fill out that form?

A.   I don't remember very well.  I don't remember if the woman's name was Irene, but I'm not sure.  That was a long time ago because she was helping the Hispanic community.

Q.   Okay.  Showing you Government's Exhibit 315, if we could go to the next page that's in evidence, do you remember Irene Garcia helping you fill out the form?

A.   I think so.  I'm not really sure.  It was many years ago.

Q.   Okay.  The document is in English.  Did you understand English back at that time?

A.   A little bit, a little bit.

Q.   Okay.  And now attached to that application was Blanca's birth certificate which showed her father as Gustavo Lerma?

A.   Yes, yes.

Q.   Did you -- when you submitted this application, were you trying to tell immigration that your name was Gustavo Lerma?

A.   No.  I presented my first -- what do you call it -- my first passport.  They saw it, and they checked it; and it was accepted.

Q.   Okay.  So you do remember applying for Blanca and Mario for permanent residence, right?

A.   Yes.  It was in a package, in a package with the attorney

Michael Carr.

Q.   Okay.  And did you intend to tell the Immigration and Naturalization Service that those two were your stepchildren?

A.   They didn't ask me any questions.  They checked my passport, and they said it was okay.

Q.   Okay.  And did you believe that at the time you applied for Blanca's permanent resident status that you were entitled to give her permanent resident status because she was your stepchild?

A.   Yes.  And because -- yes, because I am -- I was Hiram Velez because the Secretary of State of Illinois told me you are Hiram Velez.

Q.   Okay.  And at the time you applied for your stepkids to get permanent resident status, you believed that stepchildren were eligible to get green cards?

A.   Yes.  I had reports that, even though Puerto Rico is a territory, that I could possibly help them.

Q.   Okay.  And you, when you filled out these applications for permanent residence for your stepkids, did you check the application with your attorney?

A.   My attorney -- well, my attorney's secretary -- now I remember.  My attorney's secretary was the one who was in charge of filling out the papers.  Not Irene, it was the secretary, my attorney's secretary, Michael Carr.

Q.   Okay.  And that secretary, did you speak to her in

Spanish?

A.   Yes.  She was Latina.

Q.   Okay.  And then did they present these documents for you to sign?

A.   Yes, yes.

Q.   And did you trust that the documents in English matched what you had told that secretary?

A.   Yes, yes.

Q.   You saw in evidence a postcard signed by a Gustavo Lerma that was found in your house.  Did you ever see that before?

A.   Never.

THE COURT:  I'm not going to allow you -- I'm going to move to strike that.  He answered the question.  Anything after that would be not responsive.  So the answer was "never."

BY MR. BEEVERS:

Q.   Okay.  Now do you know an Antonia Lerma?  Have you ever met a person Antonia Lerma?

A.   She visit us in 2000.

Q.   Now is she the biological grandmother of Blanca, if you know?

A.   I don't know, but she mentioned to me that she had registered to get a Mexican passport.  She registered in Mexico to get her Mexican passport.  I don't know.

Q.   Okay.  And so were you friendly with Antonia Lerma?

A.   I conversed with her.  I conversed with her.  A really

good woman, a really good woman, yeah.  I would call her my saint.  My saint because she suffered a lot.  She told me about her life, and she had suffered as an orphan.

Q.   Okay.

A.   I never had a mother, and I met her.

Q.   Okay.  Did you meet her through your wife?

A.   She came to visit us.  She came to visit us, yeah.  But I don't know what relationship she has with my wife.  I don't know.

Q.   Now you saw in evidence the government put in a marriage certificate that showed that your wife Maria, before you married her in Los Angeles, had registered a marriage to Gustavo Lerma in Mexico.  Had you ever seen that certificate before?

A.   No, never, never.

Q.   When you married Maria, did she tell you she was married at the time?

A.   I never asked her.

Q.   Did you believe she was single at the time you married her?

A.   Yes.  That's how I always knew her.  A single -- a single mother, that's what I thought.

Q.   Okay.  And when you married Maria in Los Angeles, how many children did she have with her?

A.   Three.

Q.   And what were those children's names?

A.   Gustavo, Blanca Alicia, Mario.

Q.   And Gustavo, is he the one who testified earlier today?

A.   Yes, Gustavo.

Q.   And did you learn of any family history as to what the name of their father was, those three children, if you know?

A.   The father, well, I never knew that the father that Gustavo Araujo had was registered with a birth certificate because in a prior investigation in the county of Sonoma --

THE COURT:  I'm going to stop him.  It's not responsive to the question.

MR. BEEVERS:  Okay.

THE COURT:  Answer will be stricken.  Try the question again.

BY MR. BEEVERS:

Q.   So had you ever seen a birth certificate for Gustavo Araujo Lerma from Mexico?

A.   Never, never.

Q.   Okay.  And did you talk with your wife much about her -- the father of her children, yes or no?

A.   No, no.  I wasn't interested.

Q.   Did you raise her kids the same as if they were your natural children?

A.   Yes, yeah, yeah.  I made them believe in God.

Q.   Okay.  Did you take them to church?

A.    Yes.

MS. LYDON:  Objection.  Relevance.

THE COURT:  Sustained.

THE WITNESS:  Yes.

BY MR. BEEVERS:

Q.    Did you use the name "Hiram Velez" in whatever church you were involved with?

A.    Yes.

Q.    Do you read in Spanish?

A.    Yes.

Q.    Do you read in English?

A.    Somewhat, yes.

Q.    Like a newspaper level?

A.    Yes.

Q.    Okay.  Now did you ever go to schools?

A.    No, no.

Q.    You were taught -- did you teach yourself?

A.    Yes.  Yes, I know how to read English, but I don't know how to speak it.  I have difficulty with sentences.

Q.    Okay.  And so do you -- did you ever know much about the structure of the Social Security Department?

MS. LYDON:  Objection.  Relevance.

THE COURT:  Sustained.

BY MR. BEEVERS:

Q.    Did you ever know about -- did you ever study anything

about the laws regarding identification?

A.    No, no.  No, never.  I studied automobile mechanics.

Q.    Okay.  Was that in a school setting or from people?

A.    No.  It was by correspondence.

Q.    Okay.  Now one moment.  Now when you voted for Donald Trump on November 8th, 2016, did you use the name Hiram Velez to sign the book?

A.    Yes, yes.

Q.    Did you do that in order to be allowed to vote?

A.    And so Trump would win too.

Q.    Okay.  And when you used the name Hiram E. Velez to sign, did you believe you had the legal authority to use that name?

A.    Yes, because.

Q.    Why?

A.    Yes.  Because Saul and Jacob in the Bible sold their right to the firstborn son, and God accepted it.  And then Jacob became the patriarch of the tribes.  Hiram Velez, nobody stole from him.  He sold himself.

Q.    Okay.  So did you believe that you had the legal authority to use the name Hiram Velez?

A.    Yes.  And from God as well.

Q.    And one other question.  You're wearing a bracelet right now?

A.    Yes.

Q.    What's the name on the bracelet?

MS. LYDON:  Objection.  Relevance.

THE COURT:  Sustained.

THE WITNESS:  Hiram Velez.

THE COURT:  The objection was sustained.

BY MR. BEEVERS:

Q.   When you are in the jail, what name do you use?

MS. LYDON:  Objection.  Relevance.

THE COURT:  Sustained.

MR. BEEVERS:  No other questions.

THE COURT:  We'll take a break.  Come back in 15 minutes.  During the break, please do not talk to anyone about this case.  Don't talk about the case among yourselves.  Don't do any independent research.  Report any violations of these admonitions to the Court.  See you in about 15 minutes.

(Jury excused.)

(Recess taken 10:22 a.m. to 10:35 a.m.)

THE COURT:  Okay.  Let's bring in the jury.

(Jury seated.)

THE COURT:  All jurors are present.  All parties are present.

Ms. Lydon, you may cross-examine the witness.

CROSS-EXAMINATION

BY MS. LYDON:

Q.   Good morning, Mr. Araujo Lerma.  You just testified under penalty of perjury; do you understand that?

A.   Yes.  I am not Gustavo Araujo Lerma.

Q.   My question is, you just testified under penalty of perjury; do you understand that?

A.   Yes, yes.

Q.   Your answers to Mr. Beevers were under oath, understood?

A.   Yes, yes, before God.

Q.   And you're still under oath; do you understand that?

A.   Yes.

Q.   But you lie under oath when it suits your interests, don't you?

A.   No.  Why did Mr. Hung concentrate on me and not on the Secretary of State of Illinois.  Because he saw that I didn't have money to hire an attorney because I was poor.

THE COURT:  I'm going to move to strike the rest of the answer after know.  One of the things we can do, Mr. Vine, let's turn off the microphone on the witness stand.  We don't need it because he's only going to answer to the interpreter. You just have to make sure the interpreter can hear him.

THE CLERK:  I just have to find that.

THE COURT:  Okay.  That may stop the feedback.

BY MS. LYDON:

Q.   Well, you've lied under oath scores of times to get the documents in evidence in this trial, haven't you?

A.   The Secretary of State saw that it was me.  They erased Hiram Velez, and they put me there.  I haven't lied.  Because

it was associated with the driving school of Laredo.

MR. BEEVERS:  Move to admit Government 101A, which is a clearer version of Government Exhibit 101, and it's been shown to the defendant.

THE COURT:  Which one?

MS. LYDON:  101A.

THE COURT:  Is 101 in evidence?

MS. LYDON:  Yes.

THE COURT:  You can publish 101A if it's the same document.

MR. BEEVERS:  No objection to it being admitted or used.

THE COURT:  Well, 101 is in.  It's the same document. You can use 101A.

BY MS. LYDON:

Q.   This is your 2009 passport application Mr. Velez; do you recognize it?  Or Mr. Araujo Lerma?

A.   Yes.  It's my passport.

Q.   And it includes that you must sign and date the application in a designated area below, and the paragraph below begins:  "I declare under penalty of perjury all of the following"; do you see that?

A.   Yes.

THE COURT:  Use the microphone, Ms. Lydon.

BY MS. LYDON:

Q.   And item 3 reads:  I have not knowingly and willfully made false statements or included false documents in support of this application"; do you see that?

A.   Uh-huh.

Q.   But you did make false statements in this passport application, didn't you?

A.   No, no.  Because before that I didn't have any official identification.  I never had it.  I didn't have a birth certificate.

Q.   Sir, I'm going to ask yes-or-no questions, okay?

A.   Uh-huh.

Q.   I'm going to ask you to answer them yes or no, not make speeches; will you do that?  You said your birthday was September 16, 1956, didn't you?

A.   Yes, exactly.

Q.   You said that under penalty of perjury?

A.   Yes.

Q.   And you --

A.   I don't know my birth date.

Q.   So this was a lie, wasn't it?

A.   No.  Because that's what was established with the Secretary of State in Illinois.

Q.   So is it your view that if you tell someone a lie and they believe it, that makes the lie true?

        MR. BEEVERS:  Objection.  Argumentative.

THE COURT:  Sustained.  There's no question pending.

BY MS. LYDON:

Q.   The Illinois Secretary of State didn't change your birthday, right?

A.   It wrote the birth date according to the papers I showed them.  I showed them a small certificate.  It was like this.  It was small, and it was from 1983.  And they knew that I was not Hiram Velez, but they fixed the problem.  They erased Hiram Velez, and they put me.  And since then, I am Hiram Velez.

Q.   It's really simple, Mr. Araujo Lerma, okay?  You told the United States Government your birthday was September 16, 1956, and you told this jury that you didn't know when your birthday was; so you lied, right?

A.   Well, I don't know, but the Secretary of State in Illinois was in charge and fixed all of that.

Q.   You lied under oath to get your other two passports as well, didn't you?

A.   It's not a lie.  I am Hiram Velez.  My California ID expiration date, the expiration date on that is 2022.

THE COURT:  Stop.  There's no question pending.

BY MS. LYDON:

Q.   You told the U.S. Government that you certified that the information you furnished, including your name and your birthday, was true and complete to the best of your knowledge and belief under oath, didn't you?

MR. BEEVERS:  Objection, your Honor.  The document's in English and speaks for itself.

THE COURT:  Overruled.

THE WITNESS:  What was the question?

BY MS. LYDON:

Q.   You told the United States Government that you were Hiram Velez born on September 16th, 1956, and that that information was true and complete to the best of your knowledge, right?

A.   Yes, yes.  That was always what I believed.

Q.   Well, true and complete, you didn't tell them that you were found as a child and didn't know who you were, right?

A.   Exactly, exactly.  But the Secretary of State of Illinois took charge in telling me who I was, and they fixed that.

Q.   You're doing speeches again.  Remember -- will you stop doing that going forward, please.

THE COURT:  Ms. Lydon, you can ask to move to strike. Don't direct the witness though.  If you want an answer stricken because it's nonresponsive, ask me.

BY MS. LYDON:

Q.   You didn't tell the United States Government the story you told the jury today because, if you had, you wouldn't have gotten the passport that you wanted, right?

A.   I never had a doubt about being Hiram Enrique Velez.  I even bought a plot under that name in the graveyard.  I bought

one.

Q.   My question is, you didn't tell the United States Government the story you told the jury today, did you?

A.   I didn't believe it was necessary because Hiram Velez was completely erased.

Q.   You had to provide a social security number to get your driver's license, right?

A.   Yes.

THE COURT:  Stop, stop.  You answered the question "yes."

BY MS. LYDON:

Q.   Let's look at Government 1A-10, please.  And you provided a birthday every time to get a driver's license?

A.   Yes, yes.

THE COURT:  He answered the question.  The answer was "yes."  Next question.

BY MS. LYDON:

Q.   You certified or declared under penalty of perjury under the laws of the State of California that your birthday was September 16th, 1956, right?

A.   And I presented proof.

Q.   Did that at least nine times to get the driver's licenses that are in evidence in this case, right?

A.   Yes.

THE COURT:  You answered the question.  The answer was

yes.  Next question.

BY MS. LYDON:

Q.   And you got a driver's license every time, right, which is what you wanted, right?

A.   Yes.

THE COURT:  He answered yes.  Next question.

BY MS. LYDON:

Q.   You lied under oath when you married your wife for the second time in 1992, right?

A.   No, no.  No, I didn't, no.

Q.   208, this affidavit reads:  "We, the undersigned, declare that we are an unmarried man and an unmarried woman."

MR. BEEVERS:  Objection, your Honor.  Not a question.  She's reading from the document.

THE COURT:  Overruled.  Let her finish her question.

BY MS. LYDON:

Q.   It goes on and ends with "and that the foregoing information is true and correct to the best of our knowledge and belief," and then you signed under that affidavit, didn't you?

A.   Uh-huh.  Because I was Hiram Velez.

Q.   And you provided that birthday, September 26, 1956, which is not the day you were actually born, right?

A.   That's the only date I know.

Q.   But it's not the date that you were born, right?

MR. BEEVERS: Objection. Lack of knowledge.

BY MS. LYDON:

Q. Yes or no, you did not come into the world on September 16, 1956?

THE COURT: Ms. Lydon, if an objection is raised, stop. I have to rule on the objection, then you can ask your question, okay?

