IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BEFORE THE HONORABLE JOHN A. MENDEZ

UNITED STATES OF AMERICA,

          Plaintiff,

vs.

GUSTAVO ARAUJO LERMA,
aka Hiram Enrique Velez,

          Defendant.
_____/

Sacramento, California
No. 2:17-CR-00195
Monday, August 19, 2019
2:12 p.m.

--oOo--

REPORTER'S EXCERPT OF JURY TRIAL
DAY 1

--oOo--

APPEARANCES:

For the Government:
    UNITED STATES ATTORNEY'S OFFICE
    KATHERINE T. LYDON
    Assistant U.S. Attorney
    SHEA J. KENNY
    Assistant U.S. Attorney
    501 I Street, Suite 10-100
    Sacramento, CA  95814

For the Defendant:
    OFFICE OF THE FEDERAL DEFENDER
    DOUGLAS J. BEEVERS
    Assistant Federal Defender
    801 I Street, Third Floor
    Sacramento, CA  95814

Official Reporter:
    KACY PARKER BARAJAS
    UNITED STATES DISTRICT COURT
    CSR No. 10915, RMR, CRR, CRC
    501 I Street
    Sacramento, CA  95814
    kbarajas.csr@gmail.com

*Proceedings recorded by mechanical stenography.  Transcript produced by computer-aided transcription.*

INDEX OF WITNESSES

--oOo--

GOVERNMENT'S                                              PAGE

JONATHAN VELEZ

        Direct Examination by Mr. Kenny              4
        Cross-Examination by Mr. Beevers             19
        Redirect Examination by Mr. Kenny            20
        Recross-Examination by Mr. Beevers           21

ROGER KLEEB

        Direct Examination by Ms. Lydon              22

WEI HUNG

        Direct Examination by Ms. Lydon              41

--oOo--

INDEX OF EXHIBITS

GOVERNMENT'S                                         IN EVIDENCE

101                                                  44

102                                                  53

105                                                  51

106                                                  29

108                                                  58

111                                                  26

113                                                  32

303                                                  59

304                                                  64

306                                                  65

INDEX OF EXHIBITS (Continued)

| GOVERNMENT'S | IN EVIDENCE |
|---|---|
| 310 | 67 |
| 312 | 73 |
| 401 | 47 |
| 401-T | 48 |
| 404 | 49 |
| 405, Page 2 | 10 |
| 405 | 18 |
| 406 | 14 |
| 407 | 11 |
| 701, Page 1 | 15 |

--oOo--

SACRAMENTO, CALIFORNIA, MONDAY, AUGUST 19, 2019, 2:12 PM

--oOo--

(Begin excerpt.)

THE COURT:  All right.  The government may call its first witness.

MR. KENNY:  The government calls Jonathan Velez.

THE COURT:  Mr. Velez, up here.

THE CLERK:  Take your seat if you would, please, and raise your right hand for me, please.

(Whereupon the oath was administered.)

JONATHAN VELEZ

was called as a witness, and having been duly sworn, was examined and testified as follows:

THE WITNESS:  Yes, sir.

THE CLERK:  I need you to state your full name and spell the first and last names, please.

THE WITNESS:  It's Jonathan Velez, J-o-n-a-t-h-a-n, V-e-l-e-z.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MR. KENNY:

Q.   Good afternoon, Mr. Velez.

A.   Good afternoon.

Q.   Where do you live?

A.   Puerto Rico.

Q.   In what city in Puerto Rico?

A.   Mayaguez.

Q.   Were you born in Mayaguez?

A.   Yes, sir.

Q.   And what do you do for a living?

A.   Security officer.

Q.   You're a security officer?

A.   Yes, sir.

Q.   What year were you born?

A.   1980.

Q.   And what is your father's name?

A.   Hiram Velez.

Q.   And I'm sorry to ask a personal question, but is your father still alive?

A.   No, sir.

Q.   When did he pass away?

A.   In 1997.

Q.   Was your father born in Puerto Rico?

A.   Yes, sir.

Q.   And where did your father live?

A.   Mayaguez.

Q.   In Mayaguez, Puerto Rico?

A.   Yeah.

Q.   Did he at any point move to another part of the country?

A.   No.

Q.   Did he at any point move to the continental United States?

A.   Yeah, Chicago.

Q.   He moved to Chicago?

A.   Yeah.

Q.   Were you living with him when he was in Chicago?

A.   Yeah.

Q.   And how old were you?

A.   I was six, seven years old.

Q.   And did you at -- you must of at some point moved back to Puerto Rico?

A.   Yeah.

Q.   And how old were you when you moved back to Puerto Rico?

A.   I was like -- like eight or nine years old.

Q.   And did your father, Hiram Velez, did he move back to Puerto Rico also?

A.   Yeah.

Q.   Did he move to Mayaguez?

A.   Yeah.

Q.   Now did you live with your father in Mayaguez?

A.   Mayaguez, no.

Q.   Did you see him occasionally in Mayaguez, Puerto Rico?

A.   Yeah.

Q.   Growing up?

A.   Couple times, yeah.

7

Q.   And again, I'm sorry to get personal here, but how old were you when he passed away?

A.   I was 16, 17 years old.

Q.   And were you at his funeral?

A.   Yes.

Q.   When you came out here to Sacramento to testify, did you bring some documents with you?

A.   Yes, sir.

Q.   I want to talk about a couple of those.  Could you open the binder in front of you to Exhibit 408.  There's a tab on the side there with numbers or maybe on the top.

A.   408?

Q.   408.  Do you have that in front of you?

A.   Yeah.

Q.   Have you seen this before?

A.   Yeah.

Q.   What is it?

A.   That's a driver's license of my father.

Q.   And did you bring this with you?

A.   Yes, sir.

Q.   Or is this a copy of the driver's license you brought with you?

A.   No.  I bring that.

Q.   And who was in -- is there a photograph on the driver's license?

A.    My dad.

Q.    And is that a fair and accurate representation of how he looked?

A.    Yes, sir.

        MR. KENNY:  Your Honor, the government moves to admit Exhibit 408.

        THE COURT:  Any objection?

        MR. BEEVERS:  No, your Honor.

        THE COURT:  It's admitted.  You may publish.

        (Government's Exhibit 408 was admitted into evidence.)

        THE COURT:  On your screens, yes, jurors?  Okay. Thank you.

BY MR. KENNY:

Q.    Now again, who is this picture of?

A.    My dad.

Q.    Your father, Hiram Velez?

A.    Yes, sir.

Q.    And does it give your father's birthday anywhere on this driver's license?

A.    Yeah.  Right here, 16 -- September 16th.

Q.    September 16, 1956?

A.    Yes, sir.

Q.    And that's at the bottom of the driver's license?

A.    Yes, sir, on the right.

Q.    And that's your father's birthday?

A.    Yes, sir.

Q.    And does it state where he lived?

A.    In Puerto Rico or --

Q.    Or does it show that he lived in Mayaguez?

A.    Yeah.  On the top it says "Mayaguez."

Q.    And where did you get your copy of this driver's license?

A.    I got it from my uncle, his brother.

Q.    Your father's brother?

A.    Yeah.

Q.    And if you could turn to Exhibit 405 to the second page of that.  Could you turn to the second page of the exhibit.  And what is this?

A.    That's his birth certificate.

Q.    I think you may be looking at the third page.  Is there a page there on the left there?  So it would be the back side of that one.  I'm sorry.

If I may approach, your Honor.

A.    Oh, okay.

Q.    So what's on page 2 of this exhibit?

A.    It's a photo of my dad.

Q.    And have you seen this before?

A.    Yes.  Yes, sir.

Q.    And is this a true and accurate depiction of how your father looked?

A.    Yes, sir.

        MR. KENNY:  Your Honor, the government moves to admit page 2 of Exhibit 405.

        THE COURT:  Any objection?

        MR. BEEVERS:  No, your Honor.

        THE COURT:  It's admitted.

        (Government's Exhibit 405, Page 2, was admitted into evidence.)

        MR. KENNY:  Please publish.

Q.    So your testimony is that this is a picture of your father, Hiram Velez?

A.    Yes, sir.

Q.    And have you seen this picture before?

A.    Yes.

Q.    Where is this picture?

A.    It's at my grandma's house.

Q.    It's at your grandmother's house?

A.    Yes, sir.

Q.    And that's your father's mother?

A.    Mother, yeah.

Q.    And where does she live?

A.    In Mayaguez also.

Q.    Now if you could turn to Exhibit 407 in front of you. Have you seen this before?

A.    Yes, sir.

Q.   And what is this?

A.   That's my birth certificate.

Q.   This is your birth certificate?

A.   Yes, sir.

Q.   And did you bring this birth certificate with you?

A.   Yes, sir.

MR. KENNY:  Your Honor, the government moves to admit Exhibit 407.