MS. LYDON: (Nods Head.)

THE COURT: Does us no good, folks, to talk over each other. So the objection's overruled.

You can ask your question again.

BY MS. LYDON:

Q. You didn't come into this world on September 16th, 1956, did you?

MR. BEEVERS: Objection. Hearsay. Lack of personal knowledge.

THE COURT: Overruled.

THE WITNESS: And the Secretary of State of Illinois also --

THE COURT: Not the question. Answer will be stricken. Answer the question.

BY MS. LYDON:

Q. I'll read it again. My answer is -- or my question is, you did not come into this world on September 16th, 1956, did you?

A.    I don't know, maybe, possibly.  It could have been.

Q.    That would be quite --

A.    There are many people who are born on the same date, but I don't know for sure.  It was in 1956.  I have no knowledge of anything.

Q.    You have no reason to believe you were born on September 16, 1956, do you?

A.    Nor on any other date because I don't know the date.

Q.    Could we look at 310, please.  You lied under oath to get Blanca and Mario legal permanent resident status, didn't you?

A.    No.

Q.    You said on this form to apply for status for Blanca that your name was Hiram Enrique Velez, and you provided a birthday, didn't you?

A.    Yes.  I am Hiram Velez, yeah.  It's right here.  But here they changed my birth date when I was taken to jail in Sacramento.

Q.    And you made those statements to the United States Government under penalty of perjury, didn't you?

A.    Yes.  But the word perjury in Spanish is very different from what you are saying.

Q.    We're operating in court today under the penalty of perjury the same way it's understood on this form; do you understand that?

A.    Uh-huh.

Q.   You lied on this form, didn't you?

A.   No, no.  I am Hiram Velez.

THE COURT:  The answer is no.  Next question.

BY MS. LYDON:

Q.   You told the government that Blanca Alicia Araujo and Mario Araujo were your children; do you see that?

A.   My stepsons, my stepchildren.

Q.   You didn't say that, did you?  You said children?

A.   I didn't write that then.

Q.   Let's look at 502, please.  You lied under penalty of perjury when you registered to vote, right?

A.   No.

Q.   You certified under penalty of perjury under the laws of the State of California that all the information on your voter's registration form was true, didn't you?

A.   No.

Q.   And you told them that your birthday was September 16, 1956, a day when you have no reason to think you were born, right?

A.   Why didn't you ask that of the Secretary of State of Illinois before?

Q.   Unfortunately for you, the way this exercise works is I ask the questions.  So I'll ask it again.  You told the government of the State of California that your birthday was September 16th, 1956, didn't you?

A.   Yes, yes.

Q.   And then you claimed U.S. citizenship in order to vote, didn't you?

A.   I voted because I was a U.S. citizen.

Q.   You claimed U.S. citizenship in order to vote, didn't you? It's a yes-or-no question.

A.   That question is very confusing.  I don't understand it well.

Q.   Let's look at 503, please.  How about 501, actually, page 3.  This exhibit lists you voting in 20 elections; do you see that?

A.   Yes, yes.

Q.   And every time you voted, you signed your name under a statement that declared I am a U.S. citizen, didn't you?

A.   I didn't pay attention to that anymore because I knew that I was.  I had no doubt.

Q.   My question is you signed your name every time you voted under a declaration that said you were a U.S. citizen, didn't you, yes or no?

A.   The first time, yes.  The other times I didn't pay attention to that.  It wasn't needed.

Q.   You don't think it's important to pay attention to things that you signed under penalty of perjury?

A.   I was always covered by the Secretary of State of Illinois and by the Social Security Administration.

Q.   Well, you didn't write don't ask me questions, talk to the Secretary of State on that voter form, did you?

A.   What was that?

Q.   You just signed your name under oath under a statement that said you're a U.S. citizen, didn't you?

A.   Yes.

Q.   20 times?

A.   Well, my signature is there, but I read that one time, not the other times because I'm Puerto Rican.

Q.   You weren't born in Puerto Rico, sir, right?

A.   But the Secretary of State of Illinois was in charge or took charge of that, and since Puerto Rico is just a territory, according to history, the federal authorities have always had power over the territory.

          MS. LYDON:  Move to strike.  It's not responsive.

          THE COURT:  The answer will be stricken.  It's not responsive.  The jury will disregard.

BY MS. LYDON:

Q.   You weren't born in Puerto Rico, were you?

A.   It's true.  But the Secretary of State of Illinois fixed that for me.

          MS. LYDON:  Move to strike everything after "it's true."

          THE COURT:  Everything after "it's true" will be stricken.  The jury will disregard.

BY MS. LYDON:

Q.   So It's true it's ambiguous.  It's a yes-or-no question.  Were you born in Puerto Rico?

A.   Before I used to think that I had been born in Texas because --

THE COURT:  Answer will be stricken.  Jury will disregard.  The question, sir --

BY MS. LYDON:

Q.   You weren't born in Puerto Rico, were you?

THE COURT:  Yes or no?

THE WITNESS:  No.

THE COURT:  Answer is "no."  Next question.  The answer is no.  Next question.

BY MS. LYDON:

Q.   But you said you were under oath over and over?

A.   Yes.

THE COURT:  Stop.  She didn't ask why.  The answer is "yes."

THE WITNESS:  But we come to the same thing --

THE COURT:  Stop, stop.  Answer is "yes."

BY MS. LYDON:

Q.   Let's talk about your family.  How many children do you have?

A.   My daughter is Raquel Velez, and my other three are my stepchildren.

Q.    So on direct examination you said that Blanca was your stepdaughter, but then you said, well, you never know with a man.  Do you think there's a possibility that she could be your biological daughter?

A.    No, no.  I said that because sometimes there is that case or that comes up.  And as a man, sometimes you don't know if those are your children, but it's not my case.  It's happens in many cases.  Except mine, I know that I'm not.

Q.    When did you meet your wife Maria Velez?

A.    I met Maria Velez for the first time in the '80s in Chicago.

Q.    When in the '80s?

A.    Around '80, '81.

Q.    '80, '81.  Well, Blanca --

A.    Around that date.

Q.    -- was born in 1982, right?  Blanca was born in 1982, wasn't she?

A.    Uh-huh.

Q.    And Maria married Gustavo Araujo Lerma earlier in the year in 1982, right?

A.    No.  I don't know.

Q.    But you testified that you met your wife in Chicago in 1981 or 1982, right?

THE COURT:  1980, 1981, he said.

BY MS. LYDON:

Q.   1980 or 1981?

A.   In '81, around that time.  She then went to Mexico.

Q.   When was the next time you saw her?

A.   Hmm, um, when was -- in the '90s.

Q.   So you weren't there when she had her second child, Gustavo Araujo Lerma, in 1983; is that your testimony?

A.   No, no.

Q.   You testified on direct examination that you didn't know whether she had been married before; is that your testimony?

A.   Exactly.

Q.   You weren't interested in whether she was married, right?

A.   No, no.  She never told me.

Q.   You didn't ask who her children's father was?

A.   I saw there that it was Gustavo Araujo, but I don't know any more.

Q.   You saw there, you mean you saw in court that her husband was Gustavo Araujo Lerma?

A.   I didn't know she had a husband.

Q.   Until you heard it in court this week; is that your testimony?

A.   I was told that they -- in Mexico that they had found a marriage certificate when they presented the discovery, but I never saw a birth certificate for Gustavo Araujo, the father.

Q.   Okay.  Let's go back to your origin story.  You testified

you were found as a five-year-old abandoned; is that right?

A.    Yes.

Q.    Who found you?

A.    A woman.

Q.    Which woman?

A.    Well, no, no.  I really couldn't say because she gave me or turned me over to another man.  The man didn't have children.  He said I'm -- I'm going to raise him.  It's no problem.

Q.    Okay.  So you don't know the name of the woman who found you, right?

A.    No.

Q.    Okay.

A.    No.

Q.    I believe you testified you were found in San Antonio, Texas; is that correct?

A.    Yes.  I recognized the houses in the U.S.

Q.    Did someone tell you you were found in San Antonio, Texas?

A.    The man, Pedro Garza.

Q.    All right.  Who is Pedro Garza?

A.    He's a man.  He possibly may have died.  He was Chicano. He told me that I had been born in Brownsville.

Q.    But you were found in San Antonio according to Pedro Garza?

A.   Yes, in San Antonio, in San Antonio, Texas.

Q.   Who raised you?

A.   He -- he did for 12 years straight.

Q.   Pedro Garza?

A.   Pedro Garza, Peter Garza, yes.

Q.   He didn't send you to school?

A.   No.  With what documents or papers, I didn't have a birth certificate.  And I asked him, why didn't you send me to school, and he said, well, what do you want them to accuse me of kidnapping, no, no.

        MS. LYDON:  Move to strike.

        THE COURT:  Answer will be stricken after the word "no."

BY MS. LYDON:

Q.   And is it your testimony that you were in the United States your entire childhood?

A.   Yes, yes.

Q.   You never learned fluent English?

A.   Very little.  I would gather and I would spend my time, most of my time with Mexican young men.

        MS. LYDON:  Move to strike everything after --

        THE WITNESS:  And the Chicanos spoke Spanish on top of that.

        THE COURT:  Everything after the words "very little" will be stricken.  Just try to answer the question, sir.

BY MS. LYDON:

Q.   You testified on direct examination that you don't think your parents were Mexican; do you recall that?

A.   Yes.  Well, because they told me I was illegitimate and would call me a bastard to offend me.

Q.   My question is a yes-or-no one.  You testified on direct that you didn't think your parents were Mexican; do you recall that?

A.   I never thought or believed that my parents were Mexican.

Q.   And on direct examination you explained that the reason you didn't think your parents were Mexican was because your parents must have done drugs, right?

A.   Well, yes, because only drug addicts do that kind of stuff because they can't be responsible or are not responsible for anything.

Q.   And you said -- and you said you didn't think your parents were Mexican because, quote, we don't do that.  You used the word "we" to refer to Mexicans, sir?

A.   No, no, no, no.  The woman who found me, she said I think the people who left you here, they must have been into drugs. And the woman, she was Mexican.  And she said, we don't do that.

Q.   But you testified "we don't do that," right, sir?

          MR. BEEVERS:  Objection.  Misstates the evidence.

THE COURT: Overruled.

THE WITNESS: No, no. In Spanish I use the word "we" because she used that word, "we," and that's correct in Spanish that, yes, we don't do that.

BY MS. LYDON:

Q. So your testimony is then you spent the rest of your childhood living here and there after the age of 12, sometimes in parks sometimes in streets; is that right?

A. Yes. That's how it was.

Q. But your entire childhood was in the United States?

A. Yes.

THE COURT: The answer is "yes." Next question. Next question.

BY MS. LYDON:

Q. When was the first time you went to Mexico?

A. It was in 2000 -- well, I took a flight. They have the information. They have the information when I went to Mexico.

Q. You went to Mexico for the first time in the year 2000; that's your testimony?

A. I would need to check the papers to give a correct answer.

Q. Sitting here today, the first time you recall going to Mexico is 2000; is that right?

A. Approximately, yeah. I think it was to Guadalajara.

Q.   You have no reason to believe you're an American citizen, do you?

A.   I could have been.  I mean, I could have been born in the U.S.

Q.   When was the last time you saw the man who raised you?

A.   When I was 12 years old.

Q.   When was the last time you saw --

A.   I ran away from home.

Q.   -- Antonia Valderrama?  When was the last time you saw Antonia Lerma Valderrama?

A.   Well, it was 2000 -- the -- I can't really give you a date for sure.  You have the dates.

Q.   Do you know where Gustavo Araujo Lerma is?

A.   I don't know.  I don't know.

Q.   Well, you're close with his --

A.   I never knew of his whereabouts or where he was.

Q.   You didn't ask his mom?

A.   She told me that he had left for the U.S. in 1970 and that she had no news from him or had had no news from him ever since.

          THE COURT:  Okay.  He answered.  Next question.

BY MS. LYDON:

Q.   So although she hadn't seen her son since 1970, she was in the U.S. visiting the children he had in the '80s?

A.   I don't know.

Q.   Because you testified --

A.   We would need to ask her about all of that.  She has a son in Chicago.  His name is Felipe.  And she had a photo, and she had a driver's license.  She had that.

Q.   Okay.  And she said -- you said on direct that she came to visit you.  Do you recall testifying that she visited you?

A.   Not me specifically, not -- she didn't come to visit me, no, no.  The family, but not me, no.

Q.   And you testified that -- sir --

A.   I told her I was Puerto Rican.

Q.   We're going to need to not talk over each other, or it's going to be very hard for the court reporter, okay?

A.   Uh-huh.

Q.   Did you know that she was your wife's mother-in-law?

A.   No.

THE COURT:  Answer is "no."  Answer is "no." Everything after "no" is not responsive.

BY MS. LYDON:

Q.   So this woman came to visit you, but you didn't know her relationship to the family?

A.   She told me that she had had problems getting her passport.

THE COURT:  Answer is nonresponsive.  The Court's going to stop the witness.

Want to try the question again, Ms. Lydon.

BY MS. LYDON:

Q.   My question is, Antonia Lerma came to visit you but you didn't know her relationship to your family?

A.   Antonia Lerma got her birth certificate when she was already very old.

Q.   My question is, Antonia Lerma came to visit you, but you didn't know her relationship to your family, yes or no?

A.   No.

Q.   Did you ask why you're here, random woman?

THE COURT:  Ms. Lydon, you've got to let the interpreter interpret, otherwise I don't have an answer to your question.  Stop.  The record's unclear.  So if you want to try that question again, try it again and wait for an answer.

MS. LYDON:  I'll move to strike everything after "no."

THE COURT:  Well, the interpreter didn't interpret it, so I don't have a "no" answer.  Wait for an answer.

If you want to try that question again, go ahead.

MS. LYDON:  I'll ask a fresh one.

THE COURT:  Go ahead.

BY MS. LYDON:

Q.   Did you ask, random woman, who are you, when she arrived at your house?

A.   No.

THE COURT:  The answer is "no."  Next question.  Next question.

BY MS. LYDON:

Q.   Did you refer to Antonia Lerma as your mother?

A.   I became very fond of her because her case was very similar to mine.

THE COURT:  Court will strike the answer.  It's nonresponsive.  Please, sir, listen to the question and try to answer the question you are asked.  The question was:  "Did you refer to Antonia Lerma as your mother?"  Yes or no?

THE WITNESS:  My saint, that's what I would call her.

BY MS. LYDON:

Q.   Did you call her your mother?

A.   No.  My saint, my saint.

Q.   Is that a no, you did not refer to her as your mother?

THE COURT:  He already said "no."  Asked and answered. He already said "no."

THE WITNESS:  No, no.

THE COURT:  Stop, stop, folks.  Question was answered.

BY MS. LYDON:

Q.   You wrote:  "nueva numero di mi mama Antonia Lerma" here, right?

A.   No, no, no, no, no, no, no.

Q.   You didn't write that?

A.   We Hispanics tend to address other people like a -- like a like a -- like a mom, like you're the mom I never had.  I would say that to Antonia Lerma.  Puerto Ricans also use that way of

saying you are like the mother I never knew.  My negrita which is an affectionate term.