MR. BEEVERS:  No objection.

(Government's Exhibit 407 was admitted into evidence.)

MR. KENNY:  Please publish.

Q.   So you said that this is your birth certificate?

A.   Yes, sir.

Q.   And does it show what date you were born?

A.   Yeah.

Q.   And what day is that?

A.   That's March 6, 1980.

Q.   And does it show where you were born?

A.   Yeah.

Q.   And is that in Mayaguez, Puerto Rico?

A.   Yes, correct.

Q.   And does it give your father's name?

A.   Yes, sir.

Q.   And what is that?

A.   On the bottom is "Hiram Velez."

Q.   And does it show where your father was born?

A.   Yeah.

Q.   And where was that?

A.   That's Mayaguez, Puerto Rico.

Q.   Thank you.

Okay.  I want to talk to you a little bit about your father's family.  You mentioned a couple of the members earlier.  Does your father have other family members who are still living in Mayaguez?

A.   Yes, sir.

Q.   Who is living in Mayaguez?

A.   His brothers.

Q.   And what are his brothers' names?

A.   Nelson Velez, Kiki Velez, and Pedro Velez.

Q.   Nelson, Kiki, and Pedro?

A.   Yeah.

Q.   Those are your father's uncles -- I'm sorry, your father's brothers?

A.   Yes, sir.

Q.   That would be your uncles?

A.   Yes, sir.

Q.   Is that right?

A.   Yes, sir.

Q.   And are your father's parents still live?

A.   Yeah.

Q.   This would be your grandparents?

A.   Yeah.

Q.   And what are their names?

A.   It's Lillian Seda and Hiram Velez also.  That's my grandpa.

Q.   And does your grandmother, Lillian Seda, does she also go by Carmen Lillian Seda?

A.   Carmen Lillian Seda, yeah.

Q.   And do you know your family members in Mayaguez?

A.   Yeah.

Q.   I'm going to ask you to turn to Exhibit 406.  And what is this document?

A.   Three photos of my dad, and the other one is my grandma.

Q.   So it's four photographs?

A.   Yeah.  It's four.

Q.   And do you recognize these people?

A.   Yeah.

Q.   You said it's your father and your grandmother?

A.   Grandma, yeah.

Q.   Are these photos fair and accurate representations of the people they portray?

A.   Yes, sir.

        MR. KENNY:  The government moves to admit Exhibit 406.

        THE COURT:  It's admitted.

        MR. BEEVERS:  No objection.

(Government's Exhibit 406 was admitted into evidence.)

BY MR. KENNY:

Q.    And just for the record, who is the person depicted in the top, right?

A.    The top, right?

Q.    This one right here.

A.    Grandma.

Q.    That's your grandmother?

A.    Yes, sir.

Q.    That's Carmen Lillian Seda?

A.    Yes, sir.

Q.    And who is represented in these other three photographs?

A.    That's my dad.

Q.    All three of those photographs are your dad?

A.    All three of them are my dad.

Q.    That's Hiram Velez?

A.    Yes, sir.

Q.    Now do you know if your grandmother received a letter from someone using the name Hiram Velez recently?

A.    Yes.

Q.    Could I ask you to look at Exhibit 701, page 1.  It's going to be towards the end of that binder.

A.    Got it.

Q.    You have 701 in front of you?

A.    Yes, sir.

Q.   We're just going to talk about the first page there you have in front of you.  Have you seen this before?

A.   Yes, sir.

Q.   And is this a copy of the envelope for the letter you just mentioned?

A.   Yes, sir.

Q.   And do you recognize the address on that envelope?

A.   Yes.  That's my grandma's address.

MR. KENNY:  The government moves to admit Exhibit 701, page 1.

MR. BEEVERS:  No objection.

THE COURT:  Hang on.  Okay.  It's admitted.

(Government's Exhibit 701, Page 1, was admitted into evidence.)

THE COURT:  Just page 1, right?

MR. KENNY:  Yes, your Honor.

THE COURT:  Okay.

BY MR. KENNY:

Q.   Now you testified this was a letter that was sent to your grandmother?

A.   Yes, sir.

Q.   And this address here in the middle of the envelope, is that your grandmother's address?

A.   Yes, sir, correct.

Q.   And Carmen Lillian Seda Cuevas is your grandmother?

A.   Yes, sir.

Q.   And she received this letter after your father had passed away, correct?

A.   Yeah.

        MR. BEEVERS:  Objection, your Honor.  Hearsay as to -- the document speaks for itself.

        THE COURT:  Overruled.  I can see the stamp.

BY MR. KENNY:

Q.   It looks like this letter is postmarked the 25th of February 2019, correct?

A.   Right.

Q.   Now as far as you know, did anyone in your family know that the defendant or anyone else was using your father's identity?

A.   No, sir.

Q.   I'm going to ask you to take a look at the defendant. He's sitting over here in a white shirt at defense table here. Do you see him?  Have you ever seen the defendant before?

A.   No, sir.

Q.   Have you ever met anyone named Gustavo Araujo Lerma before?

A.   No, sir.

Q.   Have you ever met anyone named Maria Eva Manriquez?

A.   No, sir.

Q.   Have you ever met anyone named Antonia Lerma?

A.   No, sir.

Q.   Have you ever met anyone named Felipe Araujo Lerma?

A.   No, sir.

Q.   Do you have a brother named Gustavo Araujo, Jr.?

A.   No, sir.

Q.   Or Mario Araujo?

A.   No.

Q.   Do you have a sister named Blanca Araujo?

A.   No, sir.

Q.   And do you have a sister named Raquel Velez?

A.   No, sir.

        MR. KENNY:  Just a moment, your Honor.

Q.   Just a couple more questions about your father.  What did your father do for work?

A.   He used to work in a tire shop changing some tires and all that.

Q.   He worked in a tire shop?

A.   Yes, sir.

Q.   And you mentioned you got to spend some time with him when you were a kid.  What kind of things did you guys like to do together?

A.   Softball.

Q.   Play softball?

A.   Yeah, sports.

        MR. KENNY:  Thank you, Mr. Velez.

No further questions at this time, your Honor.

THE COURT:  Cross-examination.

MR. BEEVERS:  Could we publish Government 405 again.

MR. KENNY:  I don't think that's been admitted into evidence.

MR. BEEVERS:  Oh, okay.

Your Honor, I move to admit Government's 405.

THE COURT:  The entire exhibit?

MR. BEEVERS:  Just the --

THE COURT:  What's that?

MR. BEEVERS:  The one marked 405, not the different pages, just the front page.

THE COURT:  Should have the sticker at the bottom.  Is it 001?

MR. KENNY:  We have no objection.

THE COURT:  Yeah.  I just want to make sure the record's clear what we're admitting though, 405?

MR. KENNY:  I believe it's just marked 405.

THE COURT:  It just says 405 on the bottom.  Okay.  That's fine.  405 is admitted.

MR. BEEVERS:  The driver's license.

(Government's Exhibit 405 was admitted into evidence.)

THE COURT:  There you go.

///

///

CROSS-EXAMINATION

BY MR. BEEVERS:

Q.   Is this the standard form of a Puerto Rico driver's license?

A.   Yes, sir.

Q.   Now at the top is the name Hiram E. Velez Seda?

A.   Yes, sir.

Q.   Can you explain why is Seda the last name in that line? What is Seda -- how does that -- why is there a "Seda" in the name?

A.   That's my grandpa's last name.

Q.   And so your father's name was Hiram Velez Seda, right?

A.   Yes, sir.

Q.   And that's how he would be known in Puerto Rico?

A.   Yes, sir.

Q.   And in Puerto Rico you would be known as Velez Gonzalez, right?

A.   Yeah.  Then Velez Gonzalez, yeah.

Q.   Okay.  And so in Puerto Rico, two last names are usually used, right --

A.   Yeah.

Q.   -- for all official purposes?

     And were you -- did you ever receive any social security death benefits through your father?

          MR. KENNY:  Objection, your Honor.  Relevance.

THE COURT:  Sustained.

BY MR. BEEVERS:

Q.   Are you involved in any litigation against this client regarding --

MR. KENNY:  Objection, your Honor.  Relevance.

THE COURT:  Let him finish his question.

BY MR. BEEVERS:

Q.   Are you involved in any litigation against my client regarding any property or any financial interest in any way?

A.   No, sir.

Q.   And had you heard of any financial problems involving this person?

A.   No, sir.

MR. BEEVERS:  That's all I have.  Thank you.