Q.   So you're changing your story.  You just testified that you didn't call her your mother, and here you're admitting you did refer to her as "mi mama"; is that right?

A.   But she's not my mother.  She's not my mother.

Q.   My question is, are you now admitting you called her "mi mama"?

A.   My saint.  Whenever I was in front of her, I would call her my saint, and I would say to her you're the mother I never knew.

Q.   You wrote on the back of this picture of her "mi mama," right?

A.   When I was there, I was near her.

THE COURT:  That wasn't the question.  Stop, stop, stop.  You're not responding to the question, sir.  The question was:  "You wrote on the back of this picture 'mi mama,' right?"  It's a yes-or-no question.  Did you write that?  Did you write that, yes or no?

THE WITNESS:  Yes, yes.

THE COURT:  There you go.  The answer is "yes."  Next question.

THE WITNESS:  Yes.

BY MS. LYDON:

Q.   This is another photo of her found in your house.  You

wrote "mi mama" on the back of that shot as well?

A.    I repeat once again, I would say it out of affection for her, but she wasn't my mother.

Q.    My question is:  You wrote "mi mama" on the back of this photo, didn't you?

A.    I never had a mother.

THE COURT:  That wasn't the question.  The question was:  You wrote "mi mama" on the back of this photo; is that correct, yes or no?

THE WITNESS:  Yes.

THE COURT:  The answer is yes.  Next question.

BY MS. LYDON:

Q.    And Raquel Araujo Lerma was your sister, wasn't she?

A.    Araujo Lerma, Araujo Lerma, no, no.

THE COURT:  Okay.  The answer is "no."  Next question.

BY MS. LYDON:

Q.    Okay so your testimony is you've never met Gustavo Araujo Lerma; is that right?

A.    Exactly.  I never met him.

Q.    You're married to his wife, and you raised his kids; but you never met him?

A.    No.  I never met him.  I never met him.

Q.    Very close with his mom.  She was your saint, su mama, but you never met Gustavo; is that your testimony?

MR. BEEVERS:  Asked and answered, your Honor.

THE COURT:  Sustained.

THE WITNESS:  No.

THE COURT:  Stop, stop.  The objection was sustained.
You don't have to answer.

BY MS. LYDON:

Q.   Do you know Raquel Araujo Lerma, Gustavo's sister?

A.   Yes.

Q.   How do you know her?

A.   Oh, over the phone.

Q.   Oh, you spoke on the phone with Gustavo's sister?

A.   Sometimes, sometimes to get to know Texas because I lived
in Texas.  I was in Texas.

Q.   You lived in Texas, but you spoke to Raquel Araujo Lerma
in order to get to know Texas; is that your testimony?

A.   No, no.  Raquel lives in Victoria, Texas.

Q.   You said you spoke to Raquel in order to get to know
Texas, and that doesn't make any sense.  So I'm trying to
understand what you meant by that.

A.   It's easy.  Well, once on the phone they gave the phone
over to her at one time because they said that she is from
Texas, and so I thought, ah, well, I would like to speak with
her so I can remember the times when I was living there.
Antonia Lerma gave us all that information.

Q.   Who gave the phone over to Raquel, who you were speaking
with?

A.   I don't remember.  I don't remember.  No, I don't remember.  I'm not sure.  I don't want to lie.  I don't know.

Q.   Did Raquel Araujo Lerma visit you at your house?

A.   No, never.

Q.   You know her property tax receipt was found in your house?

A.   Her mother brought a lot of papers which she forgot there, and Mexican money Mexican coins too.

Q.   Well, the last time Antonia Lerma visited you you testified was in 2000, right?  So why was Raquel's 2005 through 2008 property tax receipts found in your house?

A.   Those belonged to Mrs. Antonia Lerma.  I don't know.  I don't know about those documents.  She forgot the documents at home.

MS. LYDON:  Move to admit Government's 617.

THE COURT:  Which exhibit?

MS. LYDON:  617.

THE COURT:  It's admitted.

MR. BEEVERS:  No objection.

(Government's Exhibit 617 was admitted into evidence.)

THE WITNESS:  Yes.  Those are the ones.

BY MS. LYDON:

Q.   The ones you don't know about.

A.   Her mother, Raquel Araujo Lerma's mother is Antonia.

Q.   This receipt is from April 2008.  Do you see that?

A.   Well, I don't know.  I don't know.

Q.   You see it says that on this piece of paper, right?

A.   Well, Mrs. Antonia Lerma didn't visit us just once.  She did it another time.

Q.   Oh.

A.   And I don't know which time she left all those papers there.  Those papers aren't mine.  They are Antonia Lerma's.

Q.   This stamp's from 2007; do you see that?

A.   2007, uh-huh.

Q.   Yeah.  This one's 2005 through 2007 it looks like.  Do you see that?

A.   Uh-huh.

Q.   So earlier in your testimony you said the last time Antonia Lerma, Gustavo Araujo's mother, visited you was 2000, but now you're saying there are other times.  Please tell me how many times Gustavo Araujo Lerma's mother visited you in Sacramento?

A.   Maybe two times, I think.

Q.   So 2000.  When was the other time?

A.   You have information about the trips that Mrs. Antonia Lerma made.

Q.   But my question is for you, sir.  When was the second time Antonia Lerma visited you?

A.   Well, no, no.  I'm feeling really confused right now because of so many questions.  I can't give -- but those papers

aren't mine.  I don't know how it was that they appeared there. I'm sure that she brought them.

Q.   So those papers aren't yours; that's your testimony?

A.   No, no.  They belong to Mrs. Antonia Lerma.

Q.   Just like Gustavo Araujo Lerma's kids aren't yours, right?

MR. BEEVERS:  Objection, your Honor.  Asked and answered.

THE COURT:  Sustained.

BY MS. LYDON:

Q.   What was your name prior to Hiram Velez?

A.   Well they used to call me Perico.  Perico, which is a parrot in Spanish.

Q.   Is that your first name or your last name?

A.   That was my nickname.  It wasn't a name.

Q.   What was your name?

A.   Many names but imaginary names.  But I never used any of those names in anything having to do with the government.  Many people would give me those names.

Q.   Sir, you had a name.  What was it?

A.   For a long time I had the name Enrique, and it's an interesting coincidence that Hiram also had Enrique.

Q.   You bought the social security card in 1992; is that right?

A.   Yes, along with a birth certificate.

Q.   How old were you when you bought it?

A.   Oh, no, no, no.  How was I going to know my age at that time?  No.  I don't have a birth date in my mind, no.

Q.   Well, you said you were --

A.   I could make an approximation.

Q.   Sir, make an approximation, please, yes.

A.   Okay.  Well, let me see.  Well, 60 -- well, no, because I'm about 63 now.  But, you know, when I was with a young lady, then I would say I was young.  And I would give other people a different age when I saw that it didn't affect me.  I did it out of convenience, but I would lie.

Q.   You would lie about your age?

A.   I don't know when I was born.

Q.   But you said your --

A.   But I do know that I'm here and that I exist and that time passes, and I do have an age.  It's forcibly that way.  So I mean, it's a -- it was approximate according to what my face looks like.  That's how it was before.

Q.   How old do you think you were when you bought the social security card?

A.   Oh, no, no.  I didn't think about how old I was at that time --

THE COURT:  Court's going to strike the answer and stop the interpreter.  The answer is nonresponsive.  It's a simple question, sir.  The question is, how old do you think

you were when you bought the social security card?

THE WITNESS:  I don't know.

THE COURT:  That's his answer, "I don't know."

BY MS. LYDON:

Q.   So your story to this jury is you don't know your real name, right?

A.   My real name now is Hiram Enrique Velez.

Q.   No.  That's the name -- sir --

A.   And my ID says the same thing.

Q.   Sir, the first time you saw the name Hiram Enrique Velez is when you bought it for $200 from a woman named Lupe; isn't that right?

A.   Yes.

Q.   So that's not your name.

MR. BEEVERS:  Objection, your Honor.  She's testifying to a legal conclusion.

THE COURT:  On that grounds, the objection is overruled.  You got another basis?

MR. BEEVERS:  It's not a question.  If it's a question, it's asking for him to make a legal conclusion.

THE COURT:  What's your objection under the Evidence Code?  Are you arguing that it's argumentative?

MR. BEEVERS:  Yeah, argumentative.

THE COURT:  Sustained.  There you go.

Ask your question again, Ms. Lydon.

BY MS. LYDON:

Q.   And you're telling this jury that you don't know when your birthday is; is that right?

THE COURT:  Yes or no, sir.  Yes or no.  Try the question again, Ms. Lydon.  Ask the question again.

BY MS. LYDON:

Q.   You don't know when your birthday was, right?

MR. BEEVERS:  Objection.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  Long ago, no.

BY MS. LYDON:

Q.   And you don't know where you were born; that's your story, right?

A.   Exactly.

Q.   But you told the U.S. Government all of those things under oath multiple times, didn't you?

A.   I'm saying it.  I'm saying that I'm Hiram Velez now, and I'm telling you why.

Q.   My question is, you told the U.S. Government that your name was Hiram Velez.  You were born on September 16, 1956, and you were born in Mayaguez, Puerto Rico.  You said that under oath multiple times, didn't you?

A.   Yes, exactly.  Because that's what I believe, and that's what I was told by the Secretary of State of Illinois.

MS. LYDON:  I have no further questions.

THE COURT: Redirect. Interpreters are going to switch.

REDIRECT EXAMINATION

BY MR. BEEVERS:

Q. Okay. You were shown this document that you signed to get a passport. That was your signature, right?

A. That's my signature, yes. That's my signature.

Q. Okay. Now the statement above it is in -- it's in English. Did you know what it said exactly?

A. Your name is listed and your most recent passport.

Q. Oh, okay. The statement above your signature is in English. Did somebody interpret that statement to you word for word, if you remember, in 2009?

A. All of this I signed without paying much attention to it. I didn't take it very much to heart. I just signed it and where I should sign it.

Q. Okay. And did you understand that basically you were supposed to tell the truth on the form?

A. On the form I always told the truth, yeah.

Q. But did you know that you were signing a statement under penalty of perjury?

A. In Spanish, the word perjury is not very common on the streets. Perjury -- perjury, what is perjury? Never -- I never dug into what that word perjury means.

Q. Oh, okay. So are you saying you didn't really understand

what perjury meant in English or Spanish?

A.   I read the word perjury, but in Spanish the word perjury is not really used in any subject.

Q.   Okay.  But today in court -- but today in court you understand that perjury means to tell the -- lying in court; is that right?

A.   No.  For me, lying is lying.  Perjury is something else. It's something that is related to -- to harm or something like that.

Q.   Okay.  So you weren't too sure what perjury meant when you signed the form in 2009?

A.   No.  Because I had already signed other ones like this.

Q.   Okay.  And the -- when you signed to get married in Government's Exhibit 208, there's a very small certification. Did you have that interpreted to you in Spanish?

A.   No, no.

THE COURT:  Answer is "no."  Next question.

BY MR. BEEVERS:

Q.   Okay.  And did you -- and when you signed that, had you been married before?

A.   No, sir.

Q.   And did you --

A.   I need a birth certificate to do that.

Q.   Okay.  And so in 1992 when you signed that, did you believe that both you and Maria were single?

A.   On my part, yes.  She, I think so too.  I was sure about me.

Q.   Okay.  And nobody interpreted the form to you in Spanish?

A.   No, no.  Not in Los Angeles, no.

Q.   You were shown on cross this form signed in '96 discussing perjury.  Did anyone interpret that form to you?

A.   No.  They just said sign here.

Q.   Okay.

A.   That's all.  They examined what I presented.  That's why I never had any trouble, because I always presented my documents.  Just sign here and put the date here and that's it.

Q.   So you didn't even know what boxes they checked; is that right?  If you remember.

A.   No, no.  I don't remember about the boxes or the questions, and there are some -- there are a lot of boxes that in English I don't really know how to answer them.

Q.   Okay.  But in any case, that form wasn't read to you word for word in Spanish?

A.   No, no, no.

Q.   For registering to vote, Government's 502, you were asked about your statement about under penalty of perjury.  Was that interpreted to you into Spanish?

A.   No.  The person who was doing this, from what I recall, was sitting down and calling people, sitting down and calling

people and saying, hey, are you registered?  Are you registered?  And then signing people up.  That's what I remember.

Q.   So you don't remember anyone mentioning perjury?

A.   No, no.

Q.   Okay.  But you told the truth, as you understood it, on that form?

A.   Yes.  Because I presented them with my -- what is it called, my ID, and with that I did everything.  They put down the number for the ID, and that was it.

Q.   Okay.  Now on this Government's 504-005 that's in evidence, there is a -- this is in 2016.  There's a declaration -- declaracion de portante in Spanish.  Did you -- you remember reading --

THE COURT:  You have to lower it so the jury can see it.

MR. BEEVERS:  Sorry.

THE COURT:  There you go.

BY MR. BEEVERS:

Q.   Do you remember reading that?

A.   Yes.

Q.   Okay.  Without --

A.   There's a part -- are you a citizen?  Are you 18 years old?  Yes, that.  But the rest, no.  That's it.  That's all I read.  The rest, I didn't think it was necessary.

Q.   Okay.  And your recollection is that you read it the first time you signed a voter registration and after that --

A.   Yes, yes.

Q.   -- you just signed?

A.   And I was older than 18.

Q.   Okay.  And after that -- so that was the first time you voted you read the paper carefully; is that right?

A.   That first part, I read that.  The rest I wasn't interested in and much less those letters in Chinese.

Q.   Okay.  You testified on cross that they have the record for Antonia Lerma Valderrama's trip to the United States.  Were you referring to the exhibits that are already in evidence?

A.   Yes.  Because you have those documents from the trips and the true information.

Q.   Showing you Government's 113, is that what you were referring to, the travel records?

A.   Yes, yes.

Q.   And these travel records, would looking at the travel records refresh your memory as to when Antonia Lerma Valderrama visited you?

A.   Possibly, yes.  There I can see some dates.  I can see the dates.

Q.   Okay.  So showing you Government's 112-002, showing that she visited in 2008 and 2013?

A.   Uh-huh, uh-huh.  Yes, there it is.  There it is.

Q.   Okay.  And that's --

A.   2013, there it is.

Q.   And you testified that she left some papers on one of her trips?

A.   Yes, at some point --

Q.   Okay.  Just yes or no.

A.   And the driver's license for Felipe was found.

Q.   Okay.  Did they find -- did you find Felipe's driver's license in her things?

A.   I saw her documents, but it never seemed important to me.  But only Mrs. Antonia Lerma could have left them there.

Q.   And so what did you do with her things that were left?  Did you save them?

A.   No, no.  I never took them or considered them to be important.  I wasn't interested.

Q.   Okay.  And do you remember which of these trips she left the papers during?

A.   Possibly, possibly it was on the second time because I remember those papers were in a drawer.  They were in a plastic bag with some Mexican coins, but I never thought that was important.  They were documents from Mexico.  They were receipts from Mexico.  How am I going to know about that?