THE COURT:  Anything further, Mr. Kenny?

MR. KENNY:  Just briefly, your Honor.

REDIRECT EXAMINATION

BY MR. KENNY:

Q.   Your father's name was Hiram Velez Seda, correct?

A.   Yes, sir.

Q.   And that's because one last name is from one side of the family and one last name is from the other?

A.   Yeah.

Q.   And your father also went by Hiram Velez?

A.   Yeah.

KACY PARKER BARAJAS
OFFICIAL COURT REPORTER, USDC - (916) 426-7640

Q.   And you also go by Jonathan Velez?

A.   Jonathan Velez, yeah.

MR. KENNY:  No further questions, your Honor.

THE COURT:  Anything further?

RECROSS-EXAMINATION

BY MR. BEEVERS:

Q.   You used just one name informally, right?  Like for social purposes, you just use the name Velez without Gonzalez?

A.   Right.

Q.   But you use Gonzalez for official purposes?

A.   Yes, sir.

MR. BEEVERS:  That's all I have.

THE COURT:  Okay.  Thank you for being here.  You may step down.

THE WITNESS:  You're welcome.

THE COURT:  United States, call its next witness.

MS. LYDON:  United States calls Officer Roger Kleeb.

THE CLERK:  Raise your right hand for me, please.

(Whereupon the oath was administered.)

ROGER KLEEB

was called as a witness, and having been duly sworn, was examined and testified as follows:

THE WITNESS:  I do.

THE CLERK:  State your full name for us and spell your names.

THE WITNESS:  Roger Kleeb.  Spelled R-o-g-e-r, last name is K-l-e-e-b.

THE CLERK:  Thank you very much.

DIRECT EXAMINATION

BY MS. LYDON:

Q.   Good afternoon, Officer Kleeb.

A.   Good afternoon.

Q.   What do you do for a living?

A.   I'm a Customs and Border Protection officer.

Q.   How long have you been a Customs and Border Protection officer?

A.   Since 2007, so about 12 years.

Q.   And could you generally describe what your job responsibilities are.

A.   Sure.  We inspect all arriving international passengers, the cargo and the conveyances they come in, into the United States.

Q.   And do you have a -- where specifically do you work?

A.   So I work at Sacramento International Airport currently.

Q.   Okay.  Do you work at other locations in the region?

A.   So in Sacramento we cover Stockton, Travis Air Force Base, couple of -- Beale Air Force Base, so basically a lot of Northern California with the exception of the Bay Area.

Q.   Okay.  Have you worked at other locations as a CBP officer?

A.    I have.  I started at San Francisco International Airport. Then I transferred to Denver International Airport, and I did a 90-day TDY to Nogales, Arizona on the border.

Q.    Did you receive any professional training in connection with your job?

A.    Yes, ma'am.  Before I started, I did a four-month academy in Glynco, Georgia, and I've had multiple trainings on and off throughout the years.

Q.    Okay.  Are you familiar with the database and systems that CBP uses?

A.    Yes, ma'am.

Q.    Let's talk about the basic processes that CBP follows when a non-U.S. citizen enters the United States or exits the United States through an airport, okay?

A.    Okay.

Q.    When a non-U.S. citizen is entering the United States through say Sacramento International Airport, what do you do?

A.    So when we process the passenger, what we'll do is we will scan the passport.  Okay.  We'll verify the information on the passport make sure it matches the traveler.  A non-U.S. citizen, they're going to have either a visa or a green card, so we'll also verify that document.  And in the case of a non-U.S. citizen, we will generally take their fingerprints and their photograph when they enter the country.

Q.    Okay.  This is a pretty basic question, but what is a

visa?

A.   A visa is a document that you apply for in an overseas embassy or consulate before you come to the United States. Basically the officer there will review the information and see if they're going to grant you a visa if you're eligible to come to the United States.  So a visa basically is a document that allows you to travel to the United States.

Q.   Okay.  You said generally you would fingerprint and photograph the person.  What are the circumstances where you might not photograph and fingerprint a non-U.S. citizen entering the United States?

A.   Currently it is if they are under 14 years old or over 79 years old, we don't fingerprint or photograph them.

Q.   Okay.  Are the procedures different for United States citizens reentering the United States?

A.   Yes, ma'am, they are.

Q.   How so?

A.   Well, we'll still verify the passport, the document in front of the individual, but we will not fingerprint or photograph them.

Q.   And are processes different for exiting the country for both non-U.S. citizens and U.S. citizens?

A.   So CBP doesn't generally do outbound inspections of travelers that you might see in other countries.  So you don't go through a checkpoint when you leave the United States, only

when you come into the United States.

Q.   Okay.  You watch who is entering the United States and track that carefully, but you don't do checks for exiting; is that right?

A.   We don't do physical checks.  We'll still transmit the information.  They'll go into the database so we'll know who's leaving the country, but they won't directly necessarily see an officer.

Q.   That makes sense.

Okay.  And are processes different for land border ports of entry as for airports?  So now I'm asking when someone is entering the United States, does CBP process people differently depending on whether they're coming through an airport or coming through a land border?

A.   Well, that's kind of a little bit of a hard question for me to answer only because I only worked for a short period of time at the land border, and it was on outbound inspections. So most of all my experience is generally in the airport environment.

Q.   Okay.  Let's look at some CBP records of encounters.

Move to admit Government Exhibit 111 which is stipulated to.

        THE COURT:  Which is what?

        MS. LYDON:  A part of the stipulation between the parties.

THE COURT:  It's admitted.

(Government's Exhibit 111 was admitted into evidence.)

MS. LYDON:  Please publish 111.

Q.   Okay.  And this appears to be a document pertaining to a Ms. Maria Eva Velez; is that right?

A.   Yes, ma'am.

Q.   Do you recognize the form of this document?

A.   I do.

Q.   Can you tell what database or system it's from?

A.   This comes from the TECS database, the Treasury Enforcement Communications System.

Q.   And is that a database relied upon by CBP to do its business?

A.   Yes, ma'am.

Q.   All right.  Does this record reflect at least five trips taken by Maria Velez between the U.S. and Mexico?

A.   Yes, ma'am.  I see at least five trips on here.

Q.   All right.  And maybe we can blow this up a bit.  All right.  Could you just walk the jury through perhaps starting from the top one of those trips.

A.   Okay.  So the top is going to be the most recent trips, and the bottom is going to be the oldest trips.  What I see here, the first travel on top would be an inbound flight.  You zoomed in a little bit far, so I can't quite see where the locations are, where they're coming from.

Q.    Sorry.

A.    That's okay.  I can see it there.  So on December 30th of 2015, Ms. Maria Velez traveled into Houston International Airport from Bajio, Mexico.

Q.    And are you referring now to IAH as denoting the Houston International Airport and BJX to note Bajio?

A.    Yes, ma'am.  That is correct.

Q.    All right.  And does the line below it perhaps represent the other leg of that trip?

A.    Yes.  The line below that is the outbound trip on December 16th that was from LAX, which is Los Angeles International Airport, into BJX or Bajio, Mexico.

Q.    And can you tell from this record whether or not that airport in Mexico was her final destination or whether she went further?

A.    I wouldn't be able to tell you from this record.

Q.    And is that because TECS primarily tracks people entering and leaving the United States; it doesn't have records from whatever they may do beyond that crossing?

A.    We wouldn't have any internal records for what they do when they reach Mexico.  Only whatever they have in nexus to the United States, those are the records that we have access to.

Q.    And do the two lines below that trip, so lines 3 and 4, does that also appear to reflect a trip between the

United States and Mexico?

A.   Yes, ma'am.  To the same location in Mexico, outbound from Houston to Bajio, Mexico on January 9th of 2013 -- excuse me. That's an inbound trip.  They arrived in Houston, and they left from Bajio, Mexico.  Whereas, on December 24th of 2012, they left the United States from Houston and arrived in Bajio, Mexico.

Q.   And the two lines below that, could you explain what that seems to signify?

A.   Yes.  That would be another trip into the United States on January 5th of 2009.  Arrived at Houston, departed from Bajio, Mexico.  And then on December 18th of 2008, they left the United States from Houston and arrived in Bajio, Mexico.

Q.   And because of what you explained earlier about how it's in sort of reverse chronological order, we're getting the coming back leg on top; is that right?

A.   That's correct.  Yes, ma'am.

Q.   Okay.  So for both of these past two trips, it looks like she flew out of the U.S. in December and returned in January?