Q.   You testified that you felt that your relationship with Antonia Lerma was like a mother; is that true?

A.   She had an adventure just like I had.

Q.   Okay.

A.   Except I never told her that I had been in San Antonio, Texas.

Q.   Okay.

A.   I always told her that I was Puerto Rican.

Q.   Okay.  And is that why you used the word "mama" with her name sometimes?

A.   I always tried to speak Puerto Rican words and the Puerto Rican way of speaking.  And it's very popular, mommy, hey, mommy, to call any person mommy or your -- or you're the mom I never knew to make the other person feel good.  Ask any Puerto Rican.  That's true.

Q.   Okay.  Now you got that -- that Puerto Rican way of using "mama," did you get that from the books that the government put into evidence?

A.   Exactly, the Puerto Rican way of speaking, of referring to people.

Q.   And you testified or you tried to testify to explain why you believed it was okay to fill out the passport application as you did.  One moment.  Can you -- did the Secretary of State of Illinois give you any direct advice on whether you could use the name Hiram Velez?

        MS. LYDON:  Objection.  Relevance.

        THE COURT:  Sustained.  It's also hearsay.

        MR. BEEVERS:  Okay.

Q.   Did you tell the Secretary of State of Illinois all of the facts that would have -- as to your history before you -- before the Secretary of State issued you the driver's license? Just yes or no.

A.   Yes, yes.  It's very interesting.  I remember something.

Q.   I understand but just yes or no.  Did you tell them all the facts?

MS. LYDON:  Objection.  Hearsay.

THE COURT:  Sustained.

MS. LYDON:  And relevance.

THE COURT:  Sustained.

MR. BEEVERS:  One moment.  Your Honor, may we have a sidebar for a moment?

(Sidebar conference between the Court and counsel.)

MR. BEEVERS:  No further questions, your Honor.

THE COURT:  Anything further, Ms. Lydon?

MS. LYDON:  Not for this witness.

THE COURT:  All right.  Witness may step down.

MR. BEEVERS:  Defense rests.

THE COURT:  Any rebuttal witnesses, Ms. Lydon?

MS. LYDON:  No, your Honor.

THE COURT:  All right.  Ladies and gentlemen, what we're going to do is we're going to give you your lunch break. It will be a little longer than normal so we can get the jury instructions completed.  So I'm going to ask you to come back

at 1:30.  I'm going to have the lawyers come back at 1:00. We'll finalize the jury instructions, and we'll begin this afternoon with closing arguments.  Depending how long those go -- I'm not sure how long they will go -- I may instruct you then this afternoon, and you'll given deliberations.  If the closing arguments go a little longer, then I will instruct you tomorrow, and then you will begin deliberations tomorrow morning.

So I'm going to go over these admonitions with you again.  You're going to start deliberating, so please don't talk to each other at all about the case until you're in that room and I've given your instructions.  So no talking among yourselves.  Don't let anyone try to come up and talk to you about that.  Walk away and report that to me immediately.

Don't go online and do any research.  Please don't do any reading.  If there are articles -- if you can, stay off the Internet, to the extent you're looking at anything that might be related to this case or to anything related to this case. And again, I'm going to ask, just try to isolate yourself because you're about to begin deliberations, and I need to instruct you before you can do that.

With that, I'll ask you to come back at 1:30.  And any violations of the admonitions, please let me know right away.

Okay.  See you all at 1:30.

(Jury excused.)

THE COURT:  Okay.  Outside the presence of the jury.  So we have a record, we did have a sidebar with respect to a jury instruction that was submitted.

MR. BEEVERS:  One moment, your Honor.  He needs to put his headset back on.

THE COURT:  Okay.  I think you labeled it estoppel by omission.

MR. BEEVERS:  Entrapment by estoppel.

THE COURT:  Entrapment by omission.  You were going to make an offer of proof as to the question you were going to ask.  I think it had to do with -- go ahead so we can have a record as to what question you were going to ask.

MR. BEEVERS:  Your Honor, the evidence I was trying to elicit was whether or not he told the Secretary of State of Illinois all of the information pertaining to his lack of knowledge of identity.  If he were to say yes, then that could establish an entrapment by estoppel defense.

THE COURT:  Okay.

MR. BEEVERS:  If it was found reasonable.  But I believe there was evidence, but it was -- he said it was stricken, that he did not give them all of the information but much of it.

THE COURT:  In response, on cross-examination he clearly said that he did not tell the Secretary of State of Illinois.  Ms. Lydon elicited testimony in which he said I did

not tell them that I was orphaned, that I was found in San Antonio.  So if he had said yes to your question, it clearly would have contradicted his earlier answer.  So again there's -- he would have impeached himself with that answer if he had said yes because he had said earlier he did not tell the Secretary of State of Illinois that he was abandoned at the age of five and thinks he grew up in San Antonio and that entire story.

So as I've indicated on sidebar, that the entrapment instruction will not be given to the jury, the Court does not believe that that's a valid defense in this case and is not an appropriate instruction.

Ms. Lydon, do you want to add anything for the record?

MS. LYDON:  Agreed, your Honor.  That offer of proof doesn't satisfy the elements.  The Secretary of State of the state of Arizona --

THE COURT:  Illinois.

MS. LYDON:  Oh, Illinois, I'm sorry, isn't a federal official, as required.

THE COURT:  Right.

MS. LYDON:  And none of the other elements are addressed by the offer of proof either, so I agree the instruction shouldn't be given.

THE COURT:  So what I'm going do is I will email both of you hopefully in the next 15 minutes a draft of the jury

instructions I anticipate using so you'll have sort of a rough idea of what I'm going to use.  Basically, they're the government's instructions.  We'll have you come back about ten after 1:00, finalize, make any comments.  I'll explain why so we have a record as to why I am not using the instructions proposed by the defense.  There were a number of them submitted.  So we have a record.  And then we'll get into closing arguments at 1:30.  So look for an email from us hopefully within the next 10 or 15 minutes along with the proposed verdict form, and then we'll come back, like I said, about five after 1:00, ten after 1:00, so we can go over these.

MR. BEEVERS:  Your Honor, can we have a printed one that is able to be shown to the jury?

THE COURT:  Once we finalize it, then I'll give you -- if there are no changes, you could use the draft form.  But if there are some changes, we'll make the changes, and then you'll actually have a printed copy you can use, put on the screen.

Okay.  Thank you.

(The luncheon recess was taken 12:04 p.m. to 1:15 p.m.)

THE COURT:  Okay.  Outside the presence of the jury, let's talk about the jury instructions and verdict form.  Let's start with the verdict form.

Ms. Lydon, does that satisfy your --

MS. LYDON:  I think it is still missing some of the

elements --

THE COURT:  There's only two elements.

MS. LYDON:  -- such as willfully and knowingly, and I'm just flipping through now looking for that specific jury instruction.

THE COURT:  Number 16.

MS. LYDON:  Yes.  Or number 17 of the draft instructions.  The defendant must have willfully and knowingly made the false statements.

THE COURT:  In order to find him guilty, they have to find that.  And then you just want to know which, if any, of the statements they're basing their verdict on.  That's what that special interrogatory covers.

MS. LYDON:  Yes.  That's what I'm trying to get at.  But once we start putting in elements --

THE COURT:  I don't have to repeat the entire instruction because they have the instruction.  I just need to know what you want to know.

MS. LYDON:  Well, we could just say, if you find the defendant guilty, please specify each of the following statements your verdict is based on.

THE COURT:  No, no.  Now you're making it to complicated.  That's why I never use special interrogatories.  If they find him guilty, then the presumption is you had to meet all the elements and that one of those statements they had

to have found to be false.  I'm not sure why you want to complicate it.  I don't see it to be -- in any way it would be an ambiguous verdict, but apparently you're concerned about that.  So I'm trying to address that concern without overcomplicating this for the jury.  A guilty verdict means they found one of those statements to be false and all the other elements were met.  A not guilty verdict means they didn't think any of them were false.

MS. LYDON:  I agree.  I think the simplest way to do it would be to say if you find defendant guilty, please specify each of the following statements your verdict is based on, period, and then have the four listed or each of the following statements upon which your verdict is based.

THE COURT:  Wow.

MS. LYDON:  Fewer words.

MR. BEEVERS:  Maybe better just to drop the special verdicts altogether.

THE COURT:  That's my thought too.  I don't think it's a grounds for an appeal, that in any way the verdict would be ambiguous.  I know that's your concern, right?

MS. LYDON:  If the defendant were to appeal on the basis of the statute of limitations issue with respect to the other three statements or some problem with the jury instructions as to the common law name defense, it would be useful for a reviewing court to know that the verdict was

supported by all four of these false statements so that any error -- and we don't think there will be any or has been -- but that so whatever the argument on appeal is, essentially it doesn't matter.

MR. BEEVERS:  I think a simple verdict is safer.  I'd drop the special verdicts is my position, your Honor.

THE COURT:  Me too.  You made it too complicated.  We're going back to a general verdict.  I understand your concern, but now we're overcomplicating the issue.

MS. LYDON:  We'd actually -- we'd be fine with the Court's verdict form.  We do want the special verdict form very much.

THE COURT:  I understand.  I just don't think you need it, and so we disagree.  But the record's clear.  We're going to go back to just the general verdict form.

Okay.  Then let's go through the instructions.  Docket 98 back on August 2nd, which I think was before the superseding indictment, wasn't it?  When was the superseding indictment?

MR. BEEVERS:  July 11.

THE COURT:  July 11th.  So you actually had the superseding indictment at the time.  Your instruction number 1 I think was withdrawn because it was incorrect.  You had based it on -- that the underlying charge in count 2 was that he had made a false statement in an application for a passport.  But

the government, in the superseding indictment, changed that, right?

MS. LYDON:  Yes.

MR. BEEVERS:  Is this defense --

THE COURT:  So I'm at docket 98.  These are the instructions you filed on August 2nd.

MR. BEEVERS:  Is that mine or --

THE COURT:  Yeah, defense instruction number 1.

MR. BEEVERS:  Oh.

THE COURT:  And what I believe is you withdrew that because it's -- factually it wasn't correct.  So that's the reason I'm not using it.

MS. LYDON:  I believe the defendant replaced it with --

THE COURT:  Right.

MS. LYDON:  Okay.

THE COURT:  Same thing on instruction number 2 in docket 98, that was replaced.

MR. BEEVERS:  Right.

THE COURT:  So I wouldn't use that.

Defense instruction number 3 in docket number 98 I'm not using.  I believe it's an incorrect and incomplete statement of the law.  I'm using the government's instruction instead.

Same thing with instruction number 4, I'm using the

government's instruction instead which I think is an accurate reflection of the law.

So those are the only four in docket number 98. And then you submitted supplemental proposed instructions on August 12th at docket 124. You resubmitted instruction number 2 and amended it. And again, I'm not using your proposed instruction because I don't think it accurately reflects the law. In particular, you used the phrase on line 18 "reasonably believed." I don't think that's an accurate statement of the law. And again, I have a government instruction that is more accurate. So I'm not using that instruction.

And then you submitted your entrapment by estoppel defense, and I've indicated already on the record I don't believe there's any basis for submitting that instruction to the jury and no evidence to support the Court giving that instruction to the jury. So those, I just want to make the record clear. You can then make your record, Mr. Beevers, as to why you disagree with me.

MR. BEEVERS:  Your Honor, at docket 124.

THE COURT:  Yes.

MR. BEEVERS:  At line 18, that's in the statute 18 U.S.C. 1015. That has to be a correct statement of the law. They have to prove he violated that law and that's a direct quote from the statute, 1015(f).

THE COURT:  You may be correct.  I'm not disagreeing with you.  It's just that your proposed -- I've got to find the one I'm going to use.

MS. LYDON:  It's a carve-out from the statute, and we're finding the statutory language.  But it's a defense that should only be instructed on if there's some facts in evidence that would show it applies.

THE COURT:  I think that was my problem is that it just was incomplete.  Let's see.  You also added in line 10, I think, the felony crime language.  I'm not sure where you got this language either, Mr. Beevers, starting on line 9 and a half, almost 10.  In order to prove the felony crime of making a false statement that he is a U.S. citizen for a purpose -- for the purpose of, which seems incomplete, the government must prove each of the following elements beyond a reasonable doubt.  Whereas, the language that I'm going to use says after 1015(f):  In order to be found guilty of making a false claim that he is a citizen of the United States in order to vote, the government must prove each of the following elements beyond a reasonable doubt:  (1) The defendant was an alien; and (2) the defendant knowingly made a false claim to be a citizen of the United States in order to vote in a federal, state, or local election.  That again is more accurate and clearer than the language that you used.

MR. BEEVERS:  I consider it similar.  It's fine.  That

part's fine.  It's really the bottom.  The defense --

THE COURT:  The government need not establish that the means of identification of another person was stolen.  You both have that.  I also know why, because in the motions in limine I ruled that it was not a defense.  I know you disagree with that, but I accepted and found the government's argument to be more persuasive that it would not be a defense to aggravated identity theft, for that reason and also that I wasn't going to use the instruction.

MR. BEEVERS:  But that's a different part.  The subsection (f) of 1015 is the reasonable mistake is part of the -- is part of the statute, and it's not in the instruction. I think -- and it -- the statute says it's a defense if the defendant reasonably believed he was a U.S. citizen.  Based on having resided here since age 16 and having U.S. citizen parents, he has established that with his testimony, if believed, that would fit 1015(f).

I'm proposing the government has the burden of disproving the exception.  It's not clear in the statute which way that goes, but it's part of the statute.

THE COURT:  Right.

MS. LYDON:  For our part, we don't think that there's been any showing that the elements of this defense are met.  If the Court is inclined to use it, we would like the precise language of the statute which we've got in front of us.

Provide subsection (f) does not apply to an alien if each natural parent of the alien or, in the case of an adopted alien, each adoptive parent of the alien is or was a citizen, whether by birth or naturalization, the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of making the false statement or claim that he or she was a citizen of the United States.

MR. BEEVERS:  That's fine with me.

MS. LYDON:  If the Court is inclined to give it, we think it is a defense or something to that effect instead of subsection (f).  And then starting with "if" would be the precise language of the statute.

THE COURT:  Well, now you're backing off of the jury instruction you proposed?

MS. LYDON:  No.  We agree completely with our jury instruction.  His is an inaccurate statement of the law.  But if he does want a statement of that defense in, we don't think there's been any assertion by the defendant that each natural parent of the alien or an adoptive parent is or was a citizen.  For that reason, we don't think it should be given at all.  But if the Court is inclined to give it, we think that the language from the statute should be added to the government's jury instruction.

THE COURT:  Yeah.  The problem with, Mr. Beevers, your

instruction is it's just not complete, and there's no basis

for -- it will cause too much confusion.  There's no basis and

no need to give the entire paragraph under subsection

(f) because there's no evidence to support that.

Okay.  I'm going to stick with the government's

instruction.  Your objection to my not using your instruction

is noted and overruled.

Anything else you want to add for the record?  Any

instructions that I am using that anyone objects to?  If not,

these are going to be the instructions that will be given to

the jury.

MR. BEEVERS:  Your Honor, as to jury instruction

number 17.