A.   Yes.

Q.   Okay.  And are there two additional trips in 2005 and 2003 respectively reflected on this document?

A.   Yes.  I do see those other two trips.

Q.   Okay.  There's a -- looks like an orphan trip 6/9/2000. Is it clear what that denotes?

A.   It's not officially clear on here.  What I see is this is an inbound flight from Mexico, Mexicana flight 146 on June 9th of 2000, but I'm not sure -- it's hard to tell if that trip actually happened from what I see here in front of me.

Q.   Okay.  And are you familiar with where BJX is?

A.   I know that it's in Leon, Mexico.

Q.   Okay.

     MS. LYDON:  Move to admit Government Exhibit 106 which is also part of the stipulation.

     THE COURT:  It's admitted.

     (Government's Exhibit 106 was admitted into evidence.)

     MS. LYDON:  Please publish.

Q.   And is Exhibit 106 a document from that same TECS database that CBP uses?

A.   Yes, ma'am.  That's correct.

Q.   And who does it pertain to?

A.   Hiram Velez.

Q.   Okay.  The first two lines again appear to -- or the first line appears to reflect a 2010 trip.  Could you walk the jury through what that line seems to represent.

A.   Yes, ma'am.  This is a flight on February 4th of 2010. This individual traveled from Bajio, Mexico into Houston International Airport.

Q.   Bajio, Mexico is in Leon, Mexico; is that right?

A.   Yes.  That's correct.  I believe the airport's called

Bajio, but it's actually in Leon.  I'm not a hundred percent on that, but it's the same location.

Q.   And there appears to be a one-week trip in 2005 reflected below that.  Is that another international trip from your reading of this document?

A.   Yes.  So I show that Mr. Velez departed the United States on November 23rd, 2005, from FAT, which is Fresno Airport in California and arrived in Guadalajara.  And then approximately seven days later on November 30th of 2005 he returned to the United States from Guadalajara, Mexico and arrived into Long Beach, California.

Q.   Okay.  And below it it appears that there is a 2003 trip. Could you just briefly go to that.

A.   Sure.  So on March 25th of 2003 Mr. Velez departs Guadalajara and arrived in BFL, I believe that's Buffalo.  I'm sorry.  I have to see where BFL is.  Oh, Meadows Field.  I'm not entirely sure where Meadows Field is to be honest with you. It's a port in the United States, I can tell you that, but I'm not sure where.

Q.   Okay.  And do the -- there could be conceivable international travel that might not be captured in TECS records, for example, crossing afoot or crossing through nonairports; is that right?

A.   So generally, when you enter the United States, there's always going to be a record of you arriving into the

United States.  However, when you leave the United States, if you're to drive a car across the border or to walk across the border, since there's no outbound inspections, your travel history may not show up in our database.

Q.   Okay.  Let's look at a different type of record or talk about a different type of record.  So both of the records we just looked at were for U.S. citizens, at least in part, traveling on United States passports; is that right?

A.   I didn't actually look at the passport number on there, so I'm not sure.

Q.   Okay.  I guess my question is do non-U.S. citizens need to get visas in order to enter the United States?

A.   Non-U.S. citizens do need to get visas into the United States.  They're either going to get paper visas from a consulate, or they can apply for a visa waiver program, which is electronic.  It depends on what country they're a citizen of.

Q.   Okay.  When visa applicants from Mexico apply for a visa to the United States, are they fingerprinted and photographed?

A.   Yes, ma'am, they are.

Q.   And are those fingerprints and photographs stored in a United States Government database?

A.   Yes, ma'am.

Q.   Do you recall the name of that database?

A.    U.S. Visit.

Q.    Is U.S. Visit relied upon by the Department of Homeland Security in the normal course of its business?

A.    Yes, ma'am.

Q.    And is it maintained by the Department of Homeland Security?

A.    Yes, ma'am.

Q.    Are records in U.S. Visit made at or near the time of the occurrence reflected in the records?

A.    Yes, ma'am.

Q.    Are the records kept in the course of a regularly conducted activity at the Department of Homeland Security?

A.    Yes, ma'am.

Q.    And is it a regular practice of the Department of Homeland Security to make and maintain the records which are kept in the U.S. Visit?

A.    Yes, ma'am.

        MS. LYDON:  Move to admit Government Exhibit 113.

        MR. BEEVERS:  No objection.

        THE COURT:  It's admitted.

        (Government's Exhibit 113 was admitted into evidence.)

        MS. LYDON:  Please publish.

Q.    And what is the document in front of you?

A.    So what I see here is a fingerprint -- excuse me -- a photograph of this individual that was taken at the consulate

in Mexico City on May 22nd of 2002.  I also know she was fingerprinted because just below the picture you will see a FIN number which is a fingerprint identification number.

Q.   Okay.  Let's flip to the second page and go through that one as an example.  All right.  Expand that, please.

Okay.  So in flipping through, did you see a number of different photographs and blurbs sort of appearing to pertain to the woman in this photograph?

A.   Yes, ma'am.

Q.   Are individuals photographed and fingerprinted each time they apply for a visa to the United States from Mexico?

A.   Yes, ma'am.  That's correct.

Q.   And does it appear that this Government Exhibit 113 reflects a number of different visa applications made by Antonia Lerma Valderrama?

A.   Yes, ma'am, it does.

Q.   Okay.  You mentioned that she was fingerprinted and referenced an FIN number.  Is that the number that you were referring to?

A.   Yes, ma'am.  That's correct.

Q.   Are FIN numbers constant?

A.   Yes.  They are unique to an individual.

Q.   Okay.  So if someone applies for a visa multiple times and is fingerprinted over and over, does the Department of Homeland Security have the capability to recognize that fingerprint and

link up those visa applications?

A.   Yes, ma'am, they do.

Q.   And do they store them then in U.S. Visit?

A.   That's correct.

Q.   Okay.  So what visa application -- approximately when does it appear that Ms. Antonia Lerma applied for the visa -- Ms. Antonia Valderrama applied for the visa that we're looking at now?

A.   March 25th, 2008.

Q.   And can you tell that because she was fingerprinted on that date?

A.   Yes, ma'am.  That's correct.

Q.   There's a site code to the right of the date "GDL."  Do you know what that denotes?

A.   Yes, ma'am.  That is Guadalajara, Mexico.

Q.   The FIN number you mentioned stays the same, but there are different photographs on the different pages of this document?

A.   That's correct.

Q.   Is a person photographed every time they apply for a visa?

A.   Yes, ma'am.

Q.   And you mentioned that there are age constraints for -- that are used by the Department of Homeland Security and CBP in determining whether to fingerprint and photograph someone each

and every time they enter the United States.  Regardless of age, are they fingerprinted and photographed every time they apply for a visa?

A.   Yes, ma'am.

Q.   And can you tell what Ms. Antonia Lerma Valderrama's date of birth is based on this document?

A.   I show March 10th of 1929.

Q.   So in 2008, would she have been right on the cusp of that age cutoff?

A.   Yes, very close to it.

Q.   Can you tell her nationality and citizenship from this document?

A.   I can tell that she is a citizen of Mexico and a national of Mexico.

Q.   And can you tell what travel document she used or the document number of the travel document?

A.   Yes.  She presented a Mexican passport, and the number is also listed here under "Document ID."

Q.   I'm circling the Document ID.  Is that the number you're referring to?

A.   Yes, ma'am.  That's correct.

Q.   If we could zoom out.  Do those photographs appear to be of the same person?

A.   Yes, ma'am.

Q.   Could we turn to the third page, please.  And does the

woman depicted in this photograph appear to be the same person?

A.    Yes, ma'am.

Q.    Does the third page show she also applied for a visa in 2004?

A.    That's correct.

Q.    And then going back to the first page, there's a fourth photo, and it appears to be the same person?

A.    Yes, ma'am.

Q.    It reflects she applied for a visa in 2002?

A.    Yes, ma'am.  That's correct.

THE COURT:  While you're looking, let's take our afternoon break at this time.  During the break, please don't discuss the case among yourselves.  Don't discuss the case with anyone.  Don't do any independent investigation or research.  And please report any violation of these admonitions to the Court.  See you in about 15 minutes.

(Recess taken 2:56 p.m. to 3:16 p.m.)

THE COURT:  Okay.  Bring in the jury.

(Jury seated.)

THE COURT:  All jurors present.  All parties present.

Ms. Lydon, you may continue your examination.

MS. LYDON:  Thank you, your Honor.

Q.    Could we pop up Government Exhibit 113, page 2, one more time and zoom in on the bottom box there.  Thank you.

I just wanted to focus back in on this document ID. You testified earlier that you interpreted that to be a Mexican passport; is that right?