THE COURT:  17, okay.

MR. BEEVERS:  Actually, it's 18.

THE COURT:  Okay.  The defense one?

MR. BEEVERS:  Right.  It -- no, as to your jury

instruction 18.

THE COURT:  I know, the one about the defense.

MR. BEEVERS:  Right, as to the defense.  I think it

needs -- it shouldn't be limited to count 2 because the common

law applies to all federal offenses, not just count 2.  And I

think I'd prefer my explanation of the common law, but this

does cover the common law.  But it should cover it.  For count

2 it's the same name.  It's the same common law.  It's the same

right to use the name or not use the name, whether you're voting or applying for passports.  It doesn't make any logical sense to not allow the defense to count 1 but to allow it to count 2.  I would argue that's essentially directing a verdict in favor of the government on that issue.  That's all.

THE COURT:  Ms. Lydon, you want to make a record on that?

MS. LYDON:  Yes.  Count 2 warrants jury instruction 18 because there's a recognized way that the common law name acquisition defense applies to passport fraud.  With respect to aggravated identity theft, there is no basis in the law to include it.  Of course, if the defendant believes his acquisition of the name that common law could negate an element of the offense for the aggravated identity theft, he can argue that because he has an accurate statement of the elements of aggravated identity theft in the jury instructions as is.  No additional instruction is warranted.

MR. BEEVERS:  Your Honor, could I explain one thing with aggravated identity theft.  That offense can be committed entirely by use of state-issued documents.  A person can commit aggravated identity theft by using a false name to get five or more state driver's licenses, and that offense would be proved or not proved under the name as applied under the state law. There's no separate federal common law of names.  The states control who gives names, and that's the -- it's a -- there just

isn't any basis to distinguish.

THE COURT:  The underlying crime is that you use someone's identity in a fraudulent manner.  Even if the defendant believed that his name was Hiram Velez, that's not the act that he's being charged with.  The act that he's being charged with is that he then took that name and he used it in a fraudulent manner.  It's theft, that he stole that name.

Now your defense is he didn't steal it.  Their argument is absolutely he stole it, and he used it 20 times in a fraudulent manner.  He's a thief of the Puerto Rican-born Hiram Velez's identity.  So it's not a defense to aggravated identity theft simply to just believe -- that's why I'm not allowing that as a defense -- simply to just believe that my name has been changed.

A lot of people change their names.  Singers change their names all the time to one name.  Athletes change their name.  Ron Artest changed his name four times.  He wasn't charged with aggravated identity theft.  But if Ron Artest then used a name of someone that he knew that he hadn't properly appropriated to obtain something fraudulently, then he used that other person's identity.  It's not theft of a name.  It's aggravated identity theft.

There seems to be an attempt to confuse that crime with a name theft.  That's not what this case is about.  It's about identity, that he's alleged to have stolen someone else's

identity including date of birth, social security number, and everything that goes along with that name. So that's why I'm not allowing the defense that he -- if the jury believed it, that he actually adopted and under common law became Hiram Velez.

MR. BEEVERS: Jury instruction 15 says the defendant knowingly used without legal authority a means of identification. The only one in evidence is the name. So whether or not it's with or without legal authority depends on the common law which the Court --

THE COURT: No. It's not just his name. A means of identification, he knowingly used without legal authority a date of birth. He knowingly used without legal authority a social security number.

MR. BEEVERS: But not on that count. That count is just for the -- that count only deals with November 8th, 2016, when he signed the name.

MS. LYDON: Correct.

MR. BEEVERS: There's no date of birth on that. So that's why I think it's significant.

MS. LYDON: We agree with that part. Count 1 does charge specifically the use of the means of identification of another, to wit, the name Hiram Velez.

MR. BEEVERS: That's why I asked the Court to substitute for means of identification a name because there is

only a name in that count.  That's why my version was more simple but --

MS. LYDON:  If we'd like to specify the name as the means of identification, that's fine, but there's no separate instruction as to common law warranted.

THE COURT:  I don't see, "to wit, a name."  Where are you reading, "to wit, a name"?

MS. LYDON:  In the superseding indictment.

THE COURT:  Well, then the instruction doesn't reflect that.

MS. LYDON:  We would have no objection to adding in --

THE COURT:  Well, if you don't have an objection, then you should have properly submitted a jury instruction, Ms. Lydon.  Now you're -- you are creating issues now that this isn't a proper instruction and that I should allow the defense is what you're telling me, right?

MS. LYDON:  No.  I think we should specify -- we would have no opposition to specifying the means of identification. The means of identification we didn't think needed to be in the jury instruction.

THE COURT:  Well, then Mr. Beevers is right.

MS. LYDON:  The evidence -- that there's evidence of it.

THE COURT:  Then he should be allowed to argue, if you believe that my client under common law is Hiram Velez, then

you also can't convict him of count 1.  You limited that, and you argue it's only limited to count 2, that he can't use that as a defense to aggravated identity theft, but you've limited your charge to just the use of the name, right?

MS. LYDON:  Means of identification of another, and that distinguishes count 1 from passport fraud.

THE COURT:  But you limit it to the name.

MS. LYDON:  Correct.

THE COURT:  Okay.  So if he actually had acquired that name under common law, then it could be a defense.

MS. LYDON:  And he can argue that it is not the means of identification.

THE COURT:  Mr. Beevers' point is I've limited instruction number 18 just to count 2, and I should allow it now to read with respect to counts 1 and 2, right, Mr. Beevers?

MR. BEEVERS:  Yes, your Honor.

THE COURT:  But now I have to change that entire instruction because it only applies to the passport application charge.  You guys are making this incredibly difficult for me.

MS. LYDON:  Our view is that no separate instruction is warranted, and that's why we submitted motions in limine about the jury instructions, about that specific one, that it could negate an element of the defense, but all kinds of arguments are possible to negate elements of the offense that don't require bespoke jury instructions with passport fraud

where the false statement charged is the name.

THE COURT:  No one's disagreeing about that.

MS. LYDON:  Right.

THE COURT:  But by limiting your aggravated identity theft to the name, that changes your argument.  Your argument is he still shouldn't be allowed to use that as a defense.  But if it's going to negate possibly the elements in this charge for count 1, then he should have the opportunity to argue that counts 1 and 2 if the jury actually believes that under common law he became Hiram Velez or has -- can use the name Hiram Velez, then they shouldn't find him guilty of count 1 either.

MS. LYDON:  There is a serious distinction though between the way that the common law acquisition, the name would work with respect to count 2 and count 1.  With count 2, if he acquired the name, his statement on the passport application that his name was Hiram E. Velez is true, and therefore, the element of falsity of passport fraud isn't met.

With respect to aggravated identity theft, it doesn't matter what his name is.  He used Hiram E. Velez's means of identification, to wit, a name which identified Hiram Velez, his voter registration form and voter ID file, which is associated with all kinds of information about Hiram Velez.  We don't think it's a meritorious defense.  Doug Beevers -- or the defense counsel may argue all kinds of theories, but this

defense is without merit and does not warrant a jury instruction.

THE COURT: Well, it's up to the jury to decide whether there's any merit to it.

MS. LYDON: Sure.

THE COURT: The issue is if the jury actually believes that there is merit to it, is that a legal defense to the charge in count 1? Now you're telling me, yes, it is.

MS. LYDON: No. Acquiring the name does not make it any less the means of identification of another specific real person.

THE COURT: Mr. Beevers, you want to respond to that?

MR. BEEVERS: I think that if they believed that he changed his name under common law, they would be required to find that he did not use the name without lawful authority. And I think the simplest way would be just -- in jury instruction 18 to just have, with respect to count 1 and 2, defendant contends that the statement on the passport application and voter sign-in log -- I'm not sure what the form's actually called -- voter sign-in log was -- Hiram Velez was not false and the rest of it the same. I think that's all we need to add.

MS. LYDON: I think that would be extremely confusing and would introduce problems.

THE COURT: No. I'm going to deny your request,

Mr. Beevers.  I'm also not going to start a horrible practice of trying to amend jury instructions on the fly two minutes before closing arguments.  These should have been submitted to the Court if you had a proposed instruction with respect to count 1.  I don't have that.  I'm not going to do that.

So I'll amend the verdict form, just have general verdicts, and I will not change the draft instructions.  That creates issues on appeal, folks.  If the defendant is found guilty, you guys can deal with them on appeal.  The record's clear.

All right.

MR. BEEVERS:  Your Honor, I would -- to make it very specific, I would object in line 2 that with respect to count 2 phrase, I would ask that that be deleted and that the phrase on the passport application be deleted.  The rest of the instruction I have no objection to.  That's all.

THE COURT:  You're talking about jury instruction 17.

MR. BEEVERS:  18, jury instruction 18.

THE COURT:  I'm sorry.

MR. BEEVERS:  Line 2, I would ask that it just read: The defendant contends that his statement that his name was Hiram Velez was not false because he had acquired the name Hiram Velez.  I think that would be enough of a modification to make it clearly the law.

THE COURT:  You would strike, with respect to count 2, you would have the instruction start with, the defendant contends that the statement --

MR. BEEVERS:  Uh-huh.

THE COURT:  You would take that out too, right?  You would have that the defendant contends that his name -- that his name was Hiram Velez and that it was not false because he acquired the name Hiram Velez by adopting the name and using it as his own, right?

MR. BEEVERS:  Well, I would think statement is okay.  It should just say the defendant contends that the statements that his name was Hiram Velez were not false.  Because there are multiple statements on multiple passport applications and multiples forms, I think just making it general is good enough.

THE COURT:  Yeah.  But again, this instruction's specifically tailored to count 2 because it also instructs the jury that, even if you found that to be true, there's three other false statements on the passport application that he's alleged to have made, and they can still find him guilty if they find any of those to be false, the last two paragraphs.  So if they find that his use of the birth date, place of birth, or the social security number on the passport application are false, they could still find him guilty.

MR. BEEVERS:  I think it's clear enough.

THE COURT:  Yeah, I understand.  Your objection is

noted.  It's overruled.

Anything else?

MS. LYDON:  No, thank you, your Honor.

THE COURT:  All right.  I'll take a few minutes.  Let the jury know, Harry, we'll let them in in about ten minutes, and we'll finalize these.

THE COURT:  Okay.

(Recess taken 1:45 p.m. to 1:53 p.m.)

THE COURT:  Bring in the jury.

(Jury seated.)

THE COURT:  All right.  All jurors are present.  All parties are present.

Ladies and gentlemen, the parties will now deliver their closing arguments to you.  It's their final attempt to address you and to summarize in their view the evidence that was presented to you.  The government will make an opening closing argument, and then they will be allowed a brief rebuttal argument.  Again, the law permits that and allows for it because the government always has the burden of proof in criminal cases and has to satisfy that burden of proof to you again beyond a reasonable doubt.  So you will hear from the government twice.  Mr. Beevers will be given only one closing argument.

All right.  Mr. Kenny, with that, you may deliver the first closing argument.

MR. KENNY:  Thank you, your Honor.

Ladies and gentlemen, good afternoon, the defendant Gustavo Araujo Lerma --

THE COURT:  Sorry to interrupt you at the beginning. You've got to amplify.  Use the handheld mic or stay close.

All right.  Go ahead.

MR. KENNY:  Good afternoon.  The defendant, Gustavo Araujo Lerma, falsely represented himself as Hiram Velez, the Puerto Rican-born United States citizen.  He did that to present himself as a United States citizen to apply for and obtain U.S. passports and to vote illegally in federal elections.  That's the evidence, the facts that you've seen and heard over the course of this trial.  It's now time for you to take those facts and that evidence and apply it to the law.

Now during this presentation, we're going to proceed step by step through the crimes that the defendant has been charged with, making a false statement in an application for United States passport, voting by alien, aggravated identity theft.  And for each crime, I will explain what the government is required to prove for each count, the element of the charges.

Now elements are like items on the checklist.  Once you have found that an element has been met, you check it off, and you can move on.  And once all of the elements have been met for any given count, you find the defendant guilty on that

count.

At the end of the presentation, after we've discussed all the charges, the elements, and how the evidence supports those elements, I'm going to ask you to return the only verdict that's supported by the evidence that you've seen in this trial, guilty on all counts.

So let's take a second and talk about your job as a jury. Your job is to find the facts and apply those facts to the law. The facts consist of the testimony you heard from the witnesses and the exhibits that were admitted in the trial and that you'll have back with you when you deliberate. The law will be given to you by the judge at the end of these arguments. You will then apply that law that the judge gives you to those facts, and the standard that you will do to apply the law to the facts and to determine whether each of the elements has been met is beyond a reasonable doubt.

And the judge will instruct you that proof beyond a reasonable doubt means proof that leaves you firmly convinced that the defendant is guilty. It's not proof beyond any possible doubt. In applying the standard, you use reason and common sense. Reasonable doubt is not doubt based on pure speculation, and after considering all of the evidence you are firmly convinced that the defendant is guilty, you find the defendant guilty.

So we'll start with count 2, making a false statement

on an application for U.S. passport.  And I want to start here because the evidence to support this count really gets at the heart of this story, that the defendant falsely claimed that he was Hiram Velez in order to obtain a U.S. passport.  Now false statement has two elements which we'll proceed through now.  And the first is that the defendant willfully and knowingly made a false statement on a passport application, and second, that the statement was made with the intent to secure a passport.

So for this first element, that the defendant willfully and knowingly made a false statement, the judge will tell you that that means the defendant made the false statement deliberately and that he knew it was untrue.  So here's Exhibit 101.  This is the defendant's March 11th, 2009, application for a United States passport.  And we know that the defendant made four specific false statements on this application because he provided the real Hiram Velez's name, date of birth, social security number, and place of birth.  And we know these statements are false because those are the answers for the real Hiram Velez, and the defendant is not the real Hiram Velez.

Here's Hiram Velez.  We know who he is.  You heard from his son Jonathan Velez.  You saw documents related to him. You know that he was born September 16th, 1956, in Mayaguez, Puerto Rico.  He had a family.  He had a son.  And we know that

unfortunately he died on September 20th, 1997 in Puerto Rico.

You have his birth certificate.  That's Exhibit 401 and 401T that shows where and when he was born, that his mother was Carmen Lillian Seda.  His father was Hiram Velez, Sr.  We saw his driver's license that his son brought with us that has the same identifiers on it, and it shows his social security number as well ending in 9302.  And we have his death certificate.  It has his birthday and the date of death.

So we know we're talking about the real Hiram Velez here.  So that's Hiram Velez, the real Hiram Velez.  We know who he is.  More importantly, we know that the defendant is not the real Hiram Velez.  So turning back to element 1, the defendant willfully and knowingly made the four false statements that he was Hiram Velez, that that was his birthday, that that's his social security number, and that he was born in Mayaguez, Puerto Rico.  We know these statements were untrue, and we know that he did them deliberately because he wanted to pass himself off as a United States citizen like the real Hiram Velez was.  But he wasn't Hiram Velez.  And it's essentially undisputed that he's not the Hiram Velez that was born in Puerto Rico on this date and with that social security number.  So you can check that element off and move on.