A. Yes, ma'am. That's correct.

Q. And the number appears to be 08110024261; is that correct?

A. Yes, ma'am. That's what I see.

MS. LYDON: Okay. Move to admit Government 112 which is part of the stipulation.

THE COURT: It's admitted.

MR. BEEVERS: No objection.

(Government's Exhibit 112 was admitted into evidence.)

MS. LYDON: Did you say no objection?

MR. BEEVERS: No objection.

MS. LYDON: Thank you.

Q. Could we look at page 2 of this document. And does this appear to be one of those TECS records we looked at earlier for an Antonia Lerma Valderrama?

A. Yes, ma'am. That's correct.

Q. And does that number that I've just circled in the column marked or titled "Document Number" pertaining to row 3, does that appear to be the same Mexican passport number that was used when Ms. Antonia Lerma Valderrama obtained the visa?

A. Yes, ma'am. It appears to be the same.

Q. And looking at other numbers on this document, indeed all

five numbers below line 3, does it appear that that same Mexican passport was used, although there are fewer numbers listed on the document itself?

A.    Yes, ma'am.  I believe it to be the same passport.

Q.    And could you explain how that might have happened.

A.    So occasionally on the older Mexican passports, in my experience, the "08" denotes the year they were issued.  And occasionally when it's transmitted, it drops the "08" off the records.  So you'll see that the one, two, three of the records are the same number but don't have a 08.  And on the third record from the bottom you do see a "08" on the front, but they dropped off a couple of numbers on the end.  That could be a transmission error.  But it appears to be the same passport number in all cases.

Q.    Okay.  And let's talk about some of the travel that it looks like is reflected for Ms. Lerma Valderrama.  Does it appear that the top two lines reflect a 2014 trip between Houston International Airport and Leon?

A.    That's correct.  It appears she enters on July 8th of 2014 and then departs on July 26th of 2014.

Q.    And for her, the arrivals and departures are going the opposite direction as the two records we looked at earlier in that Antonia Lerma Valderrama was going from Mexico to the United States and back to Mexico; is that right?

A.    Yes, that's correct.

Q.   Okay.  And the records 3 and 4 in the chart, does that seem to reflect a 2013 trip between the United States and Mexico?

A.   Yes ma'am.  Arriving in Chicago on July 7th, 2013, and departing on July 26th of 2013.

Q.   All right.  And it looks like she went through different airports in the United States; is that correct?

A.   Yes.  That's correct.  That most recent trip, it was she entered in Chicago and she departed from San Antonio, Texas.

Q.   Okay.  And then on the fifth line, that type of trip appears to be pedestrian.  What does that mean?

A.   Pedestrian means she would have walked across the land border in this particular case.  It's site code L236 which corresponds -- there should be a legend on the bottom.  I can't see it on here.  But that is a land border crossing.

Q.   Okay.  Could we flip over.  So that site is L236 you said?

A.   That's correct, yes.

Q.   If we could flip over to the second page of this document or the third page of this document.  On the second graph, the second line down, does "L236" appear to correspond to Laredo?

A.   Yes.  Laredo, Texas, that's correct.

Q.   And is that a port of entry?

A.   Yes, ma'am, it is.

Q.   Okay.  Could we flip back to the second page, please.  And

let's look at the chart one more time.  And could you walk the jury through those last two lines and the trip that that appears to represent.

A.    Okay.  So on July 22nd of 2008 Ms. Valderrama entered the United States in Chicago, and then she then departed the United States on August 11th of 2008.

Q.    Okay.  Through Atlanta, is that correct?

A.    The departure was through Atlanta, that's correct, yes.

Q.    And again for these records you can't tell what happens after the person enters the United States or departs the United States.  It just recounts the crossing; is that right?

A.    Yes.  I couldn't see internal travel, if that's what you're asking.

Q.    Okay.  One moment.

      Thank you, Officer Kleeb.  That's all I have for now.

            MR. BEEVERS:  No questions, your Honor.

            THE COURT:  Thank you for being here.  You may step down.

            THE WITNESS:  Thank you.

            THE COURT:  You may call your next witness.

            MS. LYDON:  The United States calls Special Agent Hung.

            (Whereupon the oath was administered.)

                        WEI HUNG

was called as a witness, and having been duly sworn, was

examined and testified as follows:

THE WITNESS:  I do.

THE CLERK:  State your full name and spell your names, please.

THE WITNESS:  First name is Wei, W-e-i.  Middle name is Cyrus, C-y-r-u-s.  Last name is Hung, H-u-n-g.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MS. LYDON:

Q.   Good afternoon, Special Agent Hung.

A.   Good afternoon.

Q.   What do you do for a living?

A.   I am a special agent with the U.S. Department of State Diplomatic Security Service.

Q.   How long have you held that position?

A.   I've been in the position since 2015.

Q.   What did you do before that?

A.   Prior to 2015 I was an active duty U.S. Army officer.

Q.   Okay.  Could you generally describe your job responsibilities with the Diplomatic Security Service.

A.   Sure.  I -- as a special agent, I conduct criminal investigations into passport and visa fraud and other programs run by the State Department.  At the same time, we also have a security and protective duty to U.S. personnel overseas, so our U.S. embassies, our U.S. diplomatic missions.

Q.   Okay.  Have you received training on investigating passport fraud and other offenses?

A.   I have.

Q.   Could you describe it.

A.   Yes.  We do a criminal investigator training program in Glynco, Georgia at the Federal Law Enforcement Training Center.  That training is approximately four months worth of training in Georgia.  Following that training, I did three to four months in the State Department's training facility in Winchester, Virginia.

Q.   Okay.  And what was your role in the investigation which led to this case?

A.   I was the primary case agent.

Q.   Did other agents with DSS work on it as well?

A.   They did.

Q.   Let's talk about how the investigation began.  What information led DSS to begin investigating the defendant?

        MR. BEEVERS:  Objection, your Honor.  Relevance.

        THE COURT:  Sustained.

Q.   BY MS. LYDON:  What information --

        THE COURT:  Why he began the investigation isn't relevant.  What he did in the investigation is relevant, so...

BY MS. LYDON:

Q.   What did you do first in the investigation?

A.   This investigation came to our attention due to a --

MR. BEEVERS:  Objection, your Honor.  Nonresponsive.

THE COURT:  Sustained.  What did you do first?

THE WITNESS:  We received a report.

BY MS. LYDON:

Q.   Let me try again.

A.   Yep.

Q.   Did you begin to look at fraud indicators in a 2009 passport application?

A.   We did.

Q.   What fraud indicators did you look at?

MR. BEEVERS:  Objection, your Honor.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  A death report match was flagged for fraud for a 2009 passport application.

BY MS. LYDON:

Q.   What is a -- did you say a death match?

A.   That's correct.

Q.   What is a death match?

A.   A death match is a database that retains all of the social security numbers in which a person has been reported deceased.

Q.   Okay.  Is it basically a list of dead people's social securities numbers?

A.   That's correct.

Q.   Which government agency maintains the death match file?

A.   The Social Security Administration.

Q.   Okay.  And what is a social security number?

A.   A social security number is Social Security Administration's unique number that they assign to an individual in order to pay social security taxes and at the same time, when they retire, receive social security benefits.

Q.   Is it used for a variety of government functions?

A.   It is.  It is used as a unique ID for an individual.

Q.   Okay.  Is it currently the Department of State's practice to check the death match file whenever someone applies for a passport?

A.   It is.

Q.   And is it currently Social Security's practice -- or sorry, the Department of State's practice to confirm that the social security number is legitimate?

A.   Yes, it is.

Q.   Was there an audit conducted in 2013?

A.   There was.

Q.   And what did that audit discover about --

        MR. BEEVERS:  Objection, your Honor.  Hearsay.

        MS. LYDON:  Well, I'll ask --

        THE COURT:  Sustained.  It is.

        MS. LYDON:  -- a further-along question.

        Move to admit Government Exhibit 101 which is part of

the stipulation.

MR. BEEVERS:  No objection.

THE COURT:  101 is admitted.

(Government's Exhibit 101 was admitted into evidence.)

BY MS. LYDON:

Q.   Do you recognize this document?

A.   I do.

Q.   What is it?

A.   This is the 2009 passport renewal application that was brought to our -- that was investigated by myself.

Q.   Okay.  And when did you first start working on this case approximately?

MR. BEEVERS:  Objection, your Honor.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I started -- I joined this case in approximately 2015 or 2016.