Now the second element, that the statement was made with the intent to secure the passport, first this is a matter of common sense.  Of course that's why he made those false

statements.  It was to present himself as a United States citizen, which he was not, in order to obtain a passport.  We also know that was his intent because he had done it before.  This was his 1992 passport application at Exhibit 105.  He's got the same false statements.  And you heard from agent Hung that that passport was issued.

You had Exhibit 102, this is his 1999 passport application, the same false statements, and a passport was issued.  So when he made these false statements in the most recent passport application, we know he was intending to get a passport.  That was the point.  You can check this element off and move on.

Now defense counsel suggested in his opening statement that the defendant cannot be guilty of having falsely stated his name was Hiram Velez because he had somehow acquired that name through usage.  And you're going to get the law on this from the judge, and it's true that it is possible to legally change your name through usage.  However, you cannot adopt a name for a fraudulent purpose.  So in order to prove that his use of the name Hiram Velez was false, the government also has to prove that the defendant is not Hiram Velez and that he assumed that name for a fraudulent purpose.

Now with respect to that first one, we know his name was not really Hiram Velez.  That's the guy who was born in Puerto Rico.  The defendant has admitted he didn't take on that

name until he purchased the application -- or the passport -- excuse me -- birth certificate sometime in the early '90s. Secondly, we know he assumed the name and used it for fraudulent purposes.  That was the reason he did it, to pass himself off as a U.S. citzen, to apply for passports, to vote in federal elections, to get legal status for his family, everything else he was doing, these are fraudulent purposes. The defendant has not legally acquired the name Hiram Velez.

And in any event, you can't adopt a place of birth. You can't adopt a social security number.  You can't adopt a birthday.  Those are still false statements.  And in order to convict on count 2, you only need to find that there was one false statement made with the intent to secure a passport.  But of course we know that all four of them were false.  So you can check off that final element and move on.

I'm going to turn now to counts 3 through 7, voting by alien.  The defendant has been charged with five counts of this, but they all have the same elements and the same basic evidence.  So I'm going to talk about them all together, and this is going to be a little bit faster than I initially planned because you already heard the defendant admit that he voted in all of these elections.  So the elements for these counts are:  first, the defendant was an alien; second, that he voted; and third, that one purpose of the election was to elect a candidate for president, vice president, presidential

elector, Senate, or House of Representatives, basically that one purpose of the election was to elect a candidate for federal office.

So the first element, that the defendant was an alien, the judge is going to tell you that alien, it's a legal term. It just means someone who is not a United States citizen. So we know the defendant is an alien. First, this is a matter of common sense. This is why he took on the identity of a U.S. citizen. It was to pass himself off as a U.S. citizen. If he were already a citizen, he wouldn't have had to do that.

And second, we know the defendant is a specific alien. We know he's Gustavo Araujo Lerma. He was born in Mexico. He never obtained United States citizenship, and that's why he was using the identity of a U.S. citizen. Here's the defendant, Gustavo Araujo Lerma. We know he was born in Mexico. He was married in Mexico to Maria Eva Manriquez. He had four children, three of them using the Gustavo Araujo Lerma name, before he changed -- started going by the Hiram Velez name, and he never obtained citizenship. There's no A-file related to Gustavo Araujo Lerma.

How do we know that the defendant is really Gustavo Araujo Lerma? Because he's got Gustavo Araujo Lerma's family. His mother is Gustavo Araujo Lerma's mother. His wife is Araujo Lerma's wife, and he's raising Araujo Lerma's children. We also know he traveled repeatedly to Gustavo Araujo Lerma's

hometown in Leon, Mexico.  The defendant is Gustavo Araujo Lerma.

Here's his birth certificate, his real birth certificate.  It shows that Gustavo Araujo Lerma was born in 1955 in Leon, that his parents were Felipe Araujo and Antonia Lerma.  Here's Antonia Lerma.  Picture on the left is from her application for a visa.  We heard Officer Kleeb talk about this.  Picture on the right is Antonia Lerma when she was visiting the defendant in California.  They're the same woman.  You'll have these pictures with you when you're back deliberating, and I encourage you to look at them.

Now we know the defendant's mother is Antonia Lerma because his house was full of evidence related to Antonia Lerma.  On the backs of two pictures the defendant had written, and he admitted this, "mi mama."  His explanation was a little bit strange about this, that he called everyone mi mama.  And sometimes he said he hadn't said that before.  But we know he wrote "mi mama" on the back of the pictures of Antonia Lerma.  We also had Antonia Lerma's State of California benefits card at his house.  Antonia Lerma's tax receipts were in his house.

Think about his explanation about this.  First he told my colleague that Antonia Lerma had only visited maybe sometime around the year 2000.  These tax receipts are from the years 2007, 2008.  When he was confronted with that evidence, he changed his story, and he said, well, maybe she visited other

times too, and he still couldn't pin down when that was.

The defendant's address books have multiple entries for Antonia Lerma.  These are Exhibits 630 and 631, and in one of them, which you saw, it said it was the new phone number for mi mama, Antonia Lerma.  It also had contact information for Felipe Araujo, Blanca Araujo, and Raquel Araujo.  That's Gustavo Araujo's brother and his two sisters.  We also saw an unsent postcard that was taken from the defendant's house.  It was addressed to mi mama, Antonia Lerma, and it was signed Gustavo, Araujo L.  You have that at Exhibit 632.

We also know he's Araujo Lerma because he's married to Maria Eva Manriquez.  They were married in Mexico.  This is Exhibits 203 and 203T.  They were married in Leon, Mexico.  But then after having three children, while he's still using the Gustavo Araujo Lerma name, his real name, he purchases the Hiram Velez birth certificate and social security card which he's admitted sometime in the early '90s.  And in 1992 he remarries Maria in Los Angeles, this time using the name Hiram Enrique Velez, shortly after he acquired that birth certificate and social security card.  There was a place on this form for them to put whether they had been previously married.  They both said no. This was a marriage that he used to get legal residency status for his wife and for his children.

And you will actually notice that he put here his date of birth is September 26th, 1956.  Now we already saw the real

Hiram Velez was born September 16th.  It looks like they made a mistake on this document, but he's more careful later on.  And from here on, he gets the birth date correct.  But this was probably the first one he used or the earliest one he used.

He then used that identification and the marriage certificate to get legal residency for his wife Maria.  She states that she's married to Hiram Velez and that she's never been married before.  When she gets citizenship, same thing.  She's married to Hiram Velez.  She's never been married before.  He did the same thing for his children.  Here he is filling out the petition for legal residency for his daughter Blanca.  He states that she's his child, not by adoption.  Did the same thing for Mario.  His child, not by adoption.  Now both of these applications were also supported by a copy of the real Hiram Velez's birth certificate, a copy of the marriage certificate that the defendant got in the Hiram Velez name in 1992, as well as a copy of one of the fraudulent passports that he obtained in the Hiram Velez name.

So we know that he is Gustavo Araujo Lerma because he also used those fraudulently acquired passports to travel back and forth between the United States and Mexico including to Leon, Gustavo Araujo Lerma's hometown.  You'll have these travel records with you.  I believe it's Exhibit 106.  You'll also have his address books where you can find sort of schedules for buses from Sacramento to Leon.  In his house

there was also an itinerary and airplane tickets for a flight for Hiram Velez, and I believe this one goes from Leon to Houston, and then there's another flight from Houston back to Sacramento.  This is Exhibit 621.

So we know the defendant is an alien.  We know that's why he took on the identity of a U.S. citizen in the first place.  We also know that specifically he's Gustavo Araujo Lerma.  You can check off this element and move on.

Second, the defendant knowingly voted in an election.  Now he's been charged in voting in five elections, November 6, 2012, June 3rd, 2014, November 4th, 2014, June 7, 2016, and November 8, 2016.  And he's admitted to voting in all of these.  Here's his registration where he registered as Hiram Velez.  He gave his address.  He gave the real Hiram Velez's birth date, place of birth.  But then we saw this, Exhibit 504.  We've got the roster of voters for each of the charged elections showing the defendant, Hiram Velez, signed that roster and proceeded to vote.  And again he admitted to that.

So here's count 4, June 3rd, November 4th, 2014, June 7th, 2016, and finally November 8th, 2016.  In each of these elections he went to the polling place.  He gave his name and address to confirm he was the registered voter.  He signed the roster of voters and he voted.  So you can check off this second box and move on.

The third element is that one purpose of the election

was to elect a candidate for either president, vice president, Senate, or House of Representatives. Now you'll have the certified list of candidates for each of these elections, and you can look through them. They're Exhibits 505 through 509. You also heard Heather Ditty from the Sacramento County Elections Board testify that each of these elections contained at least one candidate for federal office. Three of them had multiple offices, president, vice president, Senate, House, but every one of them, at least one purpose was to elect a candidate for federal office. So you can check off this third element and move on.

Finally, we're going to turn back to count 1, aggravated identity theft. This count relates to the defendant's use of the identity Hiram Velez to illegally vote in the November 8th, 2016, election. To prove aggravated identity theft, the government must prove, first, the defendant knowingly used without legal authority a means of identification of another person. Second, that he knew the means of identification belonged to a real person. It wasn't just a fake made-up person. It was a real human being. And third, it was during and in relation to making a false claim -- or I'm sorry, that he used the means of identification during and in relation to another felony, and here that other felony is making a false claim of U.S. citizenship in order to vote. And we'll talk about these in turn.

So the first element is that the defendant knowingly used without lawful authority the means of identification of another.  The judge will tell you that means of identification can include a name used to identify a specific person.  Now it must be a real person, either living or dead, but it must be a real person, as I said.  And the name doesn't have to be stolen.  It doesn't really matter how you acquired it.  Here he's admitted that he purchased it from someone on the street, birth certificate and the social security card.

So we know that when he registered to vote in Sacramento County.  He used the name Hiram Velez.  He used the real Hiram's date of birth and place of birth, and he did this because he knew you would have to be a U.S. citizen to vote.  And we know more importantly that when he voted on November 8th, 2016, he signed the name Hiram Velez next to Hiram Velez's -- the registration information that he had provided.  And I think it's important to think about the fact that, when he registered to vote, it was in the entire identity of Hiram Velez, the Puerto Rican-born U.S. citizen.  That's why he's using this information, to represent himself as a citizen so that he can do things like vote.

So when the defendant voted on that date, he used the means of identification of another person, specifically the name of Hiram Velez, the U.S. citizen to vote.  You can check off that first element and move on.

The second element is that the defendant knew the name Hiram Velez belonged to another real person.  This is essentially uncontested.  We know that it belonged to a real person.  We've seen evidence from the real Hiram.  We've heard testimony from his son.  But importantly, we know that the defendant knew he was a real person.  Again, that's why he used this identity.

But there's other evidence that he knew he was a real person.  When the government executed its search warrant, it found envelopes from the Puerto Rico Department of Health alongside copies of the real Hiram Velez's birth certificate.  You saw this in some of the evidence, and you'll have it back there with you.

There was also an envelope and a letter from a church in Mayaguez, Puerto Rico that included the real Hiram Velez's baptismal certificate, and there was a letter included in that envelope that said, in response -- something to the effect of, in response to your letter, here's a copy of your baptismal certificate.  The defendant was committed to this lie that he was Hiram Velez, and he was writing the government of Puerto Rico and to the church in Puerto Rico in order to get the documents that he needed to back this up.

And of course, we know that he wrote a letter to the real Hiram Velez's mother where he admitted to buying the birth certificate and social security card.  The evidence on the

second element is overwhelming.  The defendant obviously knew that the name Hiram Velez belonged to a real person.  You can check this off and move on.

Finally, the third element is that the defendant used that means of identification during and in relation to the felony of making a false claim of U.S. citizenship to vote.  Now that's a separate crime that the defendant committed.  He hasn't been charged with that, but in order to convict him on the count of aggravated identity theft, the government has to prove that the defendant committed this crime of making a false statement -- false claim of U.S. citizenship.

So how do we prove U.S. citizenship to vote?  To prove this, the government must prove, first, that the defendant was an alien, and second, that he knowingly made a false claim to be a U.S. citizen to vote.

Now we've already established that he's an alien.  He's Gustavo Araujo Lerma.  We know that.  You can check that off and move on to the second element.

And we know that he made a false claim of U.S. citizenship in order to vote.  In that November 8th, 2016, election, right here at the top it says, voter declaration.  I am a U.S. citizen.  I am at least 18 years old.  It says it in English, and it says it in Spanish.  When he signed to vote that day, when he signed "Hiram Velez" next to his registration information, he was affirming that he was a U.S. citizen.

Now the defendant testified that he doesn't read a lot of these forms before he signs them, but he was very specific that he did read this one.  So we know he made that false declaration to vote, and we know that he was doing it in order to vote because he had done it before.  He had falsely claimed to be a U.S. citizen when he registered to vote.  He knew what he was doing.  That was his motive for doing it, was in order to vote.

So when the defendant signed the roster of voters that day as Hiram Velez, he falsely declared that he was a U.S. citizen in that November 8th, 2016, election.  We can check that off as well.

So because of that, we know when he voted on that day, he was using the means of identification of another person, the real Hiram Velez, in order to commit the felony of making a false claim of U.S. citizenship to vote.  You can check off this third element and move on as well.

So that's it.  That's the evidence.  Every box on every count has been checked.

Now the standard that you will use when applying the law to the facts is beyond a reasonable doubt.  The government always has the burden of proof.  We welcome that standard and to meet it we've presented evidence pertaining to every element of every count and to give you the context you need to understand the defendant's scheme, and the evidence that the

government has presented here shows beyond a reasonable doubt that the defendant, Gustavo Araujo Lerma, took on the identity of Hiram Velez to falsely represent himself as Hiram Velez, a U.S. citizen, and to do the things that only a U.S. citizen can do, to apply for and obtain passports and to vote in federal elections.

And this was about more than just a name. He didn't just take on this name because he liked the sound of it. He took on the social security number. He took on the birth date. He took on the place of birth. He took on the entire identity because he wanted to present himself as that person, the man born in Puerto Rico who is a U.S. citizen.

And in a few minutes the judge will instruct you on the law, as I said, and you can use that law to decide the case based on all this evidence. And based on that law and the evidence you've heard, I'm asking you to return the only verdict that is consistent with the evidence you've seen, guilty on all counts. Thank you.

THE COURT: Mr. Beevers, closing argument.

MR. BEEVERS: Thank you. Do you have a handheld mic.

THE CLERK: The government's got it.

MR. BEEVERS: On November 8th, 2016, there were over 200 million United States citizens. To prove the defendant guilty of the voting related counts, which are 1, 3, 4, 5, 6, and 7, the government must prove beyond a reasonable doubt that

the defendant is not a U.S. citizen.  That means they have to prove beyond a reasonable doubt that he is not one of those 200 million U.S. citizens.  That's a very tough burden.

Count 2 is much easier.  Count 2, the government just has to prove that the defendant is not one specific U.S. citizen, a man named Hiram Velez Seda, born in Puerto Rico on a specific date of birth.