BY MS. LYDON:

Q.   Okay.  Had other agents done some work before that?

A.   That's correct.  The previous agent started working this case in 2013.

Q.   Okay.  So is this the passport application which started the investigation?

A.   It is.

Q.   All right.  On what date did -- was this passport application signed?

A.   It appears the passport application was signed on March 11th, 2009.

Q.   And can you tell whether it was submitted?

A.   Yes.   This is on a State Department Form DS-82 which is an application for U.S. passport by mail.

Q.   Okay.   Approximately when was it submitted?

A.   It appears that it was processed in June -- on June 29th, 2009.

Q.   Okay.   There's a photo affixed to the application.   Who is the person in the photo?

A.   It appears to depict the defendant.

Q.   What did the person who applied for this passport state his social security number was?

A.   It appears to be 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.

Q.   Did you determine whether the person assigned that social security number was alive or dead in 2009?

        MR. BEEVERS:   Objection, your Honor.   Hearsay.

        THE COURT:   Sustained.

BY MS. LYDON:

Q.   What did the person who filled out this application state his name was?

A.   Hiram Enrique Velez.

Q.   And what did he state his birthday was?

A.   September 16, 1956.

Q.   And where did he claim he was born?

A.    In Mayaguez, Puerto Rico.

Q.    Was a passport issued in response to this application?

A.    It was.

Q.    Did the Department of State conduct an investigation into the identity that this passport application was submitted in?

A.    We did.

Q.    Okay.  And did the Department of State obtain official documents in connection with that investigation?

A.    We did.

Q.    Let's talk about some of those documents.

      Move to admit Government Exhibit 401 which is part of the stipulation.

          THE COURT:  401 is admitted.

          (Government's Exhibit 401 was admitted into evidence.)

BY MS. LYDON:

Q.    Do you recognize this document?

A.    I do.

Q.    What is it?

A.    This is a birth certificate from Puerto Rico.

Q.    Okay.  Who is it for?

A.    This birth certificate is for Hiram Velez.

Q.    Okay.  Could we take a look at 401-T or move to admit 401-T which the parties stipulated is a translation of this birth certificate.

          THE COURT:  It's admitted.

(Government's Exhibit 401-T was admitted into evidence.)

BY MS. LYDON:

Q.   And do you recognize this document?

A.   I do.

Q.   Could we move to the second page or the third page of this document, please, and blow it up.  Whose birth certificate is this?

A.   It's the birth certificate of Hiram Enrique Velez.

MR. BEEVERS:  Objection, your Honor.

THE COURT:  Well, that's the name on the certificate. It speaks for itself.  It's admitted.

BY MS. LYDON:

Q.   And where does the birth certificate indicate that Mr. Velez was born?

A.   In Mayaguez, Puerto Rico.

Q.   Who is his mother?

MR. BEEVERS:  Objection, your Honor.  The document speaks for itself.

THE COURT:  It does.  He doesn't have to read the document.  You can point it out, if you want, Ms. Lydon.

BY MS. LYDON:

Q.   Does this document indicate that his mother was Carmen Lillian Seda?

A.   It does.

Q.   And does the birth certificate indicate the date on which he was born?

A.   It does.  It says September 16, 1956.

MS. LYDON:  Thank you.  You can take that down.

Government moves into evidence Government Exhibit 404, part of the stipulation.

THE COURT:  404?

MS. LYDON:  Yes.

THE COURT:  It's admitted.

(Government's Exhibit 404 was admitted into evidence.)

BY MS. LYDON:

Q.   Could we take a look at this document.  Do you recognize this document?

A.   I do.

Q.   What is it?

A.   It is a death certificate from Puerto Rico.

Q.   And whose death certificate is it?

A.   The death certificate belongs to Hiram Enrique Velez.

MR. BEEVERS:  Objection, your Honor.  The document speaks for itself.

THE COURT:  We recognize that.  The objection is overruled.  That's the name on the certificate.

BY MS. LYDON:

Q.   Does this death certificate reflect that the subject of the death certificate, Hiram E. Velez, passed away in

Puerto Rico in Mayaguez?

A.    It does.

Q.    Does it reflect that his date of birth was September 16, 1956?

A.    It does.

Q.    And does it reflect that he died on September 20th, 1997?

A.    It does.

Q.    Does it reflect -- well, first, have you also reviewed a translation of this birth certificate?

A.    I have.

        MS. LYDON:  And we don't need to look at it, but I'll move it into evidence, Government Exhibit 404-T.

        THE COURT:  It's admitted.

        (Government's Exhibit 404-T was admitted into evidence.)

        MS. LYDON:  Thank you.

Q.    Does this death certificate indicate that Mr. Hiram Velez passed away from a heart attack due to the operation of opiates?

A.    It does.

Q.    You can take that down.

        Did DSS investigate the history of passports being applied for and issued in the identity of Hiram Velez?

A.    We did.

Q.   Did you find any passport applications which appeared to have been submitted by the real Hiram Velez?

A.   We did not.

Q.   Did you find a history dating back decades of the defendant applying for passports in the identity of Hiram Velez?

A.   We did.

MS. LYDON:  Okay.  Move to admit Government Exhibit 105, please.

THE COURT:  Admitted.

(Government's Exhibit 105 was admitted into evidence.)

BY MS. LYDON:

Q.   Do you recognize this document?

A.   I do.

Q.   What is it?

A.   This is the 2009 passport application of the defendant.

Q.   And do you recognize the person depicted in this photograph?

A.   I do.

Q.   Does it appear to be a younger version of the defendant sitting in this courtroom today?

A.   It is.

MR. BEEVERS:  Objection, your Honor.  Foundation for how he knows that.

THE COURT:  Sustained.

BY MS. LYDON:

Q.    Have you met the defendant before today?

A.    I have.

Q.    Are you familiar with how he looks?

A.    I am.

Q.    Have you had an opportunity to observe him up close?

A.    I have.

Q.    Have you had an opportunity to interact with him multiple times?

A.    I have.

Q.    Does it appear that the person in this photograph in Government Exhibit 105 is a younger version of the defendant?

A.    It does.

Q.    On what date was this passport application submitted?

A.    August 28th.

Q.    Okay.  August 28 of what year?

A.    I believe it's 2009.

Q.    Was this passport application approved?

A.    It was.

Q.    So the passport was issued by the Department of State in response to this application?

A.    It was.

Q.    And did the person who submitted this passport application claim his name was Hiram Enrique Velez?

A.    It did.  They did, yes.

Q.   Did he claim he was born in Mayaguez, Puerto Rico?

A.   He did.

Q.   And did he claim his date of birth was September 16, 1956?

A.   He did.

Q.   An did he state a social security number?

A.   He did.

Q.   Is that the social security number belonging to the Hiram Velez who passed away in Puerto Rico in 1997?

A.   It is.

        MS. LYDON:  Move to admit Government Exhibit 102.

        THE COURT:  Admitted.

        (Government's Exhibit 102 was admitted into evidence.)

BY MS. LYDON:

Q.   Oh, I think I misspoke in a prior question.  Is this passport application we're looking at now, Government Exhibit 105, was it submitted in 1992?

A.   It is.

Q.   Okay.

A.   Sorry, yeah.

Q.   It's not the best photocopy of it, but is this a certified version of the document?

A.   It is.

        MS. LYDON:  All right.  Could we look at -- or move to admit Government Exhibit 102, please.

THE COURT: Admitted.

MS. LYDON: Could we publish.

Q. Do you recognize this document?

A. I do.

Q. What is it?

A. It is a passport application from 1999.

Q. Do you recognize the person depicted in this photograph?

A. I do.

Q. Does it appear to be a version of the defendant?

A. Yes.

Q. From earlier years?

A. Yes.

Q. Did the person who submitted this passport application claim his name was Hiram Enrique Velez?

A. He did.

Q. Did he claim he was born in Mayaguez, Puerto Rico?

A. He did.

Q. Did he claim his date of birth was September 16, 1956?

A. He did.

Q. And did he claim that the social security number was the one ending in 9302?

A. Sorry?

Q. Did he claim his social security number ended in 9302?

A. He did.

Q. Was this passport application that we're looking at now,

Government 102, approved by the State Department?

A.   It was.

Q.   Did you find evidence that the defendant traveled on the passports he applied for in the Velez identity?

A.   I did.

Q.   And where did he go?

A.   He went to Leon, Mexico.

Q.   Repeatedly?

A.   Multiple times, yes.

Q.   Once you determined that the defendant had applied for passports in the identity of a dead person, did you take steps to figure out who the defendant really was?