And they put on a lot of evidence to support that, and the defendant admitted that on the stand, that he was -- he had no real reason to believe that he was physically born in Puerto Rico and that he didn't really know what his date of birth was.  So for count 2, your job is pretty simple.

This is the application, and in 2009 and the government just needs to prove that the defendant is not this person, Hiram Velez Seda, that simple.  If you find that this defendant signed this application, and he said he did and knew what was in it, then you would have to find him guilty of that count.

For count 2, it doesn't matter if he's a U.S. citizen. Even a U.S. citizen is not allowed to lie on a passport application about their date of birth or place of birth.  That should take you only a couple of minutes to reach a verdict on that charge.

But for the other voting counts, it's much harder. What is the actual evidence that the defendant was not one of

those other 200 million U.S. citizens?  The government claims that the defendant is Gustavo Araujo Lerma born in Mexico.  But there's very little evidence of this except some circumstantial evidence.  The strangest one is the government's argument that the defendant, by checking the box child when he applied for his stepkids' naturalization, that he was admitting to immigration that they were his children.  That makes no sense whatsoever.  That would be an admission that he's Gustavo Lerma.  Why would he tell immigration that?  It's obviously a mistake.  It's in a form filled out in English by somebody else.

What he described makes perfect sense.  You go to a immigration lawyer.  You tell them the story, they're my stepkids.  It's the story.  It's not the whole story.  It's not the story that he bought a driver's license.  It's the story that he wants immigration to believe.  He wants immigration to believe that he is Hiram Velez, born in Puerto Rico.  So of course he's not going to say anything inconsistent with that on purpose.

But you heard the testimony of Special Agent Hung that there were -- there was a way to obtain a green card, a permanent residence for a stepchild.  He wasn't that clear how it was actually done.  So if immigration approved the petition for what appeared to be a stepson of Hiram Velez, what's the big deal?  Wrong form, the lawyers got the forms wrong,

submitted the forms wrong, that makes sense.  That's what my client, Mr. Velez, says happened.  That makes perfect sense.  The government's hyper literalistic interpretation of the form filled out in English as being an admission that Blanca is his natural, biological daughter, that makes no sense.

The evidence in the case from the defendant's family members, his son -- his stepson and his daughter, who testified in the trial, testified that my client used the name Hiram Enrique Velez for all purposes for their entire lives.  This is not the kind of person to make an inconsistent statement.

The government claims that an unmailed postcard with a signature Gustavo Araujo Lerma is found in my client's house is proof that he is Gustavo Araujo Lerma.  The defendant's description is that Antonia Lerma left a lot of stuff at his house.  That makes sense.  There's one document in his house connected to Gustavo Araujo Lerma, a postcard from Texas, obviously an old document from some time, that's his wife, who also lives in the house, that's his wife's first husband.  Is it so surprising that his wife's first husband's postcard might be found in her things in a house?  That's quite likely.

Felipe Araujo's driver's license, expired, that's my client's wife's brother-in-law.  Is it so surprising that she has some of his old junk from the 1990s?  The evidence showed that my client's wife Maria lived in Chicago.  Felipe Araujo lived in Chicago.  These people knew each other.  An expired

Mexican driver's license, what's the great value of that? That doesn't prove anything.

My client admitted that Antonia Lerma came and visited a few times. Is it so surprising that he doesn't remember exactly when she visited? She visited a few times. He referred to the government's evidence. Well, you have the travel trips. Look at those. It's pretty obvious that she visited after the dates of those tax forms, and it's quite likely that she left tax forms for her family. There's no purpose for my client to have Mexican tax forms while he's living in the United States. His explanation makes a lot more sense.

The government argues that it's somehow suspicious that the defendant is raising his stepchildren, Mario Araujo Gustavo Araujo and Blanca Salcedo, that that's somehow suspicious that he speaks to their relatives or that they're his wife's prior mother-in-law, that that's somehow suspicious that these people all know each other or that they traveled to Mexico, to the same state. The evidence is that my client's wife was from the same state where Antonia Lerma and Gustavo Lerma and her whole family, they all came from the same place. So what's so suspicious about my client going to Mexico and visiting his wife's hometown? It happens to also be the hometown of her first husband which isn't that surprising either. So those trips are not suspicious.

The only thing that is suspicious is that he wrote "mama" on the back of a photo.  The government's theory is that that's his admission that he's actually Gustavo Araujo Lerma.  The defendant testified that that's just a term of -- a term of endearment, calling people "mama," that he wrote it that way, that he also called her "my saint," things like that, and that "mama" was more Puerto Rican, he's trying to strengthen his Puerto Rico vibe to convince people he's Puerto Rican.  That makes sense.  But that use of "mama" on the back of an envelope, the back of a photo, does that prove beyond a reasonable doubt that he's a Mexican citizen, that that is his mother?  We didn't hear any eye witnesses as to what their relation was or who he was or where he was.  They provide certified documents showing someone named Gustavo Araujo Lerma was born in Mexico.  But who is he?

Now you heard the rest of the defendant's testimony.  Some of what may have seemed a bit confusing, trying to get his story out, but mostly his story came out.  And he admitted things that the government couldn't prove.  He admitted that he voted in the 2018 election after the government's own witnesses said they destroyed all the ballots.  There really was no way for the government to prove he voted in all those elections after they let the evidence be destroyed.  But he admitted it anyway.  And I'd submit, you look at his credibility, that he's telling it how he remembers it.  He told you that he voted, and

he told you why.  He told you he used the name Hiram Velez.  He told you why he believed he was entitled to use that name.

Now of course none of us really know where we were when we were born.  We have to rely on family history.  When we choose to participate in an election, as he did, we all have to do it based on some understanding that we've heard.  For the charges 3 through 7, the government has to prove beyond a reasonable doubt that the defendant voted and he's not a citizen and that he knew he's not a citizen.  There are many reasons why people might not use their own true identity.  And his explanation makes sense.

There are -- it makes sense that people could exist in the United States without knowing, without having records, and that may be fine for a while.  In the '70s and '80s, that may be fine.  But as society developed and the rules get stricter, he needs to have documents.  He needs to have something to survive, and so he does whatever it takes to try to work.  He testified that he had no Mexican documents.  He couldn't just go to Mexico.  But for count 1 -- but basically the voting counts are fairly simple, just whether or not beyond a reasonable doubt the defendant is not a citizen.  It's the government's burden.

For count 1, the government has an additional hurdle. The government has to prove that the defendant is not a U.S. citizen, but it also has to prove that he used someone else's

name because that count relates only to the November 8th, 2016, date.

And if we -- the Court will instruct you that in order to prove aggravated identity theft, the government has to prove beyond a reasonable doubt that the defendant knowingly used without legal authority a means of identification of another person. Now means of identification could mean social security number, date of birth, other things. But it can mean a name. But we look at what is the actual means of identification we're talking about on that date. Ms. Ditty testified that when a person first goes to vote, you need to present some sort of documents or some other things that would be other means of identification, driver's license, something to show your address, but they don't require it every time. He voted at least 19 times before this. So there's no -- the only means of identification that matters for aggravated identity theft is name.

So basically, as you read this, first the defendant knowingly used without legal authority a means of identification, you can substitute the defendant knowingly used without legal authority a name because there really -- the other parts of the definition don't make -- are not important because the document we're talking about on November 8th, the only means of identification used on that date is the name. No documents.

So the question that you'll have to decide is whether the government's proved beyond a reasonable doubt that the defendant used that name without legal authority, knowingly used the name without legal authority. You heard him testify that he thought that was his name. He had been using that name for 25 years exclusively. You heard his family members testify that he socialized in that name, that he raised his family in that name, that he worked in that name. You heard him testify that he went to church in that name, that he socialized. You heard that he was introduced to family members under that name and that there's no evidence that during that 25 years he used any other name.

Now the Court will instruct you that one can change your name. It can't be for fraud. Now there's evidence that originally when Mr. -- when my client started using the name Hiram Velez, he did so to get documents that he wouldn't have been entitled to otherwise, but that's 25 years ago. The most, the majority of his life, what is he doing in the name Hiram Velez? He's doing what we all do, working, paying taxes, raising his family.

Now once in a while, every ten years, he renews his passport. Renewing the passport using that name to get a passport he's not entitled to, that's a kind of fraud. That's a fraud. The most recent one is 2009. But from 2009 until 2016, what's the fraud that he's doing with that name? The

fraud that he's working?  That's not fraud.  Raising his kids, socializing under the name Enrique, that's not fraud.  Driving his car, that's not fraud.

I'd submit that at the end, by 2016, he had used that name so long, based on his belief that Illinois allowed him to use that name and based on his testimony, Illinois -- he believed that Illinois people were involved with the driving school that accepted these documents, even though he was old, older at the time, that they knew what was going on, and they allowed him to use that name.  And he kept using the name forever, and that's the only name he could use.

I'd submit that even if he used it once in a while for something that could be considered fraud, that was small, that was so small that when he went to vote and used the name Hiram Velez, he did it without thinking anything except that that was his real name.

I'd ask you to look at all of the evidence for all of the counts, and at the end of the case I would ask you to vote not guilty on count 1.  And as to the other counts, you can make up your own mind based on what you've heard of the evidence.  On the count, the aggravated identity theft, I'd ask you to vote not guilty.

I will not get another chance to speak.  The prosecutor gets to respond to what I say, but I would ask you to try to imagine from the evidence and what we've argued so

far how I would respond.  We can't go back and forth all day long on this.  I'd ask you to think about the case fairly from both sides and vote not guilty on count 1.  Thank you.

THE COURT:  Ms. Lydon, final argument.

MS. LYDON:  I won't respond to all of that, but I do have a few quick points to respond to.  So first, with respect to alienage, that the defendant is not a citizen of the United States, the government has to prove that to convict him on all of the counts except passport fraud.  The proof is overwhelming.  The defendant is an alien.  First, it's the only reason that makes any sense why he would be living in a false identity in the first place.  If he was a U.S. citizen, he could have gone to a U.S. Government agency in his real identity and obtained all of the documents that he needed.  He could have obtained citizenship for the children of any woman he married.  He could have done all of the things that in this case he lied to do.  He provided a false identity.

And second, he is a specific alien.  He's Gustavo Araujo Lerma, and that's what the evidence has shown.  It's hard to imagine a situation where he could have taken on so much of Gustavo Araujo Lerma's life without explanation were he not him.  So he basically is living with Gustavo Araujo Lerma's wife.  He is raising Gustavo Araujo Lerma's children.

He's calling Gustavo Araujo Lerma's mother "mi mama." He changed his story on the reasons for that three times on the

stand.  First, he said he never called her "mi mama."  Then when I showed him his handwriting in three separate places describing her as "mi mama," he said, well, it was a term of endearment to make her feel good.  And then by the time he was on redirect examination, it was that he called everyone mi mama, that it was a common thing to do.  It was a term that was used in Puerto Rico.  And he read that in the Puerto Rican book that he bought to bolster his fake identity in case the authorities ever came calling.

So the time line doesn't make sense either.  By his telling, he met his wife in 1980 or 1981.  But she married Gustavo Araujo Lerma the next year.  She had Gustavo Araujo Lerma's first child in 1982, second child in 1983, third child in the early '90s or 1986, actually, and there was no explanation for that.

He told you that Antonia Araujo Lerma had not seen her son Gustavo since the 1970s.  He claimed that he didn't know that Antonia Araujo Lerma was his daughter Blanca's grandmother, and he didn't know that Antonia Araujo Lerma was his wife's former mother-in-law.  And I submit that does not make logical sense.  He had no explanation for who he thought this woman was who showed up at his house repeatedly, left her personal documents there, and became so close to him that he called her mi mama.

It also doesn't make sense that he would have carried

personal documents pertaining to Gustavo Araujo Lerma's siblings through multiple moves in the United States, this person who no one's seen -- who his mother hasn't seen since the 1970s and he didn't even know existed until he got discovery in this case, according to his story on this stand.

He had Felipe Araujo Lerma's driver's license in his house through several moves. He had Raquel Araujo Lerma's property tax receipts from Leon. You'll recall that seeing those property tax receipts was what caused him to change his story about how many times Antonia had visited. It went from the year 2000 being the only time she visited, to saying, oh, it must have been a later visit as well, and that's where she left the tax receipts. The whole thing is entirely inconsistent and it's incoherent, and it doesn't make sense.

The third reason that you can tell that he's an alien is that his story provided on the stand strains all credulity. The idea that he was abandoned at age five by a woman that he can't recall, that he was raised to the age of 12 and then he wandered from town to town staying in parks for two to three days as at a time. Never acquired a name. I asked him several times what his name was, and he wouldn't tell me. Doesn't bear up to scrutiny at all, and that's the third reason you should realize that the only logical explanation is that he is Gustavo Araujo Lerma.

The defendant argued that we have to prove that he

knowingly used, without lawful authority, the name of Hiram Velez, and that is true.  And he argued that we cannot show that because he simply used the name to vote.  For count 1, the name of Gustavo -- or I'm sorry -- of Hiram Velez on those voter rolls to vote is the means of identification of another real person, Hiram Velez.  It's tied to the voter ID number at the other end of the voter roll.  The only reason that name and voter ID number appear on the voter roll at all is because the defendant provided California with information that didn't belong to him.  He convinced them that he was Hiram Velez, so they signed him up as a registered voter.  They put his name on the voter rolls.  And when he showed up to vote, he provided that name, and that name signified the entire identity of Hiram Velez.  And that's why count 1 is satisfied.

MR. BEEVERS:  Objection, your Honor.

THE COURT:  Overruled.

MR. BEEVERS:  Prejudicial.  Variance.

THE COURT:  Overruled.

MS. LYDON:  Defense counsel argued that the defendant believed that the statements were true.  He believed he was a U.S. citizen, and he was Hiram Velez.  I submit that doesn't make any sense.  The defendant telling people lies and having them believe it does not make those statements true.  And you know that the defendant knew that, because after he gave the Illinois Secretary of State the social security card and the

birth certificate that he had purchased, and the Secretary of State issued him a driver's license in response to seeing those documents, he continued lying for more than 25 years.  He didn't then tell all of the subsequent governmental agencies that he interacted with, well, I used to be this person who was found crying and alone, but now I bought this social card, and I got a driver's license, and I'm Hiram Velez, please let me vote and have a passport because that wouldn't have worked. Telling the truth wouldn't have gotten him all of the things that he wanted.  So he continued to lie.  And the fact that he continued to lie shows he knew he wasn't Hiram Velez.

Defense counsel argued that the defendant changed his name by repeated nonfraudulent use.  And that's not the case. Because the evidence has shown that the defendant used the name Hiram Velez from the beginning for a fraudulent purpose -- fraudulent purposes.  Immediately in 1992 he got a passport issued in that name illegally by making false statements about his own identity.  He married a wife that he was already married to in Mexico and then used the resulting license and certificate of confidential marriage to naturalize his children.  There was nothing legitimate about the defendant's use of this name, and you've seen proof of multiple fraudulent uses of it.

The defendant lied to the United States over and over. He lied to the United States to obtain the benefits of

United States citizenship that were owed to Hiram Velez.  We ask that you look at all the evidence and look at all the law -- or look at the law as the judge gives it to you and return a verdict of guilty beyond a reasonable doubt.