A.   I did.

Q.   And as part of that investigation, did you visit his house?

A.   I did.

Q.   What is the defendant's residence address?

A.   He lives at -- he lived at 38 De Fer.  De Fer is two separate words, D-e space F-e-r.

Q.   All right.  What town is that in?

A.   That's in Sacramento, California.

Q.   All right.  Who did you encounter at the house?

A.   I encountered the defendant and his wife Maria Eva Velez.

Q.   All right.  Did you ask him if he had any

identification?

A.    I did.

Q.    And did he present any identification in response?

A.    Yes.  He presented a U.S. passport card and a U.S. passport book.

Q.    All right.  Did he also present a California driver's license?

A.    I don't recall.

Q.    Not a driver's license, an identification card.

A.    I believe so, yes.

Q.    Okay.  One moment.  Did you show the defendant any photographs while you were at his house?

A.    I did.

Q.    Please publish Government Exhibit 406 which was previously admitted.

       Do you recognize Government Exhibit 406?

A.    I do.

Q.    Who created it?

A.    I created this photo lineup.

Q.    And is it what you showed the defendant at his house?

A.    It is.

Q.    What did you ask him, and what did he do in response?

A.    I showed the defendant these pictures.  I inquired whether he recognized any of the individuals depicted.  He stated he did not.

MS. LYDON:  We're moving faster than we expected, so I didn't expect to use physical evidence this quickly. Permission to approach?

THE COURT:  You may.

BY MS. LYDON:

Q.   I'm showing you what's been marked Government Exhibit 108. Do you recognize that?

A.   I do.

Q.   What is it?

A.   This is the U.S. passport book that was presented to me during the interview.

Q.   By who?

A.   By the defendant.

Q.   And could you describe who is depicted in that passport that you're holding now?

A.   The defendant.

Q.   Okay.  And what did you do with it?

A.   I'm sorry?

Q.   Did you confiscate the passport?

A.   I did.

Q.   Did you also confiscate the passport card that he presented?

A.   I did.

Q.   You can just set that aside but keep it on the witness stand.

THE COURT:  Do you want to move that into evidence?

MS. LYDON:  Yes, your Honor.  Thank you.

MR. BEEVERS:  No objection.

THE COURT:  It's admitted.

(Government's Exhibit 108 was admitted into evidence.)

BY MS. LYDON:

Q.  So you had this person, the defendant, living in the identity of a Puerto Rican citizen; is that right?

A.  That's correct.

Q.  Did you then investigate to determine his true identity?

A.  I did.

Q.  And did you obtain immigration files associated with him?

A.  I did.

Q.  Which files did you obtain?

A.  I obtained A-files related to his wife and children.

Q.  What are A-files?

A.  A-files are alien files maintained by the Department of Homeland Security and the U.S. Citizen and Immigration Services.

Q.  And what types of documents are in an A-file?

A.  An A-file consists of all the interactions and records that the U.S. Government has of interactions or immigration benefits or applications for an alien.

Q.  Okay.  Did you obtain A-files for his wife Maria Velez,

59

formerly Maria Manriquez?

A.   I did.

MS. LYDON:  Okay.  Move to admit Government Exhibit 303.

THE COURT:  Stipulated?

MR. BEEVERS:  I think so.  Is that stipulated?

MS. LYDON:  I believe so.

THE COURT:  It's admitted.  Go ahead.

(Government's Exhibit 303 was admitted into evidence.)

BY MS. LYDON:

Q.   What is Government Exhibit 303?

A.   It's an application to adjust status or register for current residency for Maria Eva Velez.

Q.   Is this basically Maria Eva Velez's application to become a legal permanent resident?

A.   Yes, it is.

Q.   Is another word for a legal permanent resident a green card holder?

A.   It is.

Q.   Okay.  Could we look at page 27 of this document.  And can you tell, based on this document, who applied for Maria Velez to have status in the United States?

A.   Yes.  So this is a petition application or petition I-130.  It's an immigration -- immigrant petition for a relative.  It needs to be filed by a petitioner.  This was filed by Hiram

Enrique Velez for beneficiary of Eva Manriquez Velez.

Q.   And is the basis for the status sought that she is the relative of a United States citizen?

A.   Yes.  Based on this, I can see that it's class CR-1 which means that it is either the wife or fiancee.  Sorry, it's the wife of a U.S. citizen.

Q.   Okay.  Could we go back to the first page of this document.  And does it appear that Maria Eva Velez's legal permanent resident application was received by the United States Government on November 9th, 1995?

A.   It appears so, yes.

Q.   Okay.  And can you tell from the stamp approximately the month and year it was approved?

A.   It appears it was approved on July 16, 1996.

Q.   So after that date she was a green card holder?

A.   Yes.  That's correct.

Q.   All right.  Could we look at page 2 of that document.  Does it -- does page 2 include various biographical pieces of information regarding Ms. Velez?

A.   I believe I see where she was born.

Q.   Okay.

A.   And then her mother and father's name.

Q.   And can you tell -- does she indicate how she entered the United States?

A.   It does.

Q.   What does it indicate?

A.   It says "EWI" which is short for entry without inspection.

Q.   So she entered the United States illegally essentially?

A.   Yes.

Q.   Okay.  And does it list various family members?

A.   It does.

Q.   Does she state that her husband is Hiram Velez and that he is a United States citizen -- or sorry, that he was -- his country of birth is the United States?

A.   Yes.

Q.   Does she provide his date of birth as September 16, 1956?

A.   It does.

Q.   And does she list four children?

A.   Yes, four children.

Q.   Does she list Blanca Araujo, her daughter, born in Mexico?

A.   Yes.

Q.   Does she list Gustavo Araujo born in the United States?

A.   Yes.

Q.   Does she list Mario Araujo, her son, born in Mexico?

A.   Yes.

Q.   And does she list Raquel Velez, her daughter, born in the United States?

A.    Yes.

Q.    Did she submit backup documentation to support her legal permanent residency application?

A.    She did.

Q.    Could we look at page 24 of this document, please.  In the top section of this document she lists her name as Maria Eva Velez; do you see that?

A.    I do.

Q.    And below it she lists other names used including Eva Manriquez Velez and Maria Manriquez; is that right?

A.    Yes.

Q.    And she also provides her husband's name as Hiram Velez; do you see that?

A.    I do.

Q.    Again, she provides birth date 9/16/56, right?

A.    Yes.

Q.    Country of origin, Mayaguez, Puerto Rico?

A.    Yes.

Q.    And date of marriage she states is August 25th, 1992, in Los Angeles; do you see that?

A.    I do.

Q.    All right.  There's a box below that section that we just discussed entitled former husbands or wives, and she indicated "N/A"; do you see that?

A.    I do.

Q.   Is that short for not applicable?

A.   It is.

Q.   Could we look at page 32 of this document.  Do you recognize page 32 of Maria Eva Velez's naturalization application as being the birth certificate of Hiram Velez?

A.   I recognize it as a birth certificate for Hiram Velez from Puerto Rico, yes.

Q.   Could we take a look at page 33 of this document.  All right.  Do you recognize this document?

A.   I do.

Q.   What is it?

A.   This was found inside Maria's A-file submitted as supporting documentation.  It is a certificate from the County of Los Angeles for a licensed certificate of confidential marriage.

Q.   And does it reflect that Hiram Enrique Velez married Maria Eva Manriquez in Los Angeles on or about August 25th, 1992?

A.   It does.

Q.   Does it state the state in which Hiram Velez purported to be born?

A.   It says that he was born in Puerto Rico.

Q.   Is there a section on this document where both parties to the marriage would list how their last marriage ended?

A.   There is.

Q.   Did either of them indicate any prior marriages?

A.    Neither indicated they were previously married.

Q.    You can zoom out of that.

      Could we take a look at -- move to admit Government Exhibit 304, part of the stipulation.

          THE COURT:  304 is admitted.

          (Government's Exhibit 304 was admitted into evidence.)

          MS. LYDON:  And publish, please.

Q.    Do you recognize Government Exhibit 304?

A.    I do.

Q.    What is it?

A.    This is an Application for Naturalization for Maria Eva Velez.

Q.    Is this basically Maria Eva Velez's application to become a citizen of the United States after being a permanent legal resident for some time?

A.    It is.

Q.    Okay.  Could we look at page 4 of this document.  Did Ms. Velez provide information about her marital history to support her citizenship application?

A.    She did.

Q.    Did she state that her husband's name was Hiram Enrique Velez?

A.    She did.

Q.    That he was born on September 16, 1956?

A.    Yes.

Q.   That the date of their marriage was August 25th, 1992?

A.   Yes.

Q.   Did she provide her spouse's social security number as one ending in 9302?

A.   Yes.

Q.   There are check marks on this page.  Are you familiar with how USCIS, the U.S. Citizenship and Immigration Service interviews for naturalization?