THE COURT:  All right.  Thank you.

We're going to take a short break.  We'll come back.  We'll instruct you and then send you in to begin deliberations.  All admonitions apply, and please report any violation of those admonitions.  We'll come back in about 15 minutes.

(Jury excused.)

THE COURT:  Outside the presence of the jury.  Go ahead.

MR. BEEVERS:  Sure.  Just, your Honor, I noticed in the jury instruction for count 1 it didn't have the date of the offense, and it probably should have it either there or on the jury instruction just because we had so many documents and things, it -- it's for count -- many of the counts have the date, but count 2 had the date in the jury instruction itself, and I think for count 1 that would make sense.

THE COURT:  Okay.  That's fine.

MS. LYDON:  That's fine with us too.

MR. BEEVERS:  And the instruction is better?  Which is better, the instruction or the verdict form to have the date?

THE COURT:  I'll put it in the jury instruction.

MR. BEEVERS:  That makes sense.

THE COURT:  The November 8, 2016, date.

MR. BEEVERS:  Thank you.

THE COURT:  Okay.

MR. BEEVERS:  That's all.

THE COURT:  Okay.

MR. BEEVERS:  Thank you.

(Recess taken 2:54 p.m. to 3:15 p.m.)

THE COURT:  Bring the jury in.

(Jury seated.)

THE COURT:  All right.  Members of the jury, now that you've heard all the evidence, it's my duty to instruct you on the law that applies to this case.  You may take your copy of these instructions with you into the jury room for you to consult.

It is your duty to weigh and to evaluate all the evidence received in the case and in that process to decide the facts.  It is also your duty to apply the law as I give it to you to the facts as you find them, whether you agree with the law or not.  You must decide the case solely on the evidence and the law.  Do not allow personal likes or dislikes, sympathy, prejudice, fear, or public opinion to influence you.  You should also not be influenced by any person's race, color, religion, national ancestry, gender, sexual orientation, profession, occupation, celebrity, economic circumstances, or position in life or in the community.  You will recall that you

took an oath promising to do so at the beginning of this case.

You must follow all these instructions and not single out some and ignore others. They are all important. Please do not read into these instructions or into anything I may have said or done any suggestion as to what verdict you should return. That is a matter entirely up to you.

The superseding indictment is not evidence. The defendant has pleaded not guilty to the charges. The defendant is presumed to be innocent unless and until the government proves the defendant guilty beyond a reasonable doubt. In addition, the defendant does not have to testify or present any evidence. The defendant does not have to prove innocence. The government has the burden of proving every element of the charges beyond a reasonable doubt.

The defendant has testified. You should treat this testimony just as you would the testimony of any other witness.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced the defendant is guilty. It does not require that the government prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation. It may arise from a careful and impartial consideration of all the evidence or from lack of evidence.

If after a careful and impartial consideration of all

the evidence you are not convinced beyond a reasonable doubt that a defendant is guilty, it is your duty to find that defendant not guilty.  On the other hand, if after a careful and impartial consideration of all the evidence you are convinced beyond a reasonable doubt that a defendant is guilty, it is your duty to find that defendant guilty.

The evidence you are to consider in deciding what the facts are consists of:

(1) the sworn testimony of any witness;

(2) the exhibits received into evidence; and

(3) any facts to which the parties have agreed.

In reaching your verdict, you may consider only the testimony and exhibits received in evidence.  The following things are not evidence, and you may not consider them in deciding what the facts are:

(1) Questions, statements, objections and arguments by the lawyers are not evidence.  The lawyers are not witnesses. Although you must consider a lawyer's questions to understand the answers of a witness, the lawyers' questions are not evidence.  Similarly, what the lawyers have said in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.

(2) Any testimony that I have excluded, stricken, or

instructed you to disregard is not evidence.

(3) Anything you may have seen or heard when the court is not in session is not evidence.  You are to decide the case solely on the evidence received at the trial.

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is indirect evidence that is it is proof of one or more facts from which you can find another fact.

You are to consider both direct and circumstantial evidence.  Either can be used to prove any fact.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness you may take into account:

(1) the opportunity and ability of the witnesses to see or hear or know the things testified to;

(2) the witness's memory;

(3) the witness's manner while testifying;

(4) the witness's interest in the outcome of the case; if any;

(5) the witness's bias or prejudice, if any;

(6) whether other evidence contradicted the witness's testimony;

(7) the reasonableness of the witness's testimony in light of all the evidence; and

(8) any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.  You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.  On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.  What is important is how believable the witnesses are and

how much weight you think their testimony deserves.

You are here only to determine whether the defendant is guilty or not guilty of the charges in the superseding indictment.  The defendant is not on trial for any conduct or offense not charged in the superseding indictment.

A separate crime is charged against the defendant in each count.  You must decide each count separately.  Your verdict on one count should not control your verdict on any other count.

You have heard testimony of the defendant who testified in the Spanish language.  Witnesses who do not speak English or are more proficient in another language testify through an official interpreter.  Although some of you may know the Spanish language it is important that all jurors consider the same evidence.  Therefore, you must accept the interpreter's translation of the witness's testimony.

You must disregard any different meaning.  You must not make any assumptions about a witness or a party based solely on the fact that an interpreter was used.

The superseding indictment charges that the offenses alleged in each count were committed on or about certain dates.  Although it is necessary for the government to prove beyond a reasonable doubt that the offenses were committed on dates reasonably near the dates alleged in the superseding indictment, it is not necessary nor the government to prove

that the offenses were committed precisely on the dates charged.

You have heard testimony that the defendant made a statement.  It is for you to decide (1) whether the defendant made the statement, and (2) if so, how much weight to give to it.  In making those decisions, you should consider all the evidence about the statement, including the circumstances under which the defendant may have made it.

You have heard evidence that the defendant committed other acts not charged here.  You may consider this evidence only for its bearing, if any, on the question of the defendant's intent, knowledge, absence of mistake, or absence of accident, and for no other purpose.

In count 1 of the superseding indictment, the defendant is charged with committing aggravated identity theft on or about November 8th, 2016, in violation of Section 1028(a) of Title 18 of the United States Code.  In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant knowingly used without legal authority a means of identification of another person;

Second, the defendant knew the means of identification belonged to a real person; and

Third, the defendant did so during and in relation to

a felony, to wit, making a false claim that he is a citizen of the United States in order to vote in any federal, state, or local election in violation of 18 U.S.C. 1015(f).

In order to be found guilty of making a false claim that he is a citizen of the United States in order to vote, the government must prove each of the following elements beyond a reasonable doubt:  (1) the defendant was an alien; and (2) the defendant knowingly made a false claim to be a citizen of the United States in order to vote in a federal, state, or local election.

The government need not establish that the means of identification of another person was stolen.

The term "means of identification" is defined as any name or number that may be used alone or in conjunction with any other information to identify a specific individual, including any name, social security number, date of birth, unique electronic identification number, or routing code.

A name qualifies as a "means of identification."

The word "person" includes both living and deceased persons, and the government is not required to prove that the defendant knew that the person was living when the defendant committed the crime of aggravated identity theft.

An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident.  The government is not required to prove that the

defendant knew that his acts or omissions were unlawful.  You may consider evidence of the defendant's words, acts, or omissions along with all of the other evidence in deciding whether the defendant acted knowingly.

The defendant is charged in count 2 of the superseding indictment with making a false statement in an application for a United States passport on or about March 11, 2009, in violation of Section 1542 of Title 18 of the United States code.  In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant willfully and knowingly made a false statement in an application for a passport; and

Second, the statement was made with the intent to induce or secure the issuance of a passport under the authority of the United States contrary to the laws regulating the issuance of passports or the rules prescribed pursuant to such laws.

In context of the crime of making a false statement in the application for a United States passport, an act is done willfully and knowingly if the defendant made the false statement deliberately and with knowledge that it was untrue.

When the defendant is charged with violating section 1542 of Title 18 of the United States Code by using a false name to secure a passport, the government is not required to

prove the defendant's true identity.

With respect to count 2, the defendant contends that the statement on the passport application that his name was Hiram Velez was not false because he had acquired the name "Hiram Velez" by adopting the name and using it as his own.

A person may legally change his name by simply adopting the name and using it as his own as long as the purpose is not fraudulent.

If you find that the defendant legally changed his name to Hiram Velez by adopting the name and using it as his own, then his use of the name was not a false statement. However if you find that he adopted the name for a fraudulent purpose, then he has not legally changed his name.

Accordingly, in addition to the other elements of making a false statement on a passport application, to prove that the defendant made a false statement on an application for a United States passport by stating that his name was Hiram Velez, the government must prove beyond a reasonable doubt:  (1) that the defendant's name was not Hiram Velez; and (2) that the defendant assumed the name "Hiram Velez" for a fraudulent purpose.

The name is one of four statements on the passport application the government has alleged are false.  This defense is only relevant to the statement of the name, not the statements of birthday, place of birth, or social security

number.

The defendant is charged in each of counts 3, 4, 5, 6, and 7 of the superseding indictment with voting by an alien in violation of Section 611 of Title 18 of the United States Code. In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant was an alien at the time alleged in the superseding indictment;

Second, the defendant knowingly voted in an election; and

Third, one purpose of the election in question was to elect a candidate for the office of either president, vice president, presidential elector, member of the Senate, or member of the House of Representatives.

In order to prove a violation of Section 611, it is not necessary for the government to prove that the defendant knew it was unlawful for an alien to vote.

An alien is a person who is not a natural-born or naturalized citizen of the United States.

When you begin your deliberations, elect one member of the jury as your presiding juror who will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so.  Your verdict, whether

guilty or not guilty, must be unanimous.  Each of you must decide the case for yourself, but you should do so only after you've considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you that you should, but do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision.  Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Perform these duties fairly and impartially.  Do not allow personal likes or dislikes, sympathy, prejudice, fear, or public opinion to influence you.  You should also not be influenced by any person's race, color, religion, national ancestry, gender, sexual orientation, profession, occupation, celebrity, economic circumstances, or position in life or in the community.

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement if you can do so.  During your deliberations you should not hesitate to reexamine your own views and change your opinion if you become persuaded that it is wrong.

Because you must base your verdict only on the

evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves.

Except for discussing the case with your fellow jurors during your deliberations, do not communicate with anyone in any way, and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone or electronic means, via email, text messaging, or any Internet chat room, blog, website, or other feature. This applies to communicating with your family members, your employer, the media or press, and the people involved in the trial. If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the Court.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it. Do not do any research such as consulting dictionaries, searching the Internet, or using other reference materials, and do not make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address. A juror who violates

these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over.  If any juror is exposed to any outside information, please notify the Court immediately.

Some of you have taken notes during the trial. Whether or not you took notes, you should rely on your own memory of what was said.  Notes are only to assist your memory. You should not be overly influenced by your notes or those of your fellow jurors.

The punishment provided by law for these crimes is for the Court to decide.  You may not consider punishment in deciding whether the government has proved its case against the defendant beyond a reasonable doubt.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the clerk signed by any one or more of you.  No member of the jury should ever attempt to communicate with me except by a signed writing, and I will respond to the jury concerning the case only in writing or here in open court.

If you send out a question, I will consult with the lawyers before answering it which may take some time.  You may continue your deliberations while waiting for the answer to any question.  Remember that you are not to tell anyone, including me, how the jury stands numerically or otherwise on any question submitted to you, including the question of the guilt

of the defendant, until after you have reached a unanimous verdict or have been discharged.

A verdict form has been prepared for you. After you have reached unanimous agreement on a verdict, your presiding juror should complete the verdict form according to your deliberations, sign and date the verdict form, and advise the clerk that you are ready to return to the courtroom.

After you elect a foreperson, I will leave it up to the foreperson to control the conduct of the jury including such things as if and when and how long you want to take breaks. You don't have to send out a note and ask me that. You decide that among yourselves. Make sure whoever the foreperson is to please have each and every juror turn off their electronic devices. I've never had a problem with that. Just make sure that your devices are off so you can actually listen to each other and deliberate without interference from electronic devices.

If you do take a break, during the break, my admonitions apply. So you cannot discuss the case. The only time you can discuss the case is when all 12 of you are sitting in that room. So if only eight of you or nine of you are in the room, please don't discuss the case or anything about the case. Again, make sure, if you're the foreperson, that all 12 people are in that room before you begin your discussions.

I'd ask that you deliberate at least until 4:30, 4:45

today.  If you do not reach a verdict, I'm going to ask that you come back tomorrow.  You'll start your deliberations again at 10:00 a.m. tomorrow.  That will allow you to at least avoid some traffic problems and give you time to get here all on time so you can start again at 10:00 a.m.

We will keep you together during the lunch hour.  So if you do not reach a verdict by lunch tomorrow, we will take you to lunch.  You do not break up, go your separate ways during lunch.  We do keep you together during the lunch hour.

The verdict form is simple, straightforward.  Just whoever again the foreperson is, make sure that it is filled out correctly, accurately reflects the verdicts of the jury, and make sure that it is dated and signed before you notify us that you have reached a verdict.

Take your notes and your jury instructions with you.  Any questions?  Okay.  All but the alternate -- I'm sorry.  Mr. Vine has to swear in the court security officers.

Go ahead.

(Whereupon the oath was administered.)

COURT SECURITY OFFICER:  I will.

THE COURT:  Mr. Vine will send in the verdict form and the exhibits that have been admitted to you so you have those with you, and again all 12 of you, other than my alternate juror, if you would go ahead and begin your deliberations.

(Jury excused.)

THE COURT:  As to my wonderful alternate juror, I can't remember.  Where are you located?  Where do you live?

ALTERNATE JUROR:  Rocklin.

THE COURT:  It's okay for you to go home.  Make sure Mr. Vine has your cell phone number.  Leave your notes and your jury instructions here.  If we do need to substitute you in, Mr. Vine will call you.  We'll wait until you come back down.  And then deliberations start all over again.  So they have to begin from the beginning.

If you want to know the status, feel free to call Mr. Vine.  And unfortunately, you are the only juror that is still bound by all those admonitions.  So you can't talk to anyone.  You can't let anyone talk to you.  You can't read anything or do any investigation.  So we'll trust that you will continue to follow those admonitions, and if and when we get a verdict, we'll notify you so you can talk to whoever you want.

But thank you so much for participating.  If we do need you, again we'll make sure you get down here, and we'll start deliberations all over again, okay?

ALTERNATE JUROR:  Thank you.

THE COURT:  Thank you.

(Alternate juror excused.)

THE COURT:  Okay.  For the attorneys, make sure you meet with Mr. Vine, and the exhibits that are supposed to go in, go in to the jury and make sure that you are no further

than about five minutes away from the courtroom so, if we get a question, we will consult with you.  There will be no answer submitted to a jury question without consulting with all counsel first, okay?  All right.  Thanks.

MS. LYDON:  Thank you.

MR. KENNY:  Thank you.

(The proceedings adjourned at 3:43 p.m.)

--oOo--

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Kacy Parker Barajas

_____

KACY PARKER BARAJAS
CSR No. 10915, RMR, CRR, CRC