A.   Somewhat, yes.

Q.   When a check mark is reflected on a naturalization application, does that mean that the question was asked in the naturalization interview, and the interviewer confirmed the answer?

MR. BEEVERS:  Objection.  Foundation.

THE COURT:  Overruled.  Go ahead.

THE WITNESS:  Yes.  That's correct.

BY MS. LYDON:

Q.   Besides question A, which reads how many times have you been married including annulled marriages, there is "1" indicated; do you see that?

A.   Yes.

Q.   Does that denote that Maria Eva Velez responded she only had been married one time?

A.   That's correct.

Q.   And there's a check mark there?

66

A.   Yes.

Q.   Could we look at page 5 of this document.  Question G asks how many times has your current spouse been married including annulled marriages, and Maria Eva Velez responded one; is that correct?

A.   Yes.

Q.   And question C inquires, is your spouse a U.S. citizen, to which she responded yes, correct?

A.   Yes.

Q.   Question D asks, when did your spouse become a U.S. citizen, to which she responded at birth; is that right?

A.   That's correct.

Q.   Okay.  Could we look at page 2 of that -- excuse me -- page 8 of this document.  Question 22D inquires whether Maria Eva Velez has ever been married to more than one person at the same time.  What was her answer?

A.   She answered no.

Q.   And does that have a check mark indicating that it was asked and answered?

A.   Yes.

Q.   Could we take a look -- well, move to admit Government Exhibit 306, part of the stipulation.

THE COURT:  306 is admitted.

MS. LYDON:  Please publish.

(Government's Exhibit 306 was admitted into evidence.)

BY MS. LYDON:

Q.   What is Government Exhibit 306?

A.   This is the naturalization certificate for Maria Eva Velez.

Q.   And does it reflect that she naturalized as a United States citizen on November 1st, 2012?

A.   It does.

Q.   You can take that down.  Did you also obtain and review the A-file of Blanca Araujo?

A.   I did.

        MS. LYDON:  All right.  Move to admit Government Exhibit 310, part of the stipulation.

        THE COURT:  It's admitted.

        (Government's Exhibit 310 was admitted into evidence.)

        MS. LYDON:  Please publish.

Q.   What is Government Exhibit 310?

A.   This is part of an A-file for Blanca Araujo.  This specific form is the Petition for Alien Relative.

Q.   Okay.  And this form was not in Maria Eva Velez's A-file; is that right?

A.   That's correct.  This is specific to Blanca Araujo's A-file.

Q.   But there was no version of this form contained in Maria's A-file; is that right?

A.   That's right.

Q.   But we know from the documents we looked at in Maria Eva Velez's A-file that a petition was submitted for her by Hiram Velez; is that true?

A.   Yes.

Q.   Okay.  So going back to this document which was found in Blanca's A-file, who submitted this form?

A.   It was submitted by a Hiram Enrique Velez.

Q.   And looking at section A, relationship, did the defendant state that Blanca Alicia Araujo was his child?

A.   He did.

Q.   Did it indicate or did it ask are you related by adoption?

A.   It did.

Q.   And what was his response?

A.   That response was no.

Q.   Column B includes information about you.  Did the person who filled out this form state that his name was Hiram Enrique Velez?

A.   Yes.

Q.   And that he was born in Mayaguez on September 16, 1956?

A.   That's correct.

Q.   Did he claim that he also used the name Hiram Enrique Velez Seda?

A.   He did.

Q.   And there's a spot for social security number.  It's

zoomed out at the moment, but do you recall whether he provided the real Hiram Enrique Velez's social security number?

A.   He did.

Q.   Okay.  There's information about your alien relative in column C.  Does the information the defendant provided about Blanca Alicia Araujo appear to be accurate?

A.   Yes.

Q.   And did Hiram Enrique Velez indicate how he obtained his purported United States citizenship on this form?

A.   It says he stated that he was born in the U.S.

Q.   Okay.  Let's look at page 2 of this document, please.  And question D1, he indicates that he's also filing a petition for Mario Araujo; is that right?

A.   Yes.

Q.   And that he had filed a petition for Maria Eva Velez previously?

A.   Yes.

Q.   And did the defendant certify under penalty of perjury that everything he'd said in this application was true or this petition was true and correct?

A.   Yes.

Q.   Do you recognize the signature?

A.   I do.

        MR. BEEVERS:  Objection, your Honor.  Foundation.

        THE COURT:  I'm not sure what signature.

MR. BEEVERS:  For the signature.

THE COURT:  No, no.  Which signature?

BY MS. LYDON:

Q.   Do you recognize the signature of Enrique E. Velez?

A.   I do.

MR. BEEVERS:  Objection, your Honor.  Move to strike.
Foundation.

THE COURT:  You need to lay a foundation.  Jury will
disregard.

If you can lay a foundation, he can testify.

BY MS. LYDON:

Q.   At the time when you reviewed the A-files, the A-files
that we're looking at, had you also reviewed the passport
applications that we looked at previously in this
examination?

A.   I did.

Q.   Did the signatures appear to be the same?

MR. BEEVERS:  Objection, your Honor.  Improper
foundation.

THE COURT:  Which signatures?

BY MS. LYDON:

Q.   The question is:  Are the signatures on the passport
applications, the three passport applications admitted into
evidence, the same in his view as the signature which appears
on this petition for alien relative?

MR. BEEVERS:  Objection, your Honor.  Unnoticed expert testimony.

THE COURT:  Sustained.  He's not a handwriting expert.  The jury can look at the signatures and make that decision as well.

MS. LYDON:  All right.

THE COURT:  Since we're moving so quickly, as soon as you finish with this document, we can break for the day.

MS. LYDON:  All right.  I just have a couple more questions on this document.

THE COURT:  Okay.

BY MS. LYDON:

Q.    Did Blanca Araujo submit backup materials or were backup materials submitted in connection with this application?

A.    Yes.

Q.    Could we look at page 4 of this document, please.  Does page 4 appear to be another copy of the license and certificate of confidential marriage purporting to reflect a marriage between Hiram Velez and Maria Eva Manriquez in Los Angeles in 1992?

A.    That's correct.

Q.    Could we take a look at page 8 of this document.  Was page 8 submitted in support of Blanca Alicia Araujo Manriquez's application for status in the United States?

A.    It was.

Q.   And does it appear to be a translation of a birth certificate reflecting that Blanca Alicia Araujo Manriquez was born in Leon Guanajuato, Mexico?

A.   It does.

Q.   Was she born, according to this document, on November 12th, 1982?

A.   It does.

Q.   To Ma. Eva Manriquez Guerrero?

A.   Yes.

Q.   And to Gustavo Araujo Lerma?

A.   Yes.

Q.   Could we look at page 11.  Does page 11, found in Blanca Araujo's A-file, appear to be a copy of the Hiram Velez birth certificate?

A.   Yes.

Q.   Could we look at page 41.  Is page 41 a copy of a passport issued in the Hiram Enrique Velez identity?

A.   Yes.

Q.   And it was submitted in support of an application for his daughter to get status in the United States; is that right?

A.   That's right.

Q.   Did Blanca apply to naturalize as a United States citizen?

A.   She did.

Q.   Was that application approved?

A.    It was.

MS. LYDON:  Move to admit Government Exhibit 312, part of the stipulation.

MR. BEEVERS:  No objection.

MS. LYDON:  This is the last line of questioning about her.

THE COURT:  That's fine.  312 is admitted.

(Government's Exhibit 312 was admitted into evidence.)

MS. LYDON:  Please publish.

Q.    And does this Certificate of Naturalization reflect that Blanca Alicia Araujo naturalized as a United States citizen on or about June 26th, 2007?

A.    That's correct.

MS. LYDON:  Okay.  This might be a good break time.

THE COURT:  All right.  We're going to break for the evening.  We will come back tomorrow at 10:30.  So again, do not -- you do not have to be here until 10:30 tomorrow.

All admonitions apply overnight as well.  Don't discuss the case with anyone.  Don't discuss the case among yourselves.  No independent investigation or research is permitted and report any violations to the Court.

We'll see all of you at 10:30 tomorrow.

(Jury excused.)

THE COURT:  Okay.  See everybody at 10:30 tomorrow.

MR. BEEVERS:  Thank you.

74

(The proceedings adjourned at 4:07 p.m.)

--oOo--

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Kacy Parker Barajas

_____
KACY PARKER BARAJAS
CSR No. 10915, RMR, CRR, CRC