IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BEFORE THE HONORABLE JOHN A. MENDEZ

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

GUSTAVO ARAUJO LERMA,
aka Hiram Enrique Velez,

        Defendant.

_____/

Sacramento, California
No. 2:17-CR-00195
Tuesday, August 20, 2019
10:36 a.m.

--oOo--

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
Volume 2, Pages 1 - 148

--oOo--

APPEARANCES:

For the Government:        UNITED STATES ATTORNEY'S OFFICE
                              KATHERINE T. LYDON
                              Assistant U.S. Attorney
                              SHEA J. KENNY
                              Assistant U.S. Attorney
                              501 I Street, Suite 10-100
                              Sacramento, CA  95814

For the Defendant:        OFFICE OF THE FEDERAL DEFENDER
                                DOUGLAS J. BEEVERS
                              Assistant Federal Defender
                              801 I Street, Third Floor
                              Sacramento, CA  95814

Official Reporter:        KACY PARKER BARAJAS
                                UNITED STATES DISTRICT COURT
                              CSR No. 10915, RMR, CRR, CRC
                              501 I Street
                              Sacramento, CA  95814
                              kbarajas.csr@gmail.com

*Proceedings recorded by mechanical stenography.  Transcript produced by computer-aided transcription.*

INDEX OF WITNESSES

--oOo--

GOVERNMENT'S                                              PAGE

WEI HUNG

        Resumed Direct Examination by Ms. Lydon         6
        Cross-Examination by Mr. Beevers                15
        Redirect Examination by Ms. Lydon               91

HEATHER DITTY

        Direct Examination by Mr. Kenny                 92
        Cross-Examination by Mr. Beevers                114
        Redirect Examination by Mr. Kenny               121

                        --oOo--


DEFENDANT'S                                               PAGE

RAQUEL VELEZ

        Direct Examination by Mr. Beevers               139
        Cross-Examination by Ms. Lydon                  142

JOAN ARAUJO

        Direct Examination by Mr. Beevers               144

                        --oOo--

INDEX OF EXHIBITS

| GOVERNMENT'S | IN EVIDENCE |
|---|---|
| 1-A | 12 |
| 110 | 51 |
| 114 | 26 |
| 115 | 30 |
| 115-2 | 30 |
| 116 | 33 |
| 201 | 14 |
| 201-T | 14 |
| 203 | 16 |
| 203-T | 16 |
| 204 | 18 |
| 204-T | 18 |
| 205 | 20 |
| 205-T | 20 |
| 206 | 19 |
| 207 | 23 |
| 208 | 22 |
| 315 | 6 |
| 317 | 9 |
| 501 | 109 |
| 502 | 94 |
| 503 | 98 |
| 504 | 105 |

INDEX OF EXHIBITS (Continued)

| GOVERNMENT'S | IN EVIDENCE |
| --- | --- |
| 505-509 | 110 |
| 601 | 37 |
| 604 | 45 |
| 607 | 41 |
| 608 | 42 |
| 611 | 40 |
| 614 | 46 |
| 619 | 54 |
| 621 | 48 |
| 621-T | 48 |
| 623 | 38 |
| 624 | 54 |
| 627 | 44 |
| 629 | 53 |
| 701-TR, Page 6 and 7 | 67 |

| DEFENDANT'S | IN EVIDENCE |
| --- | --- |
| B | 83 |
| H | 83 |
| I | 84 |
| J | 86 |
| K | 84 |
| L | 85 |
| M | 82 |

SACRAMENTO, CALIFORNIA, TUESDAY, AUGUST 20, 2019, 10:36 AM

--oOo--

THE COURT:  Okay.  I did receive Mr. Beevers' first amended exhibit list, the one behind the government, just so you know.  Are we ready?  Got a witness?

MS. LYDON:  Ready, your Honor.

Special Agent Hung, will you take the stand.

THE CLERK:  We do have a new interpreter this morning.

(Jury seated.)

THE COURT:  All right.  Good morning.  All jurors are present.  All parties are present.  Witness is back on the stand.

We do have a new interpreter joining us.  If you could state your appearance for the record.

THE INTERPRETER:  Good morning, your Honor.  Mari Fitzgibbon, previously sworn interpreter.

THE COURT:  Welcome.

All right.  Ms. Lydon, you may continue your direct examination.

MS. LYDON:  Thank you, your Honor.

WEI HUNG

was called as a witness, and having been previously duly sworn, was examined and testified as follows:

///

///

RESUMED DIRECT EXAMINATION

BY MS. LYDON:

Q.   Good morning, Special Agent Hung.

A.   Good morning.

Q.   So when we broke for the afternoon yesterday, we were going over the A-files of the defendant's family members.  Do you recall that?

A.   I do.

Q.   And you had just gone over his wife's A-file and his daughter Blanca's A-file?

A.   That's correct.

Q.   Did you also obtain the A-file of the defendant's son, Mario Araujo?

A.   I did.

     MS. LYDON:  Move to admit Government Exhibit 315 which is part of the stipulation.

     THE COURT:  Admitted.

     (Government's Exhibit 315 was admitted into evidence.)

BY MS. LYDON:

Q.   Do you recognize Government Exhibit 315?

A.   I do.

Q.   What is it?

A.   This is the A-file for Mario Araujo.  Specifically, it's a Petition for Alien Relative.

Q.   And can you tell what date the petition was submitted?

A.    It was approved around March 5th, 1997.  I believe a latter page will say when it was submitted.  Actually, sorry.  I can see here on the top, right there's a stamp, and it says August 22nd, 1996.

Q.    Is the blown-up portion the stamp you're referring to?

A.    That's correct.

Q.    Okay.  And if we zoom back out, will you blow up this portion.

In section A, did the defendant claim that Mario Araujo was his child?

A.    Yes.

Q.    And there's a box to indicate are you related by adoption.  Which box did the defendant check?

A.    No.

Q.    And what biographical information did the person who provided this petition provide?

A.    He stated his name was Hiram Enrique Velez born on September 16, 1956, in Mayaguez, Puerto Rico.

Q.    He provided the biographical information of the real Hiram Velez; is that right?

A.    That's right.

Q.    All right.  And did he provide biographical information regarding Mario Araujo indicating that he had been born in Leon, Guanajuato?

A.    He did.

Q.    Can we move to page 2.  At the bottom there, do you see a signature in the name of Hiram Velez?

A.    I do.

Q.    Did Mr. Velez -- or Mr. Araujo Lerma submit backup materials in support of his application for his son Mario to obtain legal permanent residency?

THE COURT:  Slow down.

MS. LYDON:  Certainly.

Q.    Did the defendant submit backup materials in support of his application for his son Mario to obtain legal permanent residency?

A.    He did.

Q.    Could we turn, please, to page 4 of this document.  Is this translation of a birth certificate among the documents which the defendant submitted in support of the application?

A.    It is.

Q.    And does this document indicate that Mario Araujo Manriquez was born to Gustavo Araujo Lerma in Leon, Guanajuato Mexico?

A.    It does.

Q.    And his wife of course?

A.    Yes.

Q.    Could we turn to page 8 of this document.  Did the defendant submit a copy of the license and certificate of confidential marriage reflecting that he and that Hiram Velez

identity had married Maria Manriquez in 1992?

A.    Yes.

Q.    Could we turn to page 6, please.  Is page 6 a copy of the Hiram Velez birth certificate submitted by the defendant in support of his son Mario's application for legal permanent residency?

A.    It is.

Q.    Could we look at page 9, please.  Is this page a copy of the passport which the defendant obtained in the Hiram Velez identity?

A.    It is.

Q.    And he submitted it as part of his package to get legal permanent residency for his son?

A.    That's right.

Q.    Did Mario Araujo Manriquez naturalize as a United States citizen?

A.    He did.

        MS. LYDON:  Move to admit Government Exhibit 317 part of the stipulation.

        THE COURT:  It's admitted.

        (Government's Exhibit 317 was admitted into evidence.)

        MS. LYDON:  Please publish.

Q.    Is Government Exhibit 317 a copy of the naturalization certificate of Mario Araujo Manriquez?

A.    It is.

Q.   Does it reflect that Mario Araujo Manriquez naturalized, became a United States citizen, on August 20th, 2008?

A.   That's correct.

Q.   So is it accurate to say that the defendant, using the identity of Hiram Velez, obtained naturalization which ultimately -- I'm sorry.  Let me ask a fresh question.

Is it accurate to say that the defendant, using the identity of Hiram Velez, obtained legal permanent resident status for his children and his wife?

A.   That's accurate.

Q.   And that legal permanent resident status ultimately led all three of them to become United States citizens?

A.   That's accurate.

Q.   Okay.  We can take that down.

So the defendant, in his Hiram Velez identity, had stated to the United States Government that he was Blanca and Mario's father; is that right?

MR. BEEVERS:  Objection, your Honor.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  That's correct.

BY MS. LYDON:

Q.   And but Blanca Araujo and Mario Araujo both had Mexican birth certificates in their A-files indicating that their father was Gustavo Araujo Lerma; isn't that also true?

A.    That's true.

Q.    Did you investigate who Gustavo Araujo Lerma was?

A.    I did.

Q.    Now did their A-files, the children's A-file or the wife's A-file, contain any photos of Gustavo Araujo Lerma?

A.    They did not.

Q.    Did they contain any fingerprints of Gustavo Araujo Lerma?

A.    They did not.

Q.    In the course of your investigation, did you find any fingerprints or photographs officially associated with the Gustavo Araujo Lerma identity?

A.    I did not.

Q.    Did you look for an A-file for Gustavo Araujo Lerma?

A.    I did.

Q.    How did you go about searching for an A-file?

A.    I submitted the name and then eventually a fingerprint from the defendant to the Department of Homeland Security's Biometrics Center.

Q.    And did any A-file come back?

A.    No A-file was found for the fingerprint indicating that the defendant was never entered into the DHS system.

Q.    Okay.  Could you turn in the binder in front of you to Government Exhibit 1-A.  Do you recognize the documents behind tab 1-A?

A.   I do.

Q.   What are they?

A.   This is a certified California Department of Motor Vehicles record for the defendant.

Q.   And is that file where you got the fingerprints that you submitted to look for an A-file for the defendant?

A.   It is.

MS. LYDON:  Move to admit Government Exhibit 1-A.

THE COURT:  All of it?

MS. LYDON:  Yes.

THE COURT:  It's admitted.

MR. BEEVERS:  No objection.

(Government's Exhibit 1-A was admitted into evidence.)

MS. LYDON:  Please publish.

Q.   And is this file a compilation of records that the California Department of Motor Vehicles had for the identity of Hiram Velez?

A.   It is.

Q.   Could we click through a few of those pages.  And the next, and the next, and the next, and the next, one more.  Does the defendant appear to be aging in reverse in this compilation?

A.   Yes.  It's a chronological depiction of the defendant.

Q.   Okay.  And in the bottom -- well, let's take one more page.  All right.  So in the bottom, right there is a

fingerprint; is that correct?

A.   Yes.

Q.   And is it also possible to obtain each of these fingerprints from the California DMV in the full page version rather than the shrunken version that we see here?

A.   That's correct.

Q.   And is that -- are those the fingerprints, the full-page, high-quality version you submitted --

A.   Yes.

Q.   -- to look for the defendant?

     Okay.  So if the defendant had applied for any legal status in the United States in his real identity, would an A-file in his name exist?

A.   It would.

Q.   And if he'd applied for any legal status in the United States using any other identity, would his fingerprints be linked to an A-file?

A.   They would.

Q.   And no A-file was found for either the fingerprints or the name?

A.   That's right.

Q.   Did you uncover any other records pertaining to Gustavo Araujo Lerma in the United States in his real name?

A.   I did not.

Q.   Did you then turn to Mexico to search?

A.    I did.

Q.    We can take that down.  Thank you.  So did the Department of State reach out to the Mexican government to seek records pertaining to Gustavo Araujo Lerma?

A.    We did.

MS. LYDON:  Move to admit Government Exhibit 201 which is part of the stipulation.

THE COURT:  Admitted.

(Government's Exhibit 201 was admitted into evidence.)

MS. LYDON:  Please publish.

Q.    Do you recognize Government Exhibit 201?

A.    I do.

Q.    What is it?

A.    This is a Mexican birth certificate for the name Gustavo Araujo Lerma.

MS. LYDON:  I'll also move to admit, but we do not need to publish, Government Exhibit 201-T which the parties have stipulated is a true and accurate translation.

THE COURT:  Admitted.

(Government's Exhibit 201-T was admitted into evidence.

BY MS. LYDON:

Q.    All right.  Please blow up that portion that's marked on the page.  Thank you.

Who is the person whose birth is reflected in this birth

certificate?

A.    Gustavo Araujo Lerma.

Q.    And does it reflect that Gustavo Araujo Lerma was born on March 27th, 1955?

A.    It does.

Q.    Was his birth registered in July of 1955?

A.    It was.

Q.    And does it reflect his nationality as Mexican?

A.    It does.

Q.    What city does it reflect Gustavo Araujo Lerma was born?

A.    Leon in Guanajuato, Mexico.

Q.    What's the name of his father reflected on this birth certificate?

A.    It's listed as Felipe Araujo.

Q.    And is his mother listed as Antonia Lerma?

A.    It is listed as Antonia Lerma.

Q.    And is that consistent with your understanding of the Mexican surname conventions that the father's last name becomes the first word of the surname and the mother's last name becomes the second?

A.    That is correct.

Q.    Okay.  Does it also include the names of Gustavo Araujo Lerma's grandparents?

A.    It does.

        MS. LYDON:  Move to admit Government Exhibit 203 which

is part of the stipulation.

THE COURT:  Admitted.

MR. BEEVERS:  No objection.

(Government's Exhibit 203 was admitted into evidence.)

MS. LYDON:  Please publish.  Also move to admit Government Exhibit 203-T, a certified translation which we do not need to publish.

THE COURT:  Admitted.

(Government's Exhibit 203-T was admitted into evidence.)

BY MS. LYDON:

Q.   Do you recognize Government Exhibit 203?

A.   I do.  It's a Mexican marriage certificate of -- between Gustavo Araujo Lerma and Maria Eva Manriquez Guerrero.

Q.   And is her first name abbreviated here to M-a?

A.   It is but it's a known abbreviation for Maria.

Q.   Is Maria a very common name in Mexico?

A.   I believe so, yes.

Q.   Okay.  And does the birth certificate -- I'm sorry -- the marriage certificate reflect where both parties to the marriage were born?

A.   It does.

Q.   Were they both born in Guanajuato, Mexico?

A.   Yes.

Q.   And does it reflect the names of both of their parents?

A.   It does.

Q.   Again, his father is Felipe Araujo, and his mother is Antonia Lerma?

A.   That's right.

Q.   Could we -- the date of registration of this marriage appears to be June 21st, 1982; is that right?

A.   Yep.

Q.   All right.  So you determined that Gustavo Araujo Lerma and Maria Eva Manriquez Guerrero were married in Mexico in Leon, Guanajuato in 1982; is that right?

A.   That's right.

Q.   And I neglected to ask.  Does it -- this marriage certificate reflect that the place of registration of the marriage was Leon, Leon, Guanajuato?

A.   Yes, it is.

Q.   Okay.  And you already knew of two children born to the marriage of Gustavo Araujo Lerma and Maria Eva Velez; is that right?

A.   Yes.

Q.   Did you request official records from the Mexican government pertaining to those children?

A.   I did.

Q.   And did they provide records?

A.   Yes.

MS. LYDON:  Move to admit Government Exhibit 204 part

of the stipulation.

THE COURT:  It's admitted.

(Government's Exhibit 204 was admitted into evidence.)

MS. LYDON:  Also move to admit government 204-T which we don't need to publish.  It's a certified translation.

THE COURT:  Admitted.

(Government's Exhibit 204-T was admitted into evidence.)

BY MS. LYDON:

Q.   Do you recognize Government Exhibit 204?

A.   I do.  It's a birth certificate for Blanca Alicia Araujo Manriquez.

Q.   All right.  Could we zoom in on that portion of it.  All right.  Thank you.

And does it reflect that Blanca Alicia Araujo Manriquez was born on November 12th, 1982, in Leon, Leon, Guanajuato, Mexico?

A.   That's right.

Q.   Does it reflect that her parents' names are Gustavo Araujo Lerma and Maria Eva Manriquez Guerrero?

A.   That's right.

Q.   And does it reflect her grandparents on her father's side are Felipe Araujo and Antonia Lerma?

A.   Yes, it does.

Q.   Did you also determine whether Maria Eva Manriquez and

Gustavo Araujo Lerma in his real identity had any children in the United States?

A.   Yes.

MS. LYDON:  Move to admit Government Exhibit 206 which is part of stipulation.

THE COURT:  206 is admitted.

(Government's Exhibit 206 was admitted into evidence.)

MS. LYDON:  If you could please publish.

Q.   Now the records we've just gone over were obtained from the Mexican government; is that right?

A.   That's right.

Q.   Is this record in front of us now, Government 206, a document that was found in a search warrant of the defendant's residence?

A.   It is.

Q.   All right.  What is it?

A.   It appears to be a -- it is a certificate of birth from Jackson County, Texas.

Q.   Please zoom in on the top.

And does it reflect the birth of Gustavo Araujo, Jr. on November 18th, 1983, in Jackson, Texas?

A.   It does.

Q.   It indicates that the father's name is Gustavo Araujo; is that right?

A.   Yes.

Q.   And that he is of Spanish origin, specifically Mexican?

A.   Yes.

Q.   And it reflects that his mother's name is Eva Manriquez; is that right?

A.   Yes.

Q.   It looks like later on down the page there is an amendment to correct various spelling mistakes; is that right?

A.   That's correct.

Q.   And then if we move to page 2, was this document accompanied by a social security card in the name of Gustavo Araujo, Jr.

A.   Yes, it was.

Q.   We can take that down.  So going back to Mexico now, we talked earlier about Mario Araujo Manriquez.  Did you obtain records from the Mexican government pertaining to him as well?

A.   I did.

        MS. LYDON:  Move to admit Government Exhibit 205.

        THE COURT:  It's admitted, 205 and 205-T.

        (Government's Exhibits 205 and 205-T were admitted into evidence.)

BY MS. LYDON:

Q.   Please publish 205.  Thank you.

     Do you recognize Government Exhibit 205?

A.   Yes, it's a certified birth certificate for Mario Araujo Manriquez.

Q.   Does this birth certificate reflect that Mario Araujo Manriquez was born on the 15th of September of 1986?

A.   That's right.

Q.   Was he born in Leon, Leon, Guanajuato, Mexico?

A.   He was.

Q.   And was he born to the marriage of Gustavo Araujo Lerma and Maria Eva Manriquez Guerrero?

A.   He was.

Q.   Are the same grandparents listed including Felipe Araujo and Antonia Lerma as seen on other documents?

A.   It matches the other grandparents on the other birth certificates.

Q.   All right.  And are -- we can take that down.

Are those all of the records you were able to obtain from Mexico of family members of Gustavo Araujo Lerma or all the records that you obtained?

A.   Yes.

Q.   Okay.  And at some point a number of those family members pop up in the United States; is that right?

A.   That's right.

Q.   And we already looked at the certificate of confidential marriage reflecting Maria Eva Manriquez married someone else using the identity of Hiram --

THE COURT:  Slow down.  Slow down.

MS. LYDON:  Thank you.

Q.    Of Hiram Enrique Velez.  In the course of your investigation, did you find multiple copies of certified licenses and certificates of confidential marriage from Los Angeles?

A.    I did.

MS. LYDON:  Move to admit Government Exhibit 208.

THE COURT:  Admitted.

(Government's Exhibit 208 was admitted into evidence.)

MS. LYDON:  Please publish.

Q.    Is that a copy of -- another copy of that same marriage certificate?

A.    It is.  And in this copy you can see the bottom of the certificate as opposed to the previous ones where it was covered by an apostille certificate.

Q.    Now we can take that down.

Maria Velez stated in her application for naturalization that she had four children --

MR. BEEVERS:  Objection, your Honor.  Document speaks for itself.

THE COURT:  Overruled.  Let her finish her question.

Go ahead.

BY MS. LYDON:

Q.    She had four children including a daughter, Raquel Velez; is that right?

A.    That's right.

Q.   In executing the search warrant on the defendant's home, did you find official documents pertaining to Raquel Velez?

A.   I did.

MS. LYDON:  Move into evidence Government Exhibit 207.

THE COURT:  Admitted.

(Government's Exhibit 207 was admitted into evidence.)

MS. LYDON:  Please publish.

Q.   Now is page 1 a copy of Raquel Velez's birth certificate found in Maria Velez's A-file?

A.   Yes, it was.

Q.   And does it reflect that Raquel Velez was born June 14th, 1993?

A.   It does.

Q.   Where was she born?

A.   In Carmichael in the County of Sacramento.

Q.   And is her father listed as Hiram Enrique Velez from Puerto Rico with the birthday of 9/16/1956?

A.   It does.

Q.   And does it list her mother as Maria Eva Manriquez?

A.   It does.

Q.   By this time they were married and she was using the name Maria Velez for some purposes; is that also right?

MR. BEEVERS:  Objection, your Honor.  Hearsay. Foundation, for the second part of the question.

THE COURT:  The document speaks for itself. Sustained.

BY MS. LYDON:

Q.   Please turn to page 2 of this document.  I think the zoom in needs to be taken down.

And is page 2 of Government Exhibit 207 a different copy of Raquel Velez's birth certificate that you found at the defendant's home?

A.   It is.

Q.   Okay.  We can take that down.

As part of your investigation, did you look into records concerning travel?

A.   I did.

Q.   And did you confirm that after the defendant started living in the Hiram Velez identity he traveled back and forth to Mexico?

A.   He did.

Q.   Did you also confirm his mother Antonia Lerma traveled back and forth to Mexico -- to the United States and Mexico?

A.   Yeah, to the United States.

MR. BEEVERS:  Objection, your Honor.  Calls for facts not in evidence --

THE COURT:  Overruled.

MR. BEEVERS:  -- as to relationship.

THE COURT:  Overruled.

THE WITNESS:  Yes.  Between Mexico and the United States.

BY MS. LYDON:

Q.   And did you confirm that Maria Eva Manriquez aka Maria Eva Velez also traveled back and forth between the United States and Mexico after her husband started living in the Hiram Velez identity?

A.   I did.

Q.   We went over U.S. visit records with Officer Kleeb reflecting that the defendant's mother Antonia --

THE COURT:  Slow down.  Go ahead.

Q.   -- applied for several visas to the United States?

A.   Yes.

Q.   Did you investigate Antonia Lerma Valderrama's visa records?

A.   I did.

Q.   Did her visa applications reflect the purposes of her visits to the United States?

A.   They reflected that she was visiting her son or daughter in the United States.

Q.   And did they indicate her son and daughter's names when she stated she was visiting them?

A.   They did.

Q.   So did you learn the names of Gustavo Araujo Lerma's siblings from his mother's visa records?

26

A.    I did.

Q.    Let's look at several of those records.  Could you turn in the binder in front of you to Government Exhibit 114.  Do you recognize that document?

A.    I do.

Q.    What is it?

A.    This is a summary of a visa applicant in the State Department's Consolidated Consular Database for CCD.

Q.    Are records in the State Department Consolidated Consular Database made at or near the time of the occurrences recorded in those records?

A.    They are.

Q.    Are the records kept in the course of a regularly conducted activity of the state department?

A.    They are.

Q.    And is it a regular practice of the state department to make and maintain the records kept in the CCD database?

A.    They are.

Q.    Who is the visa applicant reflected in Government Exhibit 114?

A.    This is a visa -- nonimmigrant visa application for Antonia Lerma Valderrama.

        MS. LYDON:  Move to admit government 114.

        THE COURT:  Admitted.

        (Government's Exhibit 114 was admitted into evidence.)

MS. LYDON:  Please publish.  Please zoom in.

Q.   Does the case memo reflect a note entered February 15th, 2001?

A.   Yes.

Q.   What does the memo say?

A.   It says a 71-year-old comerciante, which is a merchant, going to visit hijo, which is son in Spanish, in Chicago for 15 days.

Q.   Okay.  Some words in this are in Spanish.  Do you understand -- is that common that there will be a mixture of English and Spanish for interview notes entered in this database pertaining to Mexican applicants?

A.   Yes.  So during a visa interview, the consular officer is taking notes at the same time that they're doing the interview in the local language.

Q.   Okay.  And first, have you been trained in how to conduct consular interviews?

A.   I have.

Q.   Could you briefly describe what training you undertook.

A.   Yes.  So the U.S. Department of State has a course called a basic consular course, also commonly known as ConGen.  This is a mandatory minimum course for consular officers to take in requiring them to know and learn how to adjudicate a visa overseas.

Q.   Okay.  And are consular officers trained to take

contemporaneous notes in this memo section while they're interviewing an applicant?

A.   They are.  During the course, they go through over a dozen practical exercises in which they conduct interviews and take notes.

Q.   Okay.  And is it common that when -- first, in what language do consular officers conduct those interviews?

A.   They do it in the local language of the country that they are assigned to.  And prior to going to the post that they are assigned to, the state department sends them to an in depth or immersion language training.

Q.   And sometimes does the language of the interview make it into the memo section of the notes?

A.   It does.  It's sometimes hard to speak another language and type in another language.

Q.   Okay.  So we know that in 2001 Antonia Lerma Valderrama applied to go to Chicago to visit her son.  Please turn in the binder in front of you to Government Exhibit 115.

        MR. BEEVERS:  I'm sorry?

        THE WITNESS:  I'm sorry?

        THE COURT:  115.

BY MS. LYDON:

Q.   Do you recognize this document?

A.   I do.

Q.   What is it?

A.    This is a nonimmigrant visa application for Antonia Lerma Valderrama.

Q.    In what year?

A.    It appears this was in 2008, and it was received about March 26, 2008.

Q.    And did you obtain this document personally?

A.    I did.

Q.    Did you obtain it from that same database?

A.    This was obtained from the CCD system.

Q.    So are all the -- are nonimmigrant visa applications such as this one made at or near the time of the occurrence recorded in the applications?

A.    They are.

Q.    And are records such as Government Exhibit 115 kept in the course of a regularly conducted activity by the State Department?

A.    They are.

Q.    And is it a regular practice of the State Department to make and maintain nonimmigrant visa records?

A.    They are.

       MS. LYDON:  Move to admit Government 115.

       MR. BEEVERS:  Objection, your Honor.  Hearsay.  It's not the records.  And relevance.  It's not the records of the agency.  It's the person's statement to get the visa.  That's hearsay.

THE COURT: Overruled. Are you moving to admit just 115?

MS. LYDON: I will also have 116, and then I'll be finished.

THE COURT: Well, you gave me a 115-2, so now I'm wondering --

MS. LYDON: Oh, so I added a second page after the original binder was printed. We have 115, page 1, which has 115.

THE COURT: That's my question. Are you seeking to move both pages in?

MS. LYDON: Yes, your Honor.

THE COURT: So the second page is the complete application?

MS. LYDON: Exactly.

THE COURT: For completeness purposes.

MS. LYDON: Yes.

THE COURT: All right. Both are admitted.

(Government's Exhibit 115 and 115-2 was admitted into evidence.)

MS. LYDON: Thank you. Please publish.

Q. There's a stamp on this document March 26, 2008. What does that stamp designate?

A. This is a stamp from the American Consulate in Guadalajara.

Q.   And in response to -- in response to question 15, Ms. Lerma Valderrama provides her home address in Leon, Mexico; is that right?

A.   Yes.

Q.   And it includes an apartment or house number 403.  Do you see that?

A.   I do.

Q.   Okay.  And in response to questions 22 and 24, she indicates she intends to arrive in July of 2008 at an address in Chicago; is that right?

A.   That's right.

Q.   What's the name of the person in the United States with whom she would be staying or visiting?

A.   It says Felipe Araujo.

Q.   And does she indicate the purpose of her trip?

A.   It does in Spanish.  It says to visit my son.

Q.   Is that in Spanish visitar a mi hijo?

A.   Yes, it is.

Q.   So based on these two applications, is it clear that Antonia Lerma Valderrama has a son named Felipe Araujo in Chicago?

A.   Yes.

        MR. BEEVERS:  Objection, your Honor.  Document speaks for itself.

        THE COURT:  Sustained.  Answer will be stricken.  Jury

will disregard.

BY MS. LYDON:

Q.   Could we turn to page 2 of Exhibit 115.  In response to question 34, which seeks the names and relationships of persons traveling with you, did Antonia Lerma Valderrama indicate she would be traveling with Blanca Alicia Araujo Lerma?

A.   She did.

Q.   And did she in parenthesis specify the relationship as hija?

A.   Yes, she did.

Q.   What does that word mean in Spanish?

A.   It's daughter.

Q.   So Antonia Lerma Valderrama's daughter, who would be Gustavo Araujo Lerma's sister, had the same first and middle name as the defendant's daughter?

A.   That's right.

Q.   Could we -- could you please turn in the binder in front of you to Government Exhibit 116.  What is that document?

A.   This is a nonimmigrant visa application for Antonia Lerma Valderrama.

Q.   And in what year was it submitted?

A.   This one was submitted February 28th -- sorry -- February 28, 2018.

Q.   Did you obtain the record in front of you?

A.   I did.

Q.    From what database?

A.    From our CCD system.

Q.    Are all the questions I asked previously about records maintained in the CCD system true for Government Exhibit 116?

A.    It is.

        MS. LYDON:  Move to admit Government 116.

        MR. BEEVERS:  Object.  Hearsay, for the statements in it.

        THE COURT:  Overruled.

        MR. BEEVERS:  No government --

        THE COURT:  I understand.  Overruled.  Admitted.

        (Government's Exhibit 116 was admitted into evidence.)

        MS. LYDON:  Please publish.

Q.    Now is Government Exhibit 116 a visa application just like Government Exhibit 115 was?

A.    It is.  It's a -- it appears differently in the form because the State Department went to a purely online submission system for visa applications.

Q.    Okay.  Focusing in on the right column, when does Antonia Lerma Valderrama indicate that she intends to arrive in the United States?

A.    July 7th, 2018.

Q.    And does she indicate that she will be staying in the United States at 2112 Center Street in Victoria, Texas?

A.    She does.

Q.   Does she indicate that Blanca Alicia Araujo Lerma is the person paying for her trip and that Blanca Alicia Araujo Lerma is her child?

A.   It does.

Q.   But she also indicates she's not staying with Blanca Alicia Araujo Lerma, right?

A.   From this section it doesn't state that, but below it states who she will be staying with.

Q.   Okay.  Let's zoom out.  Thank you.  On the -- please zoom in on the bottom right column, please.

And does she indicate that she will be traveling with her child, Blanca Alicia Araujo Lerma?

A.   It does.

Q.   Is her contact person's name in the United States Raquel Araujo?

A.   It is.

Q.   Please move to page 2 of this document.  And that right-most column continues; is that correct?

A.   It is.

Q.   Zoom in on that box.  Does Antonia Lerma Valderrama indicate that her -- Raquel Araujo's contact address is 2112 Center Street in Victoria, Texas?

A.   It does.

Q.   And she provides a phone number?

A.   She does.

Q.   All right.  So in summary, Antonia applies to stay with her daughter Raquel Araujo and indicates she will be traveling with her other daughter Blanca Alicia Araujo Lerma, correct?

A.   It does.

Q.   All right.  You can take that down.  In the course of your investigation, did you confirm whether the identity of Hiram Velez had been registered to vote or voted since the defendant started using his identity in 1992?

A.   I did.

MR. BEEVERS:  Objection, your Honor.  Assumes conclusion of a change of identity that he has not witnessed.

THE COURT:  That wasn't the question.  Overruled.  She just asked whether he investigated it.  He hasn't reached any conclusion yet.

Go ahead.

BY MS. LYDON:

Q.   Did you learn that someone using the Hiram Velez identity had voted in numerous elections?

A.   I did.

Q.   Did you obtain a warrant to search the defendant's residence?

A.   I did.

Q.   Now in executing that warrant, did the Department of State seize physical evidence?

A.   We did.

36

Q.   Did the Department of State also take photographs of the items found in the residence?

A.   We did.

Q.   I'll now go over some of the evidence that the Department of State found, and for some, we'll look at the physical evidence, and for some where it's important to read the documents, we'll look at photographs, okay?

A.   Yes.

Q.   Did you find evidence in the defendant's house indicating that he was a dedicated voter?

A.   I did.

Q.   Turn in the binder in front of you, please, to Government Exhibit 601.

A.   I'm at 601, but there are -- there's nothing in my sleeve.

THE COURT:  It just says "Physical Evidence."

MS. LYDON:  Move to admit Government Exhibit 601 which is --

THE COURT:  I don't know what it is.

MS. LYDON:  A voter -- sample ballot and voter information pamphlet found in the defendant's home.

THE COURT:  Well, he hasn't said that.  You haven't showed it to him.  How do I know that?

MR. BEEVERS:  Is it 601?

THE COURT:  601.

MR. BEEVERS:  Oh, it's physical, okay.

MS. LYDON:  May I approach?

THE COURT:  You may.

BY MS. LYDON:

Q.   Did you find, what I'm handing you, in the defendant's home?

A.   I did.

MS. LYDON:  Move to admit Government Exhibit 601.

MR. BEEVERS:  Can I just look at it.  No objection.

THE COURT:  Admitted.

(Government's Exhibit 601 was admitted into evidence.)

THE COURT:  Now you can ask him what it is.

BY MS. LYDON:

Q.   All right.  What is Government Exhibit 601?

A.   These were found in the house during the search warrant. They are sample ballots and voter information pamphlets.  One is for the presidential general election for November 8th, 2016, and the other is for the presidential primary election on Tuesday June 7, 2016.

Q.   And flipping over to the back of these pamphlets, were they sent to Hiram Velez at 38 De Fer Circle?

A.   They were.

Q.   Is that the address of the residence that you searched?

A.   It is.

MS. LYDON:  Your Honor, I move to admit Government

Exhibit 623 which has been shown to the defendant and was found in the defendant's house.

MR. BEEVERS:  No objection.

THE COURT:  Is it stipulated?

MR. BEEVERS:  Stipulated as found.

THE COURT:  Okay.

(Government's Exhibit 623 was admitted into evidence.)

MS. LYDON:  If there's a dispute about anything coming in, I will show it to the witness and lay a foundation, but if it's stipulated, is it okay if I forego going back and forth?

THE COURT:  If it's admitted, you can publish.

MS. LYDON:  Okay.  Just for future exhibit practice.

THE COURT:  If it's admitted, you can publish.

BY MS. LYDON:

Q.   What is Government Exhibit 626?

A.   These are postcards that were found in the course of the search warrant.

MS. LYDON:  I also move to admit Government Exhibit 626-P, which is photographs of these documents, which do not need to be published at this time.

THE COURT:  Any objection?

MR. BEEVERS:  No objection, your Honor.

BY MS. LYDON:

Q.   Do the front of the two cards comprising Government 626 reflect that they were sent to the defendant at two different

addresses?

A.   It does.

THE COURT:  Just out of curiosity, why do you need 626-P if 626 is admitted?

MS. LYDON:  It's a photograph of the evidence which will be used in closing.

THE COURT:  You can use it.  It doesn't have to be admitted.  It's redundant.  So 626-P is not admitted.  It's redundant.  You can use it in your closing.

MS. LYDON:  All right, with that understanding.

THE COURT:  I mean, you can use the photograph.

MS. LYDON:  Okay.

Q.   Does it appear that Hiram E. Velez's signature appears on one of the two cards on the back?

A.   They do.

Q.   Did you find, in the course of executing the search warrant, various official documents regarding the family of Gustavo Araujo Lerma?

A.   I did.

Q.   We already went over the birth certificate of Gustavo Araujo, Jr. that was found in the defendant's house.  Do you remember that?

A.   I do.

Q.   Did you also find baptism records pertaining to Gustavo Araujo, Jr.?

A.   I did.

MS. LYDON:  Move to admit Government Exhibit 611 which has been shown to the defendant.

THE COURT:  Any objection?

MR. BEEVERS:  No objection.

THE COURT:  611 is admitted.

(Government's Exhibit 611 was admitted into evidence.)

BY MS. LYDON:

Q.   Did you find Government's 611 in the defendant's home?

A.   I did.

Q.   What is it?

A.   It is a certificate of baptism for Gustavo Araujo, Jr.

Q.   And does it reflect he's the child of Gustavo Araujo, Sr. and Eva Manriquez?

A.   It does.

Q.   And was it found in this sleeve originally?

A.   It was.

Q.   Did you also find birth certificates and official documents for the other children?

A.   I did.

Q.   Did you find evidence at the defendant's home that he had sought out information on Puerto Rico and how to speak like a Puerto Rican?

A.   Yes, I did.

MS. LYDON:  Move to admit Government's 607 which has

been shown to the defendant.

THE COURT: Admitted.

MR. BEEVERS: Yes admitted.

(Government's Exhibit 607 was admitted into evidence.)

BY MS. LYDON:

Q. Did you find Government Exhibit 607 in the defendant's home?

A. I did.

Q. And what is it?

A. It says "*Speaking Borciua*" which is -- in the caption it says "A Practical Guide to Puerto Rican Spanish."

Q. All right. So it's a book; is that right?

A. It is.

Q. And are there annotations in this book indicating that it has been used?

A. Yes. Throughout the book there were handwritten notes.

Q. On the third page below the title do you see the "Hiram E. Velez" signature?

A. I do.

Q. Is Boricua or Puerto Rican-style Spanish different than Mexican-style Spanish?

A. It is.

THE COURT: Is there an objection?

MR. BEEVERS: No. No, your Honor.

THE COURT: Okay.

MR. BEEVERS:  It's a book about it.

BY MS. LYDON:

Q.   Did you find other books on Puerto Rico as well?

A.   I did.

MS. LYDON:  Move to admit Government 608 which has been shown to the defendant.

THE COURT:  Admitted.

(Government's Exhibit 608 was admitted into evidence.)

BY MS. LYDON:

Q.   Government Exhibit 608 is a compilation of five books on Puerto Rico; is that right?

A.   It is.

Q.   Did you find them all in the defendant's home?

A.   I did.

Q.   *Puerto Rico in the American Century a History Since 1898* is the title of one, right?

A.   It is.

Q.   Does it also have marginalia and markings indicating it was used?

A.   It does have notes throughout the book.

Q.   Does it have the Hiram E. Velez signature on the first page?

A.   It does.

Q.   The defendant also had Puerto Rico -- or *A to Z Puerto Rico* in his home; is that right?

A.   He did.

Q.   He had written in it, and he had signed it, right?

A.   Yes.

Q.   The defendant had *A History of Puerto Rico, a Panorama of Its People* in his home, didn't he?

A.   He did.

Q.   Written in it?

A.   Yep.  Extensive notes throughout the book.

Q.   And he had signed it, hadn't he?

A.   He did.

Q.   Sort of coffee table book *Puerto Rico Then and Now*, right?

A.   Yes.

Q.   He had written in this book as well, hadn't he?

A.   There were handwritten notes throughout the book and his signature.

Q.   And finally you found *Puerto Rico Remembered* in the defendant's home, right?

A.   I did.

Q.   And it bears the Hiram E. Velez signature too?

A.   It does.

Q.   Did you find evidence that the defendant had studied the specific Puerto Rican neighborhood where the real Hiram Velez was born?

A.   I did.

Q.    Is that the neighborhood of Mayaguez?

A.    It is the city of Mayaguez.

MS. LYDON:  Move to admit Government Exhibit 627 which has been shown to the defendant.

THE COURT:  Admitted.

MR. BEEVERS:  No objection.

(Government's Exhibit 627 was admitted into evidence.)

BY MS. LYDON:

Q.    Did you find the two pages which comprise Government Exhibit 627 in the defendant's home?

A.    I did.

Q.    And are they maps of Mayaguez?

A.    They are.

Q.    On the backs of both of the maps were barrios listed and handwriting?

A.    Yes, that's right.

Q.    Barrios, do you know what "barrios" means?

A.    Somewhat like a district.

Q.    And on one of the maps had a handwritten drawing of Mayaguez been drawn?

A.    Yes, it was.

Q.    Did you find evidence that the defendant had reached out to official sources in Puerto Rico to request official documents to support the Hiram Velez identity?

A.    I did.

MS. LYDON:  Move to admit Government Exhibit 604.

MR. BEEVERS:  No objection.

THE COURT:  Admitted.

(Government's Exhibit 604 was admitted into evidence.)

BY MS. LYDON:

Q.   Government's 604 is a sleeved document.  Did you find it in the defendant's home, or this series of documents, did you find them in the defendant's home?

A.   Yes.

Q.   Did you find them in this sleeve?

A.   I did.

Q.   What is Government Exhibit 604?

A.   It appears to be the birth certificate from Puerto Rico of the real Hiram Velez.  And then with it were envelopes showing that they were mailed from Puerto Rico to addresses of the defendant.

Q.   The Departmento de Salud, is that the Department of Health?

A.   Department of Health and then the Registrar's Office for Vital Statistics.  It's somewhat of a translation.

Q.   And do the postmarks indicate they were mailed from San Juan on or about March 15th, 2000, and April 24th, 2000?

A.   They do.

Q.   And inside the sleeve accompanying the two envelopes, were there two color copies of the Hiram Velez birth certificate

with fold marks indicating they would fit into an envelope?

A.   Yes.

MS. LYDON:  Move to admit Government Exhibit 614 which has been shown to the defendant.

THE COURT:  It's admitted.

(Government's Exhibit 614 was admitted into evidence.)

BY MS. LYDON:

Q.   Did you find the Government Exhibit 614 in the defendant's home?

A.   I did.

Q.   And Government's 614, a postmarked envelope from the Obispado de Mayaguez in Mayaguez, Puerto Rico?

A.   It is.

Q.   Is it addressed to Hiram E. Velez?

A.   It is addressed to a Hiram E. Velez in Sacramento.

Q.   And is it postmarked reflecting it was sent through San Juan on May 26th --

A.   1998.

Q.   It appears to be 1998?

A.   Yes.

Q.   Did you find two documents inside the envelope?

A.   I did.

Q.   Is one of the documents on letterhead and appear to be a letter addressed to Mr. Velez?

A.   It does.

MS. LYDON:  Move to admit Government 614-T, page 3, which is a certified translation of one of the documents in the envelope.

THE COURT:  It's admitted.

BY MS. LYDON:

Q.   Before I move to that, the second document, does this appear to be a baptism certificate?

A.   It does.

Q.   Who is the baptizee in this baptism certificate?

A.   The baptism certificate was for Hiram Enrique Velez Seda, the child of Hiram Velez and then the child of Carmen Lillian Seda.

Q.   Does it appear to reflect that he was born on September 16th, 1956, and baptized in December of 1958?

A.   It does.

MR. BEEVERS:  Sorry.  What exhibit is that one?

MS. LYDON:  That is 614.  And could we publish 614-T, please, page 3.

Q.   Is 614-T a certified translation of 614?

A.   It is.

Q.   And does it indicate that the note we just looked at reads:  "Dear Mr. Velez, in response to your letter requesting your baptism document, I am sending you that document"?

A.   It does.

Q.   All right.  Did you find evidence that the defendant

traveled back to Guanajuato where Gustavo Araujo Lerma and his family hailed from?

A.   I did.

MS. LYDON:  Move to admit Government 621 and 621-P, which has been shown to the defendant.  The photo that's in evidence that are in the binder at 621-P is a bit easier to read than the documents on the Elmo.  So I would ask to admit both of them.

THE COURT:  All right.  Admitted.

(Government's Exhibits 621 and 621-P were admitted into evidence.)

BY MS. LYDON:

Q.   Government's 621 consists of an Orbitz printout and some ticket stubs.  Did you find Government Exhibit 621 at the defendant's home?

A.   I did.

Q.   Could we please publish 621-P.  Could we look at page 3.  621-P, page 3, appear to be an Orbitz printout reflecting a one-way flight in the name of Hiram Velez?

A.   Yes.

Q.   And is that flight going from Sacramento, California to Guanajuato, Leon, Mexico on November 22nd, 2009?

A.   It does.

Q.   Please zoom out.  Could we look at page 2.  Or sorry, the next page, page 4.  Does it appear that this flight was paid

for on a credit card in the name of Hiram E. Velez?

A.    It was.

Q.    Could we look at page 5 of this document.  Are these ticket stubs reflecting another one-way flight taken by Hiram Velez?

A.    It is.  It appears to be from Leon, Guanajuato through Houston and then from Houston to Sacramento.

Q.    Could we blow that up.  Does the date appear to be February 4th that this flight was taken?

A.    Yes.

Q.    Please zoom back out.

Somewhere on here the year is indicated.  Do you see an indication of a year?

A.    I believe it's 2010.  It says 04 Feb and then I believe, yeah.

Q.    On that third ticket there's a stamped date 04 February 2010; is that right?

A.    That's correct.

Q.    Hiram Velez had a ticket from Guanajuato, Leon back to Sacramento?

A.    Yes.

Q.    So based on these records collectively, does it appear the defendant flew from Sacramento to Guanajuato in November of 2009?

A.    Yes.

Q.   Stayed approximately two and a half months and flew back in February of 2010?

A.   It does.

Q.   Now the passport book that you seized from the defendant the first time you visited his home is already in evidence. Government Exhibit 108, did you examine that passport book for stamps reflecting international travel?

A.   I did.

Q.   And on page 26 of the visa page, do you see a stamp coming into Guanajuato on November 23rd, 2009?

A.   Yes.  That stamp was found inside the passport book.

Q.   On the emergency data and contact information in pencil, do you see 38 De Fer Circle in Sacramento?

A.   I do.

Q.   Is that the defendant's home address?

A.   It is.

Q.   And had he listed as the emergency contact Blanca A. Araujo also at 38 De Fer Circle?

A.   Yes.

Q.   During the search warrant, did you seize the defendant's wife's passport?

A.   We did.

Q.   Did Maria Velez also have passport stamps reflecting travel to Guanajuato?

A.   Yes.

Q.   Or to Mexico?

Move to admit Government 110, Maria Eva Velez's passport?

MR. BEEVERS:  No objection.

THE COURT:  Admitted.

(Government's Exhibit 110 was admitted into evidence.)

BY MS. LYDON:

Q.   On the very last -- or page 26 of Maria Eva Velez's passport visa stamp section, is there a stamp reflecting travel to Guanajuato?

A.   It does.

Q.   What does that indicate?

A.   It appears to be an entry stamp into Guanajuato.  It looks like the stamp is 24 December 2010.

Q.   Page 17 of her passport, do you see another visa stamp or entry stamp?

A.   I do.  It also appears to be an entry stamp to Guanajuato, Mexico.  Appears to say 16 December 2015.

Q.   Did you find records pertaining to a Raquel Araujo Lerma?

A.   I did.

Q.   Now we've already talked about the defendant's daughter, Raquel Velez.  Do you recall that?

A.   I do.

Q.   But you also learned through Antonia Lerma Valderrama's

visas that she had a daughter, Raquel Araujo Lerma, right?

A.   Yes.

MS. LYDON:   Move to admit Government Exhibit 617. It's been shown to the defendant.

THE COURT:   Any objection to 617?

MR. BEEVERS:   Relevance.

BY MS. LYDON:

Q.   Well, could you turn in the binder in front of you to Government Exhibit 617-P which is an image of the physical evidence tag 617.

A.   Okay.

Q.   What is Government Exhibit 617-P?

A.   These are receipts from the municipality of Leon that were found inside the house of the defendant.

Q.   And what is the name at the top of those receipts?

A.   It's a receipt addressed to Raquel Araujo Lerma.

MS. LYDON:   Move to admit Government's 617 and 617-P.

THE COURT:   Sustained.   Relevance.   Doesn't need to be admitted.

MS. LYDON:   Well, your Honor, the defendant disputes identity.

THE COURT:   He hasn't disputed anything yet.   If you need it for rebuttal, I'll let you put it in for rebuttal.

MS. LYDON:   This is affirmative evidence of the

defendant's identity and alienage required.

THE COURT: It is not affirmative evidence of the defendant. The name Raquel's on there. You're too far afield. I sustain the objection. We don't need it.

BY MS. LYDON:

Q. Did you find evidence regarding Gustavo Araujo Lerma's mother Antonia Lerma Valderrama and his brother Felipe Lerma?

A. I did.

MS. LYDON: Move to admit 629 which has been shown to the defendant.

THE COURT: Admitted.

(Government's Exhibit 629 was admitted into evidence.)

BY MS. LYDON:

Q. What's Government Exhibit 629?

A. This is a driver's license issued by Guanajuato in Mexico to a Felipe Araujo Lerma that was found in the search warrant -- in the residence during the search warrant.

Q. And does this appear to be a rather old driver's license?

A. It does. The expiration is sometime in the '90s.

Q. And who is Felipe Araujo Lerma?

A. We've learned that Felipe Araujo Lerma is the biological brother of Gustavo Araujo Lerma.

MS. LYDON: Move to admit Government 624 which has been shown to the defendant.

THE COURT:  It's admitted.

(Government's Exhibit 624 was admitted into evidence.)

MS. LYDON:  624-P, which is an image and easier to display than this large paper on the Elmo.

THE COURT:  You can display 624-P.

BY MS. LYDON:

Q.   Did you find Government's 624, an image which is depicted at 624-P in the defendant's home?

A.   I did.

Q.   And does it appear to be a sort of ornate birth certificate in the name of Felipe Araujo Lerma?

A.   It is.

MS. LYDON:  You can take that down.

Q.   All right.  Let's talk about the defendant's mother.

Move to admit Government's 619 and 619-P, which have been shown to the defendant.  They include documents which are easier to display.

THE COURT:  You can display 619-P.  619 is admitted.

(Government's Exhibit 619 was admitted into evidence.)

BY MS. LYDON:

Q.   Is Government Exhibit 619 comprised of State of California benefits cards and another cards and official documents pertaining to Antonia Lerma Valderrama?

A.   It is.

Q.   At the top of page 1, what is that document?

55

A.    That's a State of California benefits identification card issued to Antonia Lerma with a date of birth of March 10th, 1929.

Q.    If we flip over to page 2, do you see that the document has a name above the signature line?

A.    It does.

Q.    All right.  Flip back to page 1, please.  Looking at the bottom, what is that?

A.    It appears to be a card issued from Mexico in the name Balderrama, Viviana.

Q.    Balderrama, is that also a name associated with Antonia Lerma Valderrama's family?

A.    It is.  There's also an address that says Lago Hederaco (Phonetic) number 403 in Guanajuato.

Q.    And that 403 house or apartment number is one that Antonia Lerma Valderrama had claimed in her visa application, correct?

A.    That's correct.

Q.    Could we flip to page 4, please.  And are those -- do they appear to be a municipal receipt from Leon in the name of Antonia Lerma de Araujo and Antonia Lerma Valderrama?

A.    They are.

Q.    Could we look at page 6, please.  Does this appear to be another municipal receipt in the name of Antonia Valderrama from Leon?

A.    It looks like the same name on there and the same address previously listed.

Q.    Page 7, these deposit slips signed by Antonia Lerma or associated with Antonia Lerma Valderrama?

A.    That's right.

Q.    On page 9, does that appear to be -- well, one moment. Does that appear to be correspondence to Antonia Lerma Valderrama?

A.    It does.

MS. LYDON:  Move to admit 632.

MR. BEEVERS:  Your Honor, object to relevance.

THE COURT:  632?

MS. LYDON:  Uh-huh.  It is -- may I approach and lay a foundation with the witness?

THE COURT:  You can try, sure.

MR. BEEVERS:  I don't have it in the binder.

MS. LYDON:  This is physical evidence.

MR. BEEVERS:  Should be a copy.

BY MS. LYDON:

Q.    What is Government's 632?

A.    This is a postcard that was found in the search warrant of the defendant's residence.  On the address here it lists the address of --

MR. BEEVERS:  Objection, your Honor.  Hearsay. Foundation.  Discovery.

THE COURT:  What do you mean "discovery"?  You didn't get it?  You've never seen it before?

MR. BEEVERS:  I've never been shown it.  I don't know the Bates number.  It doesn't have any names on it.

THE COURT:  Was it provided to the defense?

MS. LYDON:  Of course.  When defense counsel inspected all of the physical evidence at our office last week.

THE COURT:  Okay.

MR. BEEVERS:  If the Court could --

THE COURT:  Is this a postcard that you found during a search of the defendant's house?

THE WITNESS:  It is.

THE COURT:  Okay.  It's admitted.

(Government's Exhibit 632 was admitted into evidence.)

THE WITNESS:  On the postcard --

BY MS. LYDON:

Q.   I'll take it back so we can talk about it and show it to everyone.

A.   Oh, sorry.

Q.   So you're describing Government Exhibit 632 as a postcard with Dallas, Texas, USA on the front?

THE COURT:  It's not on the screens.

MS. LYDON:  Oh, thank you.

Q.   Is this the postcard?

A.   It is.

Q.    Written in the note section of the postcard is "para mi mama Antonia Lerma de parte de su hijo"?

A.    I'm sorry.  It's out of focus on the Elmo.  That's good.

Q.    You have this.  I'll start over.  "Para mi mama Antonia Lerma de parte de su hijo Gustavo Araujo L.," do you see that?

A.    I do.

Q.    And there's an address listed in the address section including house or apartment number 403; is that right?

A.    It does.

Q.    Did you find handwritten address books and notebooks in the defendant's home?

A.    I did.

Q.    Let's go through some of the relevant portions.

      First, move to admit Government's 630 which has been shown to the defendant.

            THE COURT:  Admitted.

            (Government's Exhibit 630 was admitted into evidence.)

BY MS. LYDON:

Q.    Did you find Government Exhibit 630 in the defendant's home?

A.    I did.

Q.    Currently it has Post-it Notes on the side to mark relevant pages.  Those were not there when you found them, correct?

A.   That's right.

Q.   Otherwise, is it the same as when you found it?

A.   Yes.

Q.   Does it include a number and a name Felipe Araujo?

A.   It does.

Q.   Do you know that to be Felipe Araujo's telephone number?

A.   I believe that I know --

        MR. BEEVERS:  Objection.  Hearsay.

        THE COURT:  Sustained.

        MS. LYDON:  Well, it's not a statement.  It's his knowledge.

        THE COURT:  Sustained.  We can see it.  Document speaks for itself.

        Is there a question about that?

        MS. LYDON:  I'm just focusing it in.

Q.   I was going to note do you see "Antonia Lerma" there?

A.   I do.

Q.   Is there an address listed for Turismo Garcia Autobus Sacramento to Leon?

A.   Yes.

Q.   And below that, are there departure times?

A.   Yes.

Q.   There's an address for Felipe Javier in Chicago?

A.   Yes.

Q.   Prior page, another number or address, Felipe Araujo.  Are

there additional bus departure times to Leon?

A.   Yes.

THE COURT:  Ms. Lydon, the document is admitted.  We don't need to go through each and every page.  The jury can have an opportunity to see it.  You can discuss it with the jury in closing.

MS. LYDON:  Just flip through one particular important one.

THE COURT:  I'm having a hard time hearing you too.  You've got to stay close to that mic.

MS. LYDON:  Just flip through some particularly important ones.

Q.   Do you recognize the name Michael P. Karr?

A.   I do.

Q.   Is that the attorney who prepared certain of the immigration filings for the defendant's family members?

A.   It is.

Q.   This is the last one in this section.  Did you also find a travel notebook with handwriting by the defendant?

A.   I did.

MS. LYDON:  Move to admit Government's 631.

THE COURT:  It's admitted.

MR. BEEVERS:  No objection.

(Government's Exhibit 631 was admitted into evidence.)

///

BY MS. LYDON:

Q.   Is this the travel notebook that you found at the defendant's house?

A.   I did.

Q.   Once again it has some Post-its.  Those were added after you found them, correct?

A.   That's correct.

Q.   Raquel Araujo Lerma, that 2112 Center Street address, is that the same address provided by the defendant's mother in the visa application where she indicated she was visiting the defendant's sister, Raquel Araujo Lerma?

A.   It is the same address.

Q.   More Autobuses de Mexico.  And bottom of this page, do you see that it's written nuevo numero de mi mama, Antonia Lerma?

A.   Yes.

Q.   This appear to be addresses and telephone numbers for the defendant's three siblings, Blanca Alicia Araujo Lerma, Felipe Araujo, and Raquel Araujo?

A.   It is.

THE COURT:  Good time to break?

MS. LYDON:  Sounds good.

THE COURT:  Okay.  We'll take our lunch break.  During the break, please do not discuss the case with anyone.  Don't let anyone discuss the case with you.  Do not do any independent investigation of this case at all.  And please

report any violation of those admonitions to the Court.  See everybody at -- let's come back at about 1:20, 1:20.

Okay.  See everybody this afternoon.

(The luncheon recess was taken 12:03 p.m. to 1:22 p.m.)

THE COURT:  All right.  Let's bring in the jury.

(Jury seated.)

THE COURT:  All jurors present.  All parties are present.  Ms. Lydon, you may continue your direct examination.

BY MS. LYDON:

Q.   Good afternoon, Special Agent Hung.

A.   Good afternoon.

Q.   When you searched the defendant's home, did you find photos of his brother Felipe and his mother Antonia?

A.   I did.

MS. LYDON:  Government moves to admit Exhibit 610.

THE COURT:  Okay.  This is 610-P.

MS. LYDON:  Yes, your Honor.

THE COURT:  610 is admitted.  Are you going to publish 610-P?

MS. LYDON:  I'm going to publish 610.

THE COURT:  Okay.

(Government's Exhibit 610 was admitted into evidence.)

BY MS. LYDON:

Q.    Is Government Exhibit 610 a photograph featuring three

individuals, one of the photos that you found at the defendant's house?

A.    It is.

Q.    And does the individual wearing the boutonniere on the right appear to be the same person depicted in the driver's license of Felipe Araujo Lerma?

A.    It is.

MR. BEEVERS:  Objection, your Honor.

THE COURT:  Sustained.  That's for the jury to draw. Documents are admitted.  It's up to the jury whether they want to draw that conclusion or not.

MR. BEEVERS:  What exhibit is this one?

MS. LYDON:  These are part of 610 that I showed you.

THE COURT:  These are all part of 610.

MR. BEEVERS:  Oh, they're all part of the same one, okay.

BY MS. LYDON:

Q.    Are these three photos also ones you found in the defendant's home?

A.    They are.

Q.    Do they depict a woman in a dark blue dress?

THE COURT:  The jury can see the photos.  The photos are in evidence.

BY MS. LYDON:

Q.    Mi mama sentada afuera del apartamento --

MR. BEEVERS:  Objection, your Honor.

Q.    -- do you know what that means in Spanish?

MR. BEEVERS:  Objection, your Honor.

THE COURT:  You have to lay a foundation.  I don't believe -- you don't speak Spanish, do you?

THE WITNESS:  Not fluently, no.

THE COURT:  Okay.  Then you can't translate.

BY MS. LYDON:

Q.   Do you know enough Spanish to know what "mi mama" means?

MR. BEEVERS:  Objection, your Honor.  Undisclosed expert opinion.

THE COURT:  Sustained.

BY MS. LYDON:

Q.   For comparison, could we take a look at Government Exhibit 112, please.  Pardon me, 113.  Flip to page 2 of this document.  Take that down.

Is this photo of a woman in a dark dress with pattern of flowers on it also one that you found in the defendant's house?

A.   Yes.

Q.   Is this photo --

THE COURT:  He's already testified all these photos were found in the defendant's house.

BY MS. LYDON:

Q.   Are you familiar with what territory or state the flag

depicted in this photo found in the defendant's house is of?

A.    It's the flag of the territory of Puerto Rico.

Q.    And Antonia Lerma Valderrama is not from Puerto Rico, is she?

        MR. BEEVERS:  Objection, your Honor.  Hearsay.

        THE COURT:  The way the question's phrased, sustained. You would have to rephrase the question.

BY MS. LYDON:

Q.    Have you reviewed documents, certified documents, from the Mexican government including the birth certificate of Gustavo Araujo Lerma which state the nationality of Antonia Lerma Valderrama?

A.    I have.

Q.    And what's her nationality?

        MR. BEEVERS:  Objection, your Honor.  Document speaks for itself.  Asked and answered.

        THE COURT:  You can remind the jury.  Go ahead. Overruled.

        THE WITNESS:  She is Mexican.

        THE COURT:  Okay.

BY MS. LYDON:

Q.    Did you learn that the true Hiram Velez's mother received a letter from the defendant in early 2019?

A.    I did.

Q.    I'm holding it up as a demonstrative but not admitting it

into evidence.  It's Government Exhibit 702.

THE COURT:  Okay.

BY MS. LYDON:

Q.   The letter that the defendant sent.

A.   I recognize the letter.

Q.   Now by early 2019 when the letter was sent, the defendant had been arrested, right?

A.   Yes, that's right.

Q.   And do you know that he had received the real Hiram Velez's mother's address in discovery?

A.   Yes.

MR. BEEVERS:  Objection, your Honor.  Foundation for that.  Move to strike.

THE COURT:  You want to lay a foundation.

MS. LYDON:  The question was do you know.

THE COURT:  Right.  You've got to lay a foundation as to how he knows.

MS. LYDON:  Well, I'll move on to the contents.

THE COURT:  Answer will be stricken.  Jury will disregard.

BY MS. LYDON:

Q.   Have you read a certified translation of the letter the defendant sent?

A.   I have.

Q.   And in that letter, did the defendant admit that he bought

the birth certificate and an unsigned social security card in the Hiram Velez identity?

MR. BEEVERS:  Objection, your Honor.  The document speaks for itself.

THE COURT:  It's not in evidence.

MR. BEEVERS:  Hearsay.

THE COURT:  Overruled.  Statement of the defendant, admission.

MR. BEEVERS:  Okay.

MS. LYDON:  I'll move the document into evidence to cure any objection.

THE COURT:  You don't have to.

MS. LYDON:  I'd like to.

THE COURT:  You want to move the entire letter in?

MS. LYDON:  No.  I'd like to move pages 5 and 6 or 6 and 7 --

THE COURT:  What exhibit, 702?

MS. LYDON:  701-TR.

THE COURT:  Okay.  701-TR, and you want to move?

MS. LYDON:  Pages 6 and 7.

THE COURT:  701-TR 006 and 007.  Those are admitted.

(Government's Exhibit 701-TR, Pages 006 and 007, were admitted into evidence.)

MR. BEEVERS:  No objection.  And the translation stipulation if we need it.

BY MS. LYDON:

Q.   All right.  Could we please publish Government Exhibit 701-TR, page 6.  Is this a redacted version of the certified translation of the letter?

A.   It is.

Q.   Does it indicate that -- or the defendant wrote: (Reading) "At one time Carlos told me that his mom, Lupe, was selling a birth certificate together with a Puerto Rico-issued social security number and asked if I wanted to buy it from her," and then some redaction follows?

A.   Yes.

Q.   (Reading) Lupe bought that certificate and information for one of her sons.  His nickname was Porky because Porky had been bought in Mexico --

THE COURT:  Born.

BY MS. LYDON:

Q.   -- born in Mexico -- apologies -- and she wanted -- please flip the page -- him to stop selling drugs and get a job, but Porky said he wouldn't try to use that birth certificate for employment because he could never pass for a Puerto Rican and that it would be better for him get a birth certificate from Texas.

A.   Yes.

THE COURT:  There's no question pending.  Go ahead.

BY MS. LYDON:

Q. The defendant admits, quote, I bought the birth certificate from Lupe through her son, Carlos Mendoza, for $200. That was for the certificate and unsigned social security card and driver's license number; is that right?

A. Yes.

THE COURT: For the jury's enlightenment, redactions, the black portions, are agreed to by the Court contains information that isn't relevant. So that's why. The letter obviously doesn't contain big, black marks, but for purposes of the trial, we redact certain -- take out certain information that's not deemed relevant.

Go ahead.

MS. LYDON: No further questions at this time.

THE COURT: Cross-examination, Mr. Beevers.

CROSS-EXAMINATION

BY MR. BEEVERS:

Q. You participated in the warrant to search my client's residence, right?

A. That's correct.

Q. And you and your team searched all the property in the house, right?

A. That's correct.

Q. And you were looking for things like birth certificates, right?

A. Yes.

Q.   And you found a lot of birth certificates?

A.   Yes.

Q.   Earlier you testified about a birth certificate from Mexico for Gustavo Araujo Lerma who the government -- well, you obtained a birth certificate from Mexico for Gustavo Araujo Lerma, right?

A.   I'm sorry?

Q.   You obtained a birth certificate for Gustavo Araujo Lerma from Mexico, right?

A.   That's correct.

Q.   That was not found in my client's house, right?

A.   That's right.

Q.   And you obtained that document by mailing a request to Mexico, right?

A.   I'm sorry.

Q.   You obtained that document, the birth certificate for Gustavo Araujo Lerma, by mailing a request to Mexico?  How did you get that document?

A.   Our agents in Mexico requested the Mexican government to query for the birth certificate in Gustavo Araujo Lerma's name.

Q.   Okay.  And when?  Approximately when did you first obtain that?

A.   I can't recall offhand.  I believe an initial inquiry was made in 2016.

Q.   Okay.  And also the marriage -- the certificate of marriage for Maria Velez and Gustavo Araujo Lerma in Mexico, how did you obtain that?

A.   The same process, our agents in Mexico requested the government query for any marriage records between Gustavo Araujo Lerma and Maria Eva Manriquez.

Q.   Okay.  And Maria Eva Manriquez is the same person as Maria Velez who was my client's wife on the date you started the investigation?

A.   Yes.

Q.   So that marriage certificate from Mexico between Gustavo Lerma and Maria, you did not find any copy of that marriage certificate in my client's house, right?

A.   That's right.

Q.   But you did find birth certificates, a certified Mexican birth certificate for Blanca Araujo, right?

A.   Not -- you're asking in the house?

Q.   Yes, in the house.

A.   I don't believe we found the certified records in the house.  We did request certified records from the Mexican government.

Q.   Did you find an uncertified birth certificate for Blanca Araujo in the house?

A.   I don't specifically recall at this moment, but if there's something in the search warrant record, I may be able to

refresh my memory.

Q.   Okay.   Now based on your -- based on the documents you have received, Blanca Araujo, her birth certificate shows that her father was Gustavo Araujo Lerma, right?

A.   Yes.

Q.   And his -- Gustavo Araujo Lerma's mother was Antonia Lerma, right?

A.   That's right.

Q.   So Antonia Lerma would be Blanca's grandmother?

A.   Yes.

Q.   And Felipe Araujo would be Blanca Araujo's uncle, right?

A.   There's two Felipe Araujos.

Q.   Felipe Araujo, the older, would be her uncle, right?

A.   The senior would be the grandfather.

Q.   Would be the grandfather, okay.   And then she would have an uncle.   The one in that Mexican driver's license would be her uncle, right?

A.   Yeah, that's right.

Q.   Okay.   Just trying to put the people together.   Do you know where was Blanca Araujo Lerma living at the time of the search warrant?

A.   She was living in Sacramento County.   I don't recall the address specifically right now.

Q.   Okay.   And what about Gustavo Araujo Lerma, Jr., where was he living?

A.   Somewhere in the vicinity also.

Q.   Okay.  And so his uncle would also be Felipe Araujo?

A.   Yes.

Q.   And his grandmother would also be Antonia Lerma?

A.   Yes.

Q.   Okay.  And now if I could, now you testified about the A-file for Blanca Araujo?

A.   Yes.

Q.   And that there was an application -- let's, see.  G -- I believe that's in evidence as G-620.  Now that application was signed by Hiram Velez, right?

A.   I'm sorry.  I would have to pull it up.

Q.   Oh, okay.  Exhibit 315-5.

THE COURT:  Did you say you want Blanca's A-file?

MR. BEEVERS:  Right.  This is from what came -- Government 315 is -- oh, actually, 310 is Blanca's A-file.

THE COURT:  Right, 310.  Do you want Exhibit 310 up?

MR. BEEVERS:  If you could.  Actually, if you could put it up.

MS. LYDON:  It's not in evidence yet.

THE COURT:  310 is.

MR. BEEVERS:  310 is?

THE COURT:  Yeah.

BY MR. BEEVERS:

Q.   Okay.  So in this exhibit, this is the standard form for a

parent file an immigration petition for their child, right?

A.    Yes.

Q.    And now to be eligible -- and there are boxes in the bottom, I believe on the second -- okay.  And so on page 1, Hiram Enrique Velez says that he's never -- he has used a different name, Hiram Velez Seda, right?

A.    Yes.  That's what the form says.

Q.    Okay.  And is there somewhere else -- is there anywhere on the form where he says he's used the name Gustavo Araujo Lerma in this A-file?

A.    It doesn't indicate so.

Q.    Okay.  And now if we could go to page 2, the second page. Now on the document it shows the relationship -- actually, I think it's on page 1.  Where does it show the relationship between this Hiram Velez and the person he's applying for?

A.    You're referring to section A, the relationship?

Q.    Yes.  I think that's page 1.

A.    Page 1, yes.  It indicates --

Q.    Oh, on the top, the boxes, right?

A.    Yes.

Q.    Okay.

A.    So it indicates that he is the child for the petitioner.

Q.    Okay.  And it asks yes or no if he's related by adoption, right?

A.    Yes.

Q.   And asks for the relationship, it has four categories of relative, husband, wife, parent, brother, sister, or child. Those are the only relationships you can apply for, right?

A.   On this form, yes.

Q.   So is there a different -- is there some kind of form that could have been filled out to apply for a stepchild who is not actually related?

A.   I'm not familiar with all the forms, especially from 1992.

Q.   Okay.  So you don't --

A.   Correct.

Q.   You don't know whether he could have filed a different form to apply for his stepdaughter?

A.   Not to my knowledge.

Q.   Okay.  And so if we could move to the next, page 5. Actually, page 9.  Okay.  Now this one, this is the document that is attached to the application, right?

A.   Yes.

Q.   And this is -- comes from the A-file?

A.   Yes.

Q.   And it's the document -- why would you need to attach a document to the application?

A.   It's usually -- a birth certificate is usually attached to show the relationship between the child and the father.

Q.   Okay.  So the birth certificate that should be attached

should match the information in the application, right?

A.    Yes.

Q.    So now this application had attached to it a birth certificate that shows that Blanca Araujo is the child of a Mexican citizen Gustavo Araujo Lerma, right?

A.    Yes.

Q.    So that, the application, should not have been granted, right?

A.    Not necessarily.  I believe there was also a marriage certificate within the A-file.

Q.    Right.  There's a marriage certificate that shows that -- there's also a marriage certificate.  I believe if we can go back to 8.  Maybe the one before that.  Oh, yeah, the one before that.  I guess 6.  There's a front page of that.  So okay.  There's a --

A.    Are you looking for the marriage certificate?

Q.    Yes.

A.    It's on page 4.

Q.    Oh, okay.  Let's go back to page 4.  Okay.  So there's a marriage certificate showing that Hiram Velez married Maria Manriquez, and then there's a document that shows that Blanca is Maria's daughter?

A.    That's correct.

Q.    Okay.  So the essence of this package is that the documents that have supported it show that Blanca Araujo is or

would appear that Blanca Araujo is the stepchild of Hiram Velez?

A.    Sorry.  The --

Q.    It would appear that from looking at these backup documents, to a reasonable investigator of the file, that Blanca is not the natural child of Hiram Velez but the stepchild of Hiram Velez?

A.    Yes, according to this A-file.

Q.    Okay.  Now this document didn't have a box to check for stepchild?

A.    Right.

Q.    But if we could go back to 315.  Yeah, page 1 of 315 -- or sorry, 310 the beginning of it and then to the second page after that.

Okay.  Now this document's all in English, right?

A.    Yes, it is.

Q.    And the -- now someone signed this Irene Garcia.  Did you investigate to see who she was?

A.    I did do a query, but I found no substantive results to pursue.  I believe this is dated 1996, and Irene Garcia is a pretty common name.

Q.    Okay.  And you have no reason to think that my client reads English, right?

A.    Sorry?

Q.    You have no reason to believe my client reads English,

right, in '96?

A.    That's not something I would know.

Q.    Okay.  You searched his house.  Did you find a lot of English books?

A.    We did find documents in English.

Q.    But novels, did you find any books in English?

A.    I don't recall.

Q.    Now if -- so if Hiram Velez in this application -- now when someone files this application for a green card, a person -- there is a process to interview the participants if there's any questions about the documents, right?

A.    I don't know how it would have been run back in '90-something.

Q.    So you don't know whether there was any further follow-up or questioning about what the relationship was?

A.    I can explain how the process works now.

Q.    Sure.

A.    Right now when there's a petition I-130 for petition for alien relative, the documents are accepted at face value, and the petition is approved or disapproved.  Whether there's an interview or not, there is not.

Q.    Okay.  And so they're accepted at face value, but if their documents don't support the application, the relationship in the application, it would be rejected, right?

A.    Yes.

Q.   Okay.  And so if someone now applies and submits a birth certificate that shows no relationship, it should be rejected?

A.   That's correct.

Q.   Okay.  If we could go to Exhibit 315 which is in evidence. And this is for Mario Araujo.  It also has the box checked as child, in English.  And if we could go to the second page, it also has the assistance of Irene Garcia, right?

A.   Yes.

Q.   Okay.  And if we could go to page 9 -- oh, sorry, page 5. Now this application has the same problem, that it shows Mario Araujo was not Hiram Velez's child, right, to a reasonable investigator?

A.   Sorry, the same problem?

Q.   It's the same problem, that this document shows that Felipe Araujo is the son of a Mexican citizen, Gustavo Lerma, right?

A.   This one's a little bit hard to read I believe the previous document is a translation that's more -- clearer.

Q.   The next -- oh, the -- so the next page or the page before?

A.   The page before.

Q.   Page before, okay.  The translation shows that Mario Araujo, his father was Gustavo Araujo.  So it doesn't match with the application?

A.   It matched -- you're correct.  It doesn't match the petitioner, but the mother's name matches the application.

Q.   Right.  But the petition is based on a person's -- this person is only eligible if he shows his father or mother is a U.S. citizen, right?  That's how this -- that's why he's eligible for a green card?

A.   Yes.  And it also -- you're eligible as a stepchild.

Q.   Might be eligible as a stepchild?

A.   Yes.

Q.   Okay.  Except that on this form there's no box to check for stepchild?

A.   It doesn't specify what type of child.  It could be a stepchild or a biological child.  But you're correct, the form doesn't specify either way.

Q.   The form doesn't specify either way, okay.

And so if we could go to the fifth page.  Now the translation doesn't show the father's citizenship, but on the original it does show his nationality Mexican, right?  I don't know if you can see it.  Can we blow that up.

A.   I think -- sorry.  The one that's zoomed in right now, that's actually for the grandparents.  But if you go up to the father's nombre del padre, that is the father.  And the copy that I see here, it does say Mexican.

Q.   Oh, yeah, there's an "X," okay.

A.   I'm sorry.  This still isn't the zoom.

Q.   Okay.

A.   It would be -- yeah.  So the circle on the top box, that shows the Mexican circle for father.

Q.   Okay.  Which would show that whoever was submitting this form was showing that -- if we could go back to page 315.

A.   The first page?

Q.   Yes.  So basically this package is showing that Hiram Velez is asking for a green card for his stepchild, Mario Araujo, who is born to -- in Mexico to two Mexican parents.  That's how a reasonable investigator would look at this package?

A.   Yes.

Q.   And they either -- either that stepchild is okay or they made a mistake and allowed him in anyway; is that your interpretation?

A.   Sorry, what did you mean by it is okay?

Q.   Either a stepchild is eligible for a green card or the immigration department messed up and gave it by mistake, right?

A.   Yep.  That seems correct.

Q.   Okay.  You found some other documents in the search as well?

     Your Honor, if I could approach, defense -- showing Defense Exhibit M.

     Did you find Defense Exhibit M in the search?

A.   Yes.

Q.   And what is that?

A.   It appears to be a birth certificate issued by the Department of Health in Puerto Rico in the name of Hiram Enrique Velez Seda.  Date of birth September 16th, 1956.

Q.   Okay.  Do you know when it was generated, if you can tell?

A.   On the bottom right, it looks like there is a date of issue that says October 27th, 1983.

MR. BEEVERS:  Move Defense M into evidence.

THE COURT:  Isn't it already in evidence?  Didn't you put in the birth certificate for Hiram?

MS. LYDON:  Not this particular copy found in the search warrant.

THE COURT:  So this one was found in the house?

MR. BEEVERS:  Found in the house.

THE COURT:  Okay.  That's fine.  It's admitted.

(Defendant's Exhibit M was admitted into evidence.)

BY MR. BEEVERS:

Q.   And take a look at defense Exhibit B, page 1 and 2.  Do you recognize that as something found in the house?

A.   I do.

Q.   And what is that?

A.   It's a Chicago driver's license -- or sorry.  One is a driver's license, and one is an ID card.

Q.   Were the actual cards found?

A.   Yes.

Q.   Okay.  So that's a -- is that a fair and accurate representation of what was found?

A.   Yes.

THE COURT:  You want to move those into evidence?

MR. BEEVERS:  Yes, your Honor.  Move Defense B into evidence.

MS. LYDON:  No objection.

THE COURT:  Two pages, right?

MR. BEEVERS:  Yes.

THE COURT:  It's admitted.

(Defendant's Exhibit B was admitted into evidence.)

BY MR. BEEVERS:

Q.   And showing Defense Exhibit H, do you recognize those documents as anything found in the search?

A.   I recognize these as items found during the search warrant.

Q.   And what are they, in general?

A.   I'm sorry.  These are hard to read.  They're cards pertaining to political party participation.

MR. BEEVERS:  Move Defense H into evidence.

MS. LYDON:  No objection.

THE COURT:  Admitted.

(Defendant's Exhibit H was admitted into evidence.)

BY MR. BEEVERS:

Q.   For I, do you recognize those as items found in the search?

A.   I do.

MR. BEEVERS:  And move those into evidence.

THE COURT:  Admitted, Exhibit I.

(Defendant's Exhibit I was admitted into evidence.)

BY MR. BEEVERS:

Q.   And showing Exhibit K, did you find that in the house?

A.   I did.

Q.   And what is it?  Is it a letter?

A.   It is a letter.

Q.   And --

A.   It's addressed to Mr. Hiram Enrique Velez at 38 De Fer Circle.

MR. BEEVERS:  Okay.  Move that Exhibit K into evidence.

MS. LYDON:  No objection.

THE COURT:  It's admitted.

(Defendant's Exhibit K was admitted into evidence.)

THE WITNESS:  There's page 1 of 2.  I don't know if there's a second page.

THE COURT:  Do you have both pages there?

MR. BEEVERS:  Yes.

Q.   Both pages were found during the search?

A.   Yes, it was.

Q.   And Exhibit L?

A.   This was also found during the search warrant.

Q.   And is it also correspondence to Hiram Velez?

A.   Yes, it is.

MR. BEEVERS:  Move Exhibit L, three pages, into evidence.

MS. LYDON:  What is Exhibit L?

BY MR. BEEVERS:

Q.   What is it?

A.   It is a letter from a political party saying order of merit.

MS. LYDON:  No objection.

THE COURT:  It's admitted.

(Defendant's Exhibit L was admitted into evidence.)

THE WITNESS:  There's four pages.

MR. BEEVERS:  Oh, sorry, your Honor.

THE COURT:  Right, four pages.

BY MR. BEEVERS:

Q.   And I believe --

A.   There's a J.

Q.   Oh, and Exhibit J, what is that?

A.   Exhibit J was -- is a letter from the 2016 congressional district census from a political party addressed to Mr. Velez.

MS. LYDON:  No objection.

THE COURT:  J is admitted.

(Defendant's Exhibit J was admitted into evidence.)

MR. BEEVERS:  Did I get I?

THE WITNESS:  You did get I.

THE COURT:  Yes.

BY MR. BEEVERS:

Q.   And did you find any other correspondence addressed to Hiram Velez in the house that you didn't seize?  You didn't seize every piece of mail in the whole house, right?

A.   No, we didn't.

Q.   Okay.  These were seized because they were somehow connected to voting?

A.   Yes.

Q.   Okay. And but basically did you find any -- isn't it true that you didn't find any correspondence addressed to Gustavo Araujo Lerma at the house, or you would have seized it?

A.   Yes.

Q.   And other than what we've seen in evidence, basically you looked through the whole house for anything that had the name Gustavo Araujo Lerma on it at all, right?

A.   Yes.

Q.   No credit cards in that name?

A.   None were found.

Q.   Okay.  You found credit cards in the name Hiram Velez, right?

A.   I believe so, yes.

Q.   And in general, bills in the name Hiram Velez?

A.   Yes.

Q.   Banking documents in the name Hiram Velez?

A.   Yes.

Q.   Tax records in the name Hiram Velez?

A.   Yes.

MR. BEEVERS:  Permission to publish briefly the exhibits.

THE COURT:  The ones you just admitted?

MR. BEEVERS:  Yes.

THE COURT:  Go ahead.

BY MR. BEEVERS:

Q.   Okay.  This is K.  Did you do any other investigation to determine if my client had any involved -- other political involvement related to voting?  Did you talk to any witnesses, anything?

A.   In terms of whether he voted?

Q.   Right.

A.   I did correspond with the Sacramento County Registrar -- Voter Registrar to confirm his voting record.

Q.   Okay.  And J.

And for Exhibit M, the one that you see, did it actually have the real stamps on it, or was it a photograph?

A.   Yeah.  The stamp was in it, and it was found within a

paper protector sheet.

Q.   Okay.  And Defense B, and just roughly the driver's license in Defendant's Exhibit B more or less matches the references in the letter that you discussed that was sent from Hiram Velez to Puerto Rico?

A.   Yes, it does.  The address is the same as the one that was stated in the letter.

Q.   And so the cards that are in these exhibits, what was -- did you find -- these were the ones -- you seized ones that were for Hiram Velez.  Were there any other ones in any other names?  Party, Republican party membership cards say for Maria Velez, anything like that?

A.   Not that I found or not that I recall either.

Q.   And these ones are for '15 and '16.  Did you find any older ones as well?

A.   The cards that I found were dating from 2015.

Q.   And do you know if you seized like all of the political membership cards in the name Hiram Velez?

A.   Yes.

Q.   And they were all signed, right?

A.   Yes, they are.

Q.   Did you do any determination to determine what they were, what those cards are used for?

A.   I think they say what they are on the cards.

Q.   Were any of them seized from his wallet?

89

A.    I don't recall.

Q.    And the letter, we have the letter from Donald Trump.  Do you know where that was found in the house?

A.    I believe it was found in a room adjacent to the kitchen that's kind of like a living or family room.  I believe it was found on a shelf, but I don't exactly recall.  But the record would say where it was found.  But if I recall correctly, that's where.

Q.    Was it stored away or just in the junk in the trash?

A.    It was not in the trash.  These -- the majority of these cards and letters were found together on a bookshelf.

Q.    Just in a heap, or were they found like neatly arranged?  They're sort of duplicate, that's why I'm asking.

A.    I don't recall how they were found.  I just recall they were found in that general area.

Q.    You testified about in Blanca Araujo's A-file there were -- she eventually naturalized as a U.S. citizen?

A.    Yes, I did.

Q.    Now the person who petitioned her, Blanca Araujo, to become a green card holder, that person has no involvement in naturalization, right?

A.    I'm sorry?

Q.    There's no -- a person who has a green card, a permanent resident who wants to naturalize, they do that on their own, right?

A.   Yes.  You're eligible to naturalize on a variety of factors.  In Blanca's case, I believe her eligibility was from being a legal permanent resident for five years.

Q.   Okay.  And so she didn't need to have my client do anything to further the petition, right?

A.   Not to further the petition but it was derived -- original LPR was derived from the petition for alien relative.

Q.   Okay.  But once that process had started in the '90s, he couldn't really like tell her don't -- she didn't have to get his permission to become a citizen?

A.   I don't -- sorry.

Q.   So when Blanca made the decision to become a citizen, she didn't have to ask for her sponsor's permission to upgrade to citizen, right?

A.   No.  I think she was an adult then, so it was between her and USCIS.

Q.   Okay.  And the same with Mario Araujo, he was an adult when he naturalized, so it was his own decision?

A.   Yes, same circumstances.

Q.   Okay.  One moment.

     Did you find any other correspondence at my client's house involving Felipe Araujo in either version, either Sr. or Jr.?

A.   Correspondences --

Q.   To or from him.

A.   Not that I recall.

Q.   Okay.  Everything that you found has been put into evidence so far as to Felipe Araujo in that residence?

A.   I don't recall.

Q.   And you've never met Antonia Lerma?

A.   I have never personally met Antonia Lerma.

MR. BEEVERS:  That's all I have.

THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MS. LYDON:

Q.   Just one quick point.  So defense counsel asked you some questions about eligibility to file a petition for an alien relative to get status.  Do you recall that?

A.   Yes, I do.

Q.   I just want to clear up is a U.S. citizen stepparent eligible to file a petition for an alien stepchild?

A.   They are.

Q.   Is an alien masquerading as a U.S. citizen eligible to file a petition for their child?

A.   No.

MS. LYDON:  That's all.

THE COURT:  Mr. Beevers, anything further?

MR. BEEVERS:  No.

THE COURT:  Thank you.  You may step down.  You may call your next witness.

MR. KENNY:  The government calls Heather Ditty.

(Whereupon the oath was administered.)

HEATHER DITTY

was called as a witness, and having been duly sworn, was

examined and testified as follows:

THE WITNESS:  I will.

THE CLERK:  Thank you.  State your full name and spell

your names for us, please.

THE WITNESS:  Heather LaMaye Ditty, H-e-a-t-h-e-r, L-a

capital M-a-y-e, D-i-t-t-y.

THE CLERK:  Thank you very much.

DIRECT EXAMINATION

BY MR. KENNY:

Q.   Good afternoon, Ms. Ditty.  What do you do for a living?

A.   I work for the Sacramento County Voter Registration &

Elections office.

Q.   And in general, what are your duties for that office?

A.   I manage the voter file maintenance which is our

registration section and our outreach department.

Q.   You mentioned that you work with registration.  Can you

sort of describe generally how voter registration works?

A.   Yes.  So every person that wants to be registered to vote

needs to fill out a registration form, also known as an

affidavit of registration.

Q.   And your office handles those affidavit of

registrations?

A.   That's correct.

Q.   And how long have you been in your job?

A.   23 years.

Q.   And what's your current title?

A.   Election manager.

Q.   And how long have you been an election manager?

A.   Since 2014.

Q.   And what were you doing prior to that?

A.   I was the election supervisor over voter registration.

Q.   Now I want to talk a little bit more about that affidavit of registration.  What kind of information is required on an affidavit of registration?

A.   First, U.S. citizenship, their name, their physical residence address, mailing, if different, their date of birth, their place of birth, their driver's license or last four of their social, political party preference, if they so choose, and their signature.

Q.   And why is it important to get this personal information?

A.   Well, it's required by state and federal law in order to be registered to vote.

          MR. KENNY:  Government moves to admit Exhibit 502.  This is subject to the parties' stipulation.

          THE COURT:  It's admitted.

          MR. BEEVERS:  No objection.

(Government's Exhibit 502 was admitted into evidence.)

BY MR. KENNY:

Q.   Have you seen this before?

A.   I have.

Q.   And what is this?

A.   This is an Affidavit of Registration also known as a Voter Registration Form.

Q.   So this is one of the voter registration forms that you were just talking about?

A.   That's correct.

Q.   If you could zoom in on that.

     And it looks like it's asking for name and date of birth like you were discussing?

A.   Correct.

Q.   And place of birth as well?

A.   Yes.

Q.   And now I think you mentioned this, but why do you ask for place of birth?

A.   It's just a portion of the election code that asks for a place of birth.  So we request -- it is now no longer required, but it was required at this time, and place of birth is just to ensure that we have the correct person on file.

Q.   And what do you mean to ensure you have the correct person on file?

A.   So there's different ways of information that you can

obtain from a person.  Their name is and their driver's license and last four are typed then, but also with Department of Motor Vehicles and the Social Security office, they also have the place of birth.  So it's another form of identification to prove who that person is.

Q.   So all of this biological information is sort of tied to one voter registration?

A.   Correct.

Q.   And in this registration form, it looks like the registering voter's name is Hiram E. Velez; that is correct?

A.   Correct.

Q.   And that address is 38 De Fer Circle?

A.   Correct.

Q.   And he gave his date of birth was September 16th, 1956, correct?

A.   That is correct.

Q.   And place of birth, Puerto Rico?

A.   Correct.

Q.   If a person registering to vote didn't include some of this information, would it still be processed?

A.   It depends on the information.

Q.   Say date of birth?

A.   It would go into a pending file requesting additional information from the voter.  A pending file is just a placeholder waiting for the rest of the information that we

need.

Q.   And so that information would be date of birth?

A.   Correct.

Q.   Okay.  If we could zoom out, please.  Now it looks like here, this question at the top, it asks are you a citizen of the United States of America; is that right?

A.   That's correct.

Q.   Why is that question on the affidavit?

A.   It is required by the National Voter Registration Act of 1993 that everyone that registers to vote is a U.S. citizen.

Q.   So you're required to be a U.S. citizen in order to vote?

A.   Correct.

Q.   And on this application the person filling it out checked yes?

A.   That is correct.

Q.   And below that it looks like there's a voter declaration that says "I am a U.S. citizen"?

A.   Correct.

Q.   Why is that on this?

A.   It is another certifying under penalty of perjury that the foregoing information that they provided is true and correct and that they are a U.S. citizen and at least 18 years of age.

Q.   And so by signing below that, you're affirming that that

is correct?

A.   Correct.

Q.   And this registered voter did sign that, correct?

A.   Correct.

Q.   And it looks like that was in June of 2008?

A.   Correct.

Q.   Now if this declaration had not been signed, would this have been processed?

A.   No.

Q.   So now talking about voter registration generally, you mentioned that each voter is assigned a unique voter ID?

A.   Correct.

Q.   And does that ID tie back to the information that's in the registration form?

A.   Yes.

Q.   So the voter ID associated with the Hiram Velez here would be associated with the person, date of birth, place of birth that we see on this voter registration?

A.   That is correct.

Q.   And is there a database that keeps information about registered voters?

A.   Yes.

Q.   And what is that database?

A.   It's called an Election Management System.

Q.   And do you have access to that database?

A.    I do.

Q.    What kind of information is stored in that database?

A.    All information from the time that they registered to vote until the time that we receive information that they have either moved out of state or are deceased.

Q.    And can you search by a specific voter?

A.    I can.

Q.    Now have you searched that database for records related to the voter registered as Hiram E. Velez?

A.    I have.

        MR. KENNY:  The government moves to admit Exhibit 503 subject to the parties' stipulation.

        THE COURT:  It's admitted.

        (Government's Exhibit 503 was admitted into evidence.)

BY MR. KENNY:

Q.    What is this, Ms. Ditty?

A.    This is a voter log of a particular voter, and every voter has one.

Q.    And what kind of information is on this?

A.    This information is information when we've made a small change to a voter record or they've reregistered.  A new line will show up telling us what we've done.

Q.    So is this related to a specific voter here?

A.    It is.

Q.    And who is that?

A.   Hiram E. Velez.

Q.   So all of the actions that would have been taken on a voter's registration would be recorded in this log?

A.   That is correct.

Q.   Okay.  And it looks like here, is this actions that were taken on or about June 25th, 2008?

A.   Yes.

Q.   And it says, "State pending reregistration due to address change."  What is that telling us?

A.   So it's just basically telling us it went to the state.  In 2008 there was a thing called state profile.  Now we have a statewide voter database.  But then there was a state profile that just went up to verify the driver's license and to come right back down.  This is within seconds of an action.  So as you can see, on the right side here it says it was done at 11:20.  And then he became -- a.m. on 6/25, and then he became active immediately on 6/25/2008 at 11:21 a.m.  It took one minute to change that.

Q.   Oh, okay.  So the line right below that shows that there had been a reregistration, and above that it looks like it was due to an address change?

A.   That's correct.

Q.   So judging by that date, June 25th, 2008, is that related to the voter registration form that we just looked at for Hiram E. Velez?

A.    It is the day we processed the voter registration form, yes.

Q.    So your office would have received that prior registration form and then processed that on June 25th, and that's recorded here?

A.    Correct.

Q.    I'm going to show you a couple of documents, pieces of physical evidence that have already been admitted.  These have been admitted as Government Exhibit 601.  Are you familiar with what this is?

A.    Yes.

Q.    And what is that?

A.    At this day and time it was called a Sample Ballot and Voter Information Pamphlet.  It is now called a County Voter Information Guide.

Q.    And it just has the information about the upcoming election?

A.    That is correct.

Q.    And can you tell who it was sent to?

A.    Yes.

Q.    And it says Hiram E. Velez there?

A.    Correct.

Q.    Now is everyone sent one of these or just registered voters?

A.    All registered voters are sent one of these unless they

opt out.

Q.   So this Hiram E. Velez here, does that correspond to the registered voter we just looked at in the Affidavit of Registration?

A.   That is correct.

Q.   And now this, also part of 601, is this also one of these voter information guides?

A.   Yes.

Q.   And it looks like it was also sent to that registered voter Hiram E. Velez?

A.   Correct.

Q.   Now these have previously been admitted as Government 626. Are you familiar with these?

A.   I am.

Q.   And what are they?

A.   These are voter notification cards that every registered voter receives when they either register for the first time or do an update for the registration.

Q.   Okay.  So you've received this after you updated your address or name or something like that?

A.   Correct.

Q.   And these are sent to registered voters then?

A.   They are.

Q.   It looks like one of these is for Hiram Enrique Velez, and another one is for Hiram E. Velez where this voter had

reregistered.  He might have gone by his middle initial instead of his full name?

A.   Correct.

Q.   You can take this down.

I want to talk about voting generally.  Do voters in Sacramento County vote in person today?

A.   Some do.

Q.   Oh, some do?

A.   Yes.

Q.   Can you describe the process for voting in person?

A.   As of today or the years --

MR. BEEVERS:  Objection, your Honor.  Relevance.

THE COURT:  Sustained.  Today doesn't matter.

BY MR. KENNY:

Q.   Okay.  Let's go back way back to 2016, the November 8th election.  Can you describe how the voting process worked for people voting in person?

MR. BEEVERS:  Your Honor, objection.  If it's not the specific polling place.

THE COURT:  I don't understand your objection.  What's the grounds?

MR. BEEVERS:  Relevance.  There may be different processes in different parts of the city, foundation for the specific location.

THE COURT:  He asked generally.  Go ahead.  Overruled.

BY MR. KENNY:

Q.  So generally, in your experience in Sacramento County, November 8th, 2016, how did voting in person work?  What did a voter have to do in order to vote?

A.  They went to the roster election officer who had the roster of voters, and they stated their name and their address. And then the election officer that was in charge of the roster of voters book then looked for their name, searched for their name, found their name, and then repeated their name and their address before the voter signed the roster.

Q.  And why are they asked to give their name and address?

THE COURT:  Sorry to interrupt.  They had to go to the right polling place first, correct?

THE WITNESS:  Yes, they do.  They had to go to the right polling place at that time, yes.

BY MR. KENNY:

Q.  Although, I suppose we would find that out if their name wasn't there.

Why are they asked to give their name and address?

A.  To confirm who they are.

Q.  Is it to confirm that they are the person registered to vote?

A.  Correct.

Q.  So that information is tied to that voter information that we were discussing earlier?

A.    That is correct.

Q.    Date of birth, place of birth?

A.    Correct.

Q.    Now I notice you brought some documents with you.  What are those?

A.    It's an actual roster of voters.

Q.    Is that what you were just testifying that a voter would sign a roster of voters?

A.    That is correct.

Q.    I haven't seen these, but do you want to hold these up as a demonstrative?

THE COURT:  Person have to show ID back in 2016?

THE WITNESS:  Not unless they were a first-time federal voter.  This is what a roster of voters looks like.

BY MR. KENNY:

Q.    And that's what a voter would sign when he went to vote?

A.    That is correct.

THE COURT:  Why do you have to do it the first time?

THE WITNESS:  It's required by the Help America Vote Act, called HAVA, that the first time that you federally vote for a federal election that you actually have to show ID unless the state can confirm your driver's license and social security number.

THE COURT:  Okay.  Thanks.

BY MR. KENNY:

Q.   And after that, is it sort of taken at face value when you fill out a registration or reregistration form?

A.   Yes.  And every time you sign your name on a roster, you're certifying that you are who you are.

Q.   Okay.  And you're certifying that all the information that you had previously given is correct?

A.   Correct.

MR. KENNY:  I'm going to look at a couple specific of these roster of voters.  Government moves to admit Exhibit 504 as part of parties' stipulation.

THE COURT:  It's admitted.

(Government's Exhibit 504 was admitted into evidence.)

BY MR. KENNY:

Q.   Now can you tell me what this is?

A.   This is a roster of voters page for November 6, 2012, out of one of these roster of voter books.

Q.   You said this is for the November 6, 2012, election?

A.   That is correct.

Q.   And up here at the top it says "Voter Declaration, I am a U.S. citizen."  Why is that information there?

MR. BEEVERS:  Objection, your Honor.  Asked and answered.

THE COURT:  Overruled.  Go ahead.

THE WITNESS:  Can you repeat the question, please.

BY MR. KENNY:

Q.    Why does it say at the top "Voter Declaration, I am a U.S. citizen"?

MR. BEEVERS:  Objection.  Calls for opinion as to law.  This is for the Court to instruct.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  It's basically telling him by signing this roster you are affirming who you are and that you are certifying under penalty of perjury.

MR. BEEVERS:  Objection, your Honor.  She's misreading the document.

THE WITNESS:  I was not reading the document.

THE COURT:  Everybody take a breath.  If he makes an objection, pause.  You're doing fine.

MR. KENNY:  Agreed, your Honor.

THE COURT:  The document does speak for itself.  She doesn't -- I don't think it says penalty of perjury anywhere, does it?

MR. KENNY:  It says, by signing this roster, you are affirming that you have not moved from the address shown.

MR. BEEVERS:  Objection, your Honor.

THE COURT:  She just used the phrase "penalty of perjury," and it doesn't say that.  Okay.  Document speaks for itself.  The objection is sustained.

Go ahead, next question.

BY MR. KENNY:

Q.   You testified that when a voter comes in he's asked to give his name and address and that that's to confirm that you are the person registered, correct?

A.   That is correct.

Q.   So there's a little "x" in the box next to Hiram E. Velez here, what does that signify?

A.   It signifies that they have stated their name and address and the election officer has put that mark there --

Q.   Okay.  And that --

A.   -- to help the person guide over to where they're supposed to sign.

Q.   And that name and address, would that have come from the voter registration information?

A.   Yes.  It would come from the database.

Q.   So when he signs next to that, is he saying he is that Hiram E. Velez there?

A.   Correct.

Q.   And after signing this, you presumably go on to vote then?

A.   That is correct.

Q.   And this voter ID number here, that's the voter ID you referenced earlier?

A.   That is correct.

Q.   If we could turn to page 2.  And is this the roster of voters for the June 3rd, 2014, election?

A.    This is a roster of voters page from, yes.

Q.    And again, it looks like the voter registered as Hiram E. Velez voted in that election?

A.    That is correct.

Q.    If we could turn to page 3, please.  And is this the roster of voters page for the November 4th, 2014, election?

A.    That is correct.

Q.    And again voter registered as Hiram E. Velez signed and voted in this election?

A.    That is correct.

Q.    Page 4, please.  And this is a roster of voters page -- well, can you tell what election this is for?

A.    This is the June 7th, 2016, election.

Q.    And it looks like the date is actually a little bit obscured there.  How do you know this is June 7?

A.    That is when the presidential primarily election for 2016 was.

Q.    And so can you tell by looking at this that the voter registered as Hiram E. Velez signed this roster of voters pages and voted in this election?

A.    That is correct.

Q.    And if we could turn to page 5, please.  Finally, what election is this?

A.    This is the November 8th, 2016, general election.

Q.    And again the voter registered as Hiram E. Velez signed

and voted in this election?

A.    That is correct.

Q.    We can take this down.

Government moves to admit Exhibit 501 which the parties have stipulated to.

THE COURT:  Admitted.

(Government's Exhibit 501 was admitted into evidence.)

BY MR. KENNY:

Q.    If you could turn to page 3.  Have you seen this before?

A.    I have.

Q.    And what is this?

A.    This is a voting history for a registered voter.

Q.    And did you -- or where is this from?

A.    This is from our election database.

Q.    And did you pull this information from the database?

A.    I did.

Q.    And was it information for a specific registered voter?

A.    It is.

Q.    And was that Hiram E. Velez?

A.    It is.

Q.    Okay.  Now what does this show?

A.    This shows the voting history of the voter from March 26, 1996, to 11/6/2018.

Q.    And it shows that he voted at that polling place in most of these elections with the exception of one down there,

June 2nd, 1998?

A.   Correct.

Q.   And then these most recent ones.  And where does this information come from?  How does it get input into the database?

A.   Roster of voters forms, the actual roster is scanned. Each individual one is scanned into our system, and our system transfers it over; and then human eyes check it to verify that it is correct.

Q.   So those roster of voter pages that we were just looking at, the information from that would be input into the system?

A.   That is correct.

        MR. KENNY:  And government moves to admit exhibits -- I think it might be easiest if we did this all at once, Exhibits 505 to 509 which the parties stipulated to.

        THE COURT:  They're admitted.

        (Government's Exhibits 505 through 509 were admitted into evidence.)

BY MR. KENNY:

Q.   If we could start with Exhibit 505.  Have you seen this before?

A.   I have.

Q.   What is this?

A.   This is a certified list of candidates for the November 6, 2012, general election.

Q.   So does this have all of the candidates that were being --
that were being voted on in that election?

A.   That is correct, throughout the state.

Q.   If we could turn to page 2.  Does this show that there
were candidates for presidency in that election?

A.   It does.

Q.   Page 3, please.  There were candidates for senator as
well?

A.   That is correct.

Q.   If we could just turn to page 4.  Does this show that
there were candidates for the House of Representatives in this
election as well?

A.   That is correct.

Q.   Presumably this would contain all of the candidates for
the whole state, correct?

A.   The certified list from the Secretary of State contains
all of the list of candidates for state and federal offices.

Q.   Okay.  And when a voter went into the Sacramento County
polling place, they would only have the candidates for their
district, right?

A.   For their area, yes.

Q.   But there would also be candidates for the House of
Representatives?

A.   Yes.

Q.   If we could turn to Exhibit 507.  Is this the certified

list of candidates for the June 3rd, 2014, election?

A.   Yes, it is.

Q.   And if we could turn to page 19, please.  Were there candidates for House of Representatives being voted on in this election?

A.   There was.

Q.   If we could turn to Exhibit 506, please.  And is this a certified list of candidates for the November 4th, 2014, general election?

A.   It is.

Q.   If we could turn to page 8, please.  And so were there candidates for the House of Representatives being voted on in this election as well?

A.   There are.

Q.   And in the actual certified list of candidates, would the following pages contain additional candidates for House of Representatives?

A.   Yes.

Q.   If we could turn to Exhibit 508, please.  Is this the certified list of presidential candidates for the June 7, 2016, election?

A.   It is.

Q.   If we could turn to page 2.  Does this show there were candidates for the president of the United States being voted on in this election?

A.   Yes.

Q.   Now were there also -- do you happen to know in this same election there were also candidates for Senate and House of Representatives being voted on?

A.   There was.

Q.   This is a primary election?

A.   Yes, correct.

Q.   And if we could turn to Exhibit 509, please.  And is this the certified list of candidates for the November 8th, 2016, election?

A.   That is correct.

Q.   And if we could turn to page 2, please.  Does this show that there were candidates for presidency being voted on in this election?

A.   Yes.

Q.   Page 3, please.  Candidates for the Senate?

A.   Yes.

Q.   Page 4.  And candidates for House of Representatives as well, correct?

A.   That is correct.

Q.   So for each of the elections we've looked at, there were candidates for federal office on the ballot in that election?

A.   That is correct.

MR. KENNY:  Just a moment, your Honor.

Thank you.  That's all I have for now.

THE COURT:  Cross-examination.

MR. BEEVERS:  Thank you.

CROSS-EXAMINATION

BY MR. BEEVERS:

Q.   So when you say there's a record -- well, you described part of the process of voting.  When a person signs in on the roster, what happens next?  They go to a booth, right?

A.   They're given a ballot, and then they go to the voting booth, yes.

Q.   Okay.  And they actually vote -- back in 2016 they vote -- is there some sort of private space where they vote and can't be seen?

A.   Yes, voting booths.

Q.   Okay.  And the location for where this alleged voting happened, you weren't there on November 8th, 2016, right?

A.   No.  I was in the office.

Q.   Okay.  And but the booths are basically the same for that location?

A.   They are the same in every polling place.

Q.   Okay.  And now it's a secret ballot, right?  So he fills out -- a person votes secretly, and then closes the envelope, right, for in-person voting, right?

A.   There isn't an envelope for in-person voting at that time.

Q.   Okay.  How does it fold over?  What does the ballot look

like?

A.   It's a long ballot, can be between 8 and a half to 11 by 8 and a half by 19 inches long depending on how many contests there are, and at this time they were voting -- voted their ballot and dropped it into a scanner where it automatically read it.

Q.   Okay.  So it's not hand read at the time in the November 8th, 2016, presidential election, those were read by machines, right?

A.   They are always read by machines, even today.

Q.   Okay.  But I'm only asking about that, the date of that incident.  Those -- a person fills out -- jurors probably know that, but just in case, you fill it out with pencil, you fill out a little circle, right?

A.   Yes.

Q.   Okay.  That's the actual voting is filling in the circle, right?

A.   Yes.

Q.   And it is possible -- so if a person signed in to vote didn't fill out anything and just turns in the blank ballot, the machine would register that as just no votes, right?

A.   If someone undervoted a contest, the ballot would automatically be kicked out of the machine at that time for them to check their ballot to see if they wanted to vote for that contest.

Q.    Okay.  And if they didn't want to vote, they could submit it again?

A.    An election officer would push an override button and drop it into the machine.

Q.    Okay.  And you don't know whether that happened on November 8th, 2016?

A.    Can you rephrase that.

Q.    You don't know whether -- you don't have a copy of Hiram Velez's actual ballot with you today that's been filled in, right?

A.    No.

Q.    What happens to those ballots after a person fills in the box, submits them for the presidential election?  What happened to that ballot after that?

A.    It goes through a canvas process.

Q.    Okay.  And what is that canvas process?

A.    Where we do a one percent manual tally against all ballots.  One percent of all ballots are manual tallied to ensured that the counting of the machine is correct.

Q.    Okay.  And then after a certain period, are the ballots destroyed?

A.    22 months, by federal law.

Q.    So they're gone by now?

A.    That is correct.

Q.    Okay.  And but they weren't gone in 2016, right, for the

November 8th, 2018, election?

A.    Can you repeat that, please.

Q.    Okay.  For the presidential election November 2018 -- sorry 2016, presidential election November 2016, those would be destroyed 22 months after that election?

A.    That is correct.

Q.    Okay.  And prior to that time, those ballots are saved, and they have the person's name on them, right?

A.    I'm sorry?

Q.    I'm asking, okay?

A.    The person as in whom?  I'm sorry.

Q.    So we're talking this case about Hiram Velez, you testified that the voter roster for November 2016 showed that he voted on that day, right?

A.    That is correct.

Q.    Okay.  But what you really mean is that he registered to vote and obtained a ballot and put a ballot into the machine, right?  That's technically what you know for sure, right?  You don't know whether he actually filled out any -- whether he actually voted for any particular candidate, right?

A.    I do not know he voted for a candidate on the November of 2016 election.

Q.    Okay.  And the only way to verify whether they actually did vote for a candidate or any candidate on November 8th, 2016, would be to check his ballot which is now destroyed,

right?

A.    The ballot is destroyed, yes.

Q.    Okay.  And for the presidential election, do you know whether any of the ballots were destroyed before the 22 months?

A.    No.  We would not have done that.

Q.    How long does it take to destroy all of the ballots for a certain election?

A.    So we wait the full 22 months, and then after -- it's usually a month or two after that that we have a big company come in and shred ballots in front of us.

Q.    Okay.  And you said that there is a -- if a ballot was submitted blank because a person changed their mind and decided not to vote, it would be kicked back, but an official could manually override that and allow the ballot to go in blank, right?

A.    Yes.

Q.    And would there be any record of that process kept?

A.    No.

Q.    Do you keep records of who the officials were on November 8th, 2016, presidential election when Hiram Velez -- at the polling place where Hiram Velez voted?

A.    Yes.

Q.    Okay.  And do you know who those people are?

A.    You want November 2016?

Q.   Yes.

A.   Inside the roster of voters book is the name of the election officials that worked that polling place.  And our election officers did not fill out that form.  However, it is in our computer.

Q.   Okay.  But it's possible to find it out?

A.   Yes.

Q.   And so those people may or may not remember helping submit a blank ballot that night, right?

A.   That is correct.  They wouldn't look at the ballot either.

Q.   Okay.  They wouldn't look at it, so they wouldn't know why it got kicked back?

A.   The machine at that time beeped at them and just -- it was an undervote or an overvote automatically beeped at them.  They would just say to the voter who was there putting their ballot in the machine, they would just say did you want to review your ballot one more time, there might be a contest you missed.  Then it would be up to a voter to decide yes or no.  And then they would feed it through again, and the election officer would press an override button to let it drop into the machine.

Q.   Okay.  And so there's really no way anyone in the office would know that a ballot was blank unless they actually looked at the hard copies that are saved, right?

A.   That is correct.

Q.   And were there any investigations done while those ballots existed looking for fraudulent voters or anything after the November 8th, 2016, election?

A.   All elections are reviewed for voter fraud.

Q.   Okay.  Do you recall anything unusual with that particular voter -- that particular polling place?

A.   No.  I do not.

Q.   So basically just the standard check of the accuracy of the machine, right?

A.   Correct.

Q.   Okay.  One moment.

Okay.  So for the election in November 8th, 2016, you don't know whether -- you don't have personal knowledge of whether Mr. Hiram Velez actually filled out the ballot to actually vote for anyone on that night, right?

A.   That is correct.

Q.   And those records would have been destroyed?

THE COURT:  22 months after the election, next question.

BY MR. BEEVERS:

Q.   Okay.  So for the most recent -- okay.  June 2016, were the time periods, the 22 months, were those different during 2014, the 22-month period to destroy the records?

A.   22 months after the date of every election ballots are

destroyed.

Q.   Okay.  And that rule has been in place back to 2012 all the way through 2016; it's the same 22 months?

A.   It's the same, yes.

MR. BEEVERS:  That's all I have.  Thank you.

THE COURT:  Any other questions?

MR. KENNY:  Just briefly, your Honor.

THE COURT:  Go ahead.

REDIRECT EXAMINATION

BY MR. KENNY:

Q.   If we could pull up exhibit -- if you could pull up Exhibit 501 again, page 3.  So this goes back to March 26th, 1996, correct?

A.   That is correct.

Q.   That's the first election that the voter registered as Hiram E. Velez voted in?

A.   In our database, yes.

Q.   In your database.  And so for each of the elections where it says "voted at polling place," the voter registered as Hiram E. Velez would have had to be registered to vote?

A.   That is correct.

Q.   And he would have gone to the polling place, correct?

A.   Correct.

Q.   And he would have had to provide his name and address?

A.   That's correct.

Q.   He would have signed the roster of voters?

A.   That is correct.

Q.   And then he would have taken a ballot, correct?

A.   Correct.

Q.   And then he would have, after filling out the ballot, dropped it into the receptacle, correct?

A.   That is correct.

MR. KENNY:  No further questions, your Honor.

THE COURT:  Anything further?

MR. BEEVERS:  No other questions, your Honor.

THE COURT:  Thank you.  You may step down.

Take a break at this time.  During the recess, please do not discuss the case with anyone.  Do not discuss the case among yourselves.  Don't do any independent investigation or research.  Please report any violation of these admonitions to the Court.  See you in about 15, 20 minutes.

(Jury excused.)

THE COURT:  Any other witnesses?

MS. LYDON:  No, your Honor.  We're going to check the exhibit list and make sure everything is squared away, and then we plan to rest.

THE COURT:  You can check it against mine.

MS. LYDON:  Thank you.

THE COURT:  Mr. Beevers, let's take a break.  We'll come back, for the record, if you want to make any motions, go

ahead after the government rests.  And then do you have witnesses here today?

MR. BEEVERS:  I think we have one who may be taking the Fifth, and another one we may have.

THE COURT:  Do you want to call a witness and have the witness take the Fifth?

MR. BEEVERS:  Yes, your Honor, because it affects the admissibility of family history.

THE COURT:  Who is the witness?

MR. BEEVERS:  Mario Araujo.

THE COURT:  Isn't that the -- is that the son?

MS. LYDON:  Yes.

THE COURT:  Why would he take the Fifth?  Does he have counsel?

MR. BEEVERS:  Yes.  His counsel has advised Blanca and Mario to take the Fifth.

THE COURT:  Is the lawyer here?

MR. BEEVERS:  I'm not sure.

THE COURT:  Who is the lawyer?

MR. BEEVERS:  David Fisher.

MR. BEEVERS:  I think the issue, your Honor, is that they naturalized as adults within the statute of limitations.

THE COURT:  Oh, that's right.  Well, I mean, they can't just take a blanket fifth.  I mean, in terms of an offer of proof, are there questions you were going to ask them, or

was the government going to ask them any questions?

MR. BEEVERS:  Who their father -- who is their father.

THE COURT:  They're going to take the Fifth on that?

MR. BEEVERS:  Yes.  And I think -- with the evidence, I think it makes sense that they should.

MS. LYDON:  I don't understand the purpose of calling them to take the Fifth.  We certainly object it being done in front of the jury, but we don't understand the purpose at all.

THE COURT:  What's the purpose, again, Mr. Beevers?  Are they here?

MR. BEEVERS:  Actually, we have three other witnesses today.

THE COURT:  You do?

MR. BEEVERS:  Yes.

THE COURT:  All right.  We'll deal with those witnesses then, and then we'll discuss the issue of the -- whether we'll allow them to take the Fifth in front of the jury.

MR. BEEVERS:  Not in front of the jury.  It was just to make sure that they're unavailable unless the government is willing to stipulate that those two aren't available for evidence purposes.  That's our main point.

THE COURT:  I guess the government could grant them

immunity too.

MR. BEEVERS:  I'm not sure they could.

THE COURT:  Isn't there a statute of limitations issue at this point too?

MS. LYDON:  I'm not entirely clear of the theory of criminal liability that the defendant and counsel for the witnesses might be embracing, and I'm certainly not authorized to grant any sort of immunity.

THE COURT:  Okay.  I just wanted to make sure the record is clear.  I don't know if you wanted them to testify or not.

Okay.  We'll do all that outside the presence of the jury, if they're going to in fact take the Fifth and they're not going to testify in front of the jury, so --

MR. BEEVERS:  Right.

THE COURT:  Okay.

MS. LYDON:  And with respect to the other witnesses, I wanted to advise the Court and Mr. Beevers that I received reverse Jencks for Raquel Velez and --

THE COURT:  Who are the three witnesses?

MS. LYDON:  Well who are the three witnesses?

MR. BEEVERS:  Raquel Velez.

THE COURT:  I can't hear you.

MR. BEEVERS:  Sorry.  Raquel Velez, Joan Araujo, and Jorge Salcedo.

THE COURT:  Give me the names again.

MR. BEEVERS:  Jorge Salcedo, Joan Araujo, and Raquel Velez.

THE COURT:  Is Raquel the daughter?

MR. BEEVERS:  Yes.

THE COURT:  Then who are the other two?

MR. BEEVERS:  Daughter-in-law and son-in-law.

THE COURT:  What's his name again?

MR. BEEVERS:  Jorge Salcedo.

THE COURT:  He's your client's son-in-law?

MR. BEEVERS:  Stepson-in-law is our theory.

THE COURT:  Well, who is he married to?

MR. BEEVERS:  Blanca.  It's the spouses of the two who are taking the Fifth.

THE COURT:  So he's married to Blanca?

MR. BEEVERS:  Right.

THE COURT:  Who you say is his stepdaughter?

MR. BEEVERS:  Right.

THE COURT:  Okay.  And the other person is Joan?

MR. BEEVERS:  Joan, who is married to --

THE COURT:  Araujo?

MR. BEEVERS:  Right.  The wife of Mario who wants to take the Fifth.

THE COURT:  Wife of Mario.  And you say that Mario is a stepson as well?

MR. BEEVERS:  Yes.  We believe Mario and his wife would say that.

THE COURT:  Your claiming that Mario is a stepson, and Blanca is a stepdaughter of your client?

MR. BEEVERS:  Yes.

THE COURT:  That's the position you're taking?

MR. BEEVERS:  Yes.  And they would testify to that.

THE COURT:  They'll testify to that?  They have lawyers?  They understand penalties of perjury?  Because I'm going to explain it to them.

MR. BEEVERS:  Those are the two who are taking the Fifth or want to take the fifth.

THE COURT:  I'm not worried about the ones taking the Fifth.  I'm worried about the ones you're going to have testify and say that the two people taking the Fifth aren't his biological children.

MR. BEEVERS:  They would testify they were told that by the --

THE COURT:  They can't testify as to hearsay.

MR. BEEVERS:  They can.  It's a statement of family history of an unavailable witness.

THE COURT:  No.  That's a reach that I'm not going to allow, unless you've got some authority for that.  Give me the code section.  That's a dangerous path to go down, Mr. Beevers, and I hope the client understands that.  Requiring witnesses to

come in here and possibly subject themselves to perjury, I'm not going to sanction that.  So I want you to talk to your client and think carefully about putting on witnesses who you believe are going to testify to that type of evidence.  And then I need also proof that you think they can testify as to what witnesses who are going to take the Fifth have said.  You think it's a -- go ahead.  Give me the code section.

MR. BEEVERS:  Your Honor, it's Rule 804, when the declarant's unavailable as a witness for taking the Fifth, the person can testify to statement of personal or family history about another person concerning any of these, the person's own birth or relationship by blood, adoption --

THE COURT:  Well, bringing in a witness that says so and so told me that she is the stepdaughter of the defendant isn't a family history statement.  Family history would be my father -- she told me that her biological father was "X" and that the defendant was not her biological father.  That's a statement of family history.  If that's the testimony you're going to elicit, then maybe that's slightly different from, I can't remember the date, but Blanca told me she wasn't the daughter of your client.  That's a much different statement.  So I'm going to require an offer of proof as to specifically what you think these witnesses are going to say, and I'm going to advise them that they have a right to counsel and that they're subject to penalties of perjury for not testifying

truthfully in court.

MR. BEEVERS:  And what we're seeking to elicit is the statement by the spouses that they were told by Mario and Blanca that Mario and Blanca said that this person was -- Hiram Velez is the stepfather, not father, that he was not their father but a stepfather.

THE COURT:  I understand what you're trying to get into evidence.  I am not sure that's a statement of family history though.

MR. BEEVERS:  Under the rule it says legitimacy, ancestry, relationship by blood, adoption, or similar facts of personal --

THE COURT:  Okay.  I'll take a look at it.  What's the code section again?

MR. BEEVERS:  It's 804(b)(4).

THE COURT:  Now setting aside all that, I'm not sure of the relevance other than attempts to undermine some of the documents, certified documents that are in evidence, but I'm not sure his parentage and who his children are is charged in this indictment last time I checked.  So what's the relevance as to whether in fact -- so let's say -- let's assume the jury did find that Blanca and Mario are his step kids.  How does that relate to any of the charges in this case?

MR. BEEVERS:  Because the government is trying to prove beyond a reasonable doubt that my client is not a U.S.

citizen.

THE COURT: Right.

MR. BEEVERS: By trying to prove he actually is Gustavo Lerma.

THE COURT: They don't have to prove who he is. They just have to prove that he's not Hiram Velez.

MR. BEEVERS: That's for the false passport. But for the false voting, they have to prove he's not just that U.S. citizen but any U.S. citizen. And their evidence of the citizenship charge is that link that he checked the box that he's actually the parent of that. That's their logical inference that says he's Gustavo Lerma, therefore, he's a Mexican. Other than that evidence, they have no evidence except the postcard, but they have -- they have very little evidence at this point to show that he's not some other U.S. citizen who is neither Gustavo Lerma, nor Hiram Velez.

THE COURT: You want to respond to that for purposes of the record?

MS. LYDON: I don't want to respond to the characterization of the evidence, but we agree we do need to prove the defendant is an alien.

THE COURT: Right.

MS. LYDON: That is -- so the evidence that the defendant wants to elicit could have some relevance to that, I suppose.

THE COURT: Okay. You're not going to -- all right.

MS. LYDON: We would just urge that it be kept extremely limited.

THE COURT: Right. Okay. Let's take a break.

MS. LYDON: And one more thing, just to put on the record what I started to say about Raquel Velez, we received a statement of reverse Jencks, and we wanted to note that if she's offered as a character witness, that her statement, which was just produced to Mr. Beevers. We just received it from an attorney who had represented her mother, that we -- that it would be probably used to impeach because in that statement she advises that Hiram Velez was extremely emotionally abusive to her mother and generally the family her whole life.

THE COURT: And did what?

MS. LYDON: Abusive to her mother and her family her whole life.

THE COURT: How is that relevant?

MS. LYDON: It wouldn't be, but as she was offered as a witness --

THE COURT: Oh, if she's offered as a character witness. I don't think you're offering her as a character witness, are you?

MR. BEEVERS: No, your Honor. Just for the name, what name he used.

THE COURT: Okay.

MS. LYDON:  Depending on the scope of that examination we wanted to --

THE COURT:  I understand.  We'll be careful about trying to elicit that information.

Okay.  We'll see you in about ten minutes.

(Recess taken 3:09 p.m. to 3:26 p.m.)

THE COURT:  Okay.  Back on the record outside the presence of the jury.  Ms. Lydon there are some additions you want to make to admitted exhibits?

MS. LYDON:  Correct, your Honor.

THE COURT:  Go ahead.

MS. LYDON:  1-A was admitted, not 1.

THE COURT:  Wasn't that with the first witness?

MS. LYDON:  1-A, I don't believe 1 was admitted.

THE COURT:  1-A was admitted, not 1.  Okay.  You're right.  1-A is in.

MS. LYDON:  116 is a new exhibit, and we will file an amended exhibit list tonight or at the close of the defense's evidence in case new exhibits are used.

THE COURT:  You don't need to file another list.  I'll just add.  So 116 was definitely admitted.  Okay.

MS. LYDON:  317 was admitted.

THE COURT:  Yes, it was.  Okay.

MS. LYDON:  614, only page 3 was admitted.

THE COURT:  614 and 614-T.

MS. LYDON:  Oh, yeah.  Sorry.  614-T, only page 3 was admitted.

THE COURT:  What was page 3?

MS. LYDON:  The translation of the baptism certificate.  614 was admitted in its entirety.

THE COURT:  And then 614-T?

MS. LYDON:  Page 3.

THE COURT:  Okay.  Page 3.  Good.  Okay.

MS. LYDON:  And 701, only page 1 was admitted, just the envelope.

THE COURT:  701-TR, 6 and 7 --

MS. LYDON:  Yes.

THE COURT:  -- were admitted.

MS. LYDON:  Uh-huh.  But 701 was just page 1.

THE COURT:  Okay.  Just page 1.  Got it.

MS. LYDON:  Those are all our -- all the ways that our list differs.

THE COURT:  Okay.  Mr. Beevers, so I'm going -- the government has to do this.  They're going to rest in front of the jury.  Do you want to make a motion now, or do you want to wait until the end of your case?

MR. BEEVERS:  I guess I can make it now.  Let me just, if I could, just check what she said.  1-A, it's not 1, and 116, 317; is that right?

MS. LYDON:  116 is admitted.

THE COURT:  116 is in, and 317.

MR. BEEVERS:  317 is in and 1-A was admitted, not 1.

THE COURT:  1-A, not 1.

MR. BEEVERS:  Yes, your Honor.

THE COURT:  Okay.  So we'll have to bring in the jury.  You can rest.  I'll have to send them out again.  You can make your motion.  The three witnesses that are going to take the Fifth are not here you said, or are they here?

MR. BEEVERS:  No.  It's just two witnesses.  They would be if we need them tomorrow, our witnesses --

THE COURT:  Right.  But in order for these other witnesses to testify, I have to make a finding that the witnesses are going to take the Fifth that are unavailable.

MR. BEEVERS:  No.  I don't think so.  Talking to them, I think we're just going to use -- we would just ask them questions about what name he used over that period of time that they knew him.  That's it.

THE COURT:  So they're not taking the Fifth now?

MR. BEEVERS:  These witnesses today would just be name witnesses.  We don't --

THE COURT:  Oh, you're not going to get into the hearsay?

MR. BEEVERS:  Right.  The step versus step, it's all very fuzzy, and nobody wants to talk about it, so --

THE COURT:  Okay.  So you're only going to say what

name did they know him by?

MR. BEEVERS:  Right.  It's just relevant to the --

THE COURT:  Okay.  That will be easy.

All right.  So let's bring in the jury.  Then we'll have you rest, and then we'll send them right back out.

(Jury seated.)

THE COURT:  All jurors are present.  All parties are present.

Ms. Lydon, any other witnesses?

MS. LYDON:  No, your Honor.  The government rests.

THE COURT:  Court has admitted and we've gone over the exhibits admitted, and we concur on that; and the government rests.

Okay.  Now I've got to send you back into the room for a second.  I'll bring you right back out in a little bit.

(Jury excused.)

The COURT:  Outside the presence of the jury, Mr. Beevers, you have a motion?

MR. BEEVERS:  Yes, your Honor, as to the false passport application charge, count 2 --

THE COURT:  Okay.

MR. BEEVERS:  -- I'd move under Rule 29 for a judgment of acquittal on the grounds that -- on the grounds of statute of limitations for the grounds other than the name.  The indictment that was filed within the statute of limitations

alleged the name.  The other -- the additions, even if the evidence was sufficient, it was not sufficient to show that it happened within the statute of limitations as to the social security number.

THE COURT:  I'm not certain I understand your argument with respect to the superseding indictment on count 2.

MR. BEEVERS:  Okay.  The superseding indictment broadened the scope of the indictment.

THE COURT:  Right.

MR. BEEVERS:  But the facts that they put in did not occur within the statute of limitations.  The original indictment was only for the -- that his name was not correct.  The government hasn't proved beyond a reasonable doubt that the name was correct.  If you -- the government has put in substantial evidence as to the place of birth being a lie, but I would argue that because the indictment has changed, the statute of limitations has expired as to the other alleged false statements that were --

THE COURT:  Okay.  I understand your argument.

MR. BEEVERS:  That's the argument.

THE COURT:  It's argued in the trial briefs.

Go ahead.

MR. BEEVERS:  Right.  As to the aggravated identity theft, the government hasn't proved beyond a reasonable doubt that my client is not a U.S. citizen.  That they may have

proved -- even if you found that he's not Hiram Velez, they didn't prove who he actually was.  It's very scanty evidence to show that he actually was, the logic of a paperwork which he could very easily have been a check in the wrong box, that he should have checked stepchild or some other form, just a nonsensical application which the application for naturalization -- the application for the kids' green card, he couldn't have intended to say that that was his name, that he was Gustavo Lerma.  That would have unraveled the whole scheme.  So that doesn't make any sense.

So what all that we're left is sort of unauthenticated documents and the word "mama" sketched in a book, that who knows where that came from.  That's pretty thin evidence to prove he actually wasn't a U.S. citizen.  That's all.

THE COURT:  Okay.

Ms. Lydon, on count 2, I know you addressed this in the trial brief, especially the specific argument, you want to just incorporate your arguments from the trial brief?

MS. LYDON:  Yes, sir.

THE COURT:  Anything else you want to add on count 2?

MS. LYDON:  No.

THE COURT:  And on count 1, anything you want to --

MS. LYDON:  Just that the government's presented evidence that he's certainly not the United States citizen he's been impersonating to get the privileges of citizenship for the

past 25 years, it would be highly unlikely that a U.S. citizen would, rather than just use his own legitimate identity, take on the identity of another United States citizen.

Second, the government's presented significant evidence that the defendant is a specific alien, Gustavo Araujo Lerma, in the form of all of the evidence found around his house of his mother, his brother, his two sisters, and his children who he naturalized.

THE COURT: Okay. Court denies the motion. Evidence taken in the light most favorable to the government which the Court's required to do, clearly shows that the jury could return a verdict of guilty on both of those counts.

All right. Let's bring the jury back in.

You got a witness ready, Mr. Beevers?

(Jury seated.)

THE COURT: All right. All jurors present. All parties present.

Mr. Beevers, you may call your first witness.

MR. BEEVERS: Defense calls Raquel Velez.

(Whereupon the oath was administered.)

RAQUEL VELEZ

was called as a witness, and having been duly sworn, was examined and testified as follows:

THE WITNESS: Yes.

THE CLERK: I need you to state your full name and

spell your names for us, please.

THE WITNESS:  Raquel Velez, R-a-q-u-e-l, last name V, as in Victor, e-l-e-z.

THE CLERK:  Thank you very much.

THE COURT:  Okay.  Mr. Beevers.

DIRECT EXAMINATION

BY MR. BEEVERS:

Q.   Do you know the defendant in this case?

A.   Yeah, my dad.

Q.   And what name do you know him by?

A.   Hiram Enrique Velez.

Q.   And were you raised by him since you were a child?

A.   Yes, sir.

Q.   And during that -- during the time that you've known him, has he ever used any other name?

A.   No, sir.

Q.   Have you ever seen your father use any other name?

A.   No.

Q.   Have you ever seen him socialize with friends?

A.   Yes.

Q.   And what name did he use with his friends?

A.   Hiram Enrique Velez or just Enrique for his friends.

Q.   Okay.  And how about among family members and in-laws say?

A.   Enrique -- or, I mean, the in-laws that he has is my

like -- how do you say it in English -- like my sister's husband would call him just dad or, you know, Enrique/dad, Hiram Enrique Velez is like the only thing.

Q.   Okay.  And who is -- do you know Blanca Araujo?

A.   Yes, my sister.

Q.   And how long did you know her?

A.   For the rest of my life, 26 years.

Q.   And do you know, prior to the -- were you aware that your father was arrested at some point?

A.   Yeah.  I think he told me about it not too long ago.  But I was young.  I don't really remember.

Q.   Okay.  No.  I mean for this case, for the beginning of this case.

A.   Oh, yeah.

        MS. LYDON:  Objection.  Relevance.

        THE COURT:  Whether he was arrested or not, we know he was arrested for this case, so sustained.

BY MR. BEEVERS:

Q.   Before your father was arrested for this case, did you -- what was the family history of your relationship with your sister Blanca?  What was that described as?

A.   She's my sister.  I mean --

Q.   Would she be your -- were you -- did you know of her as your sister or your stepsister?

A.   Well, she's my half sister, but we don't really use that

term, so she's just my sister.

Q.   Okay.   And when you say "half sister," half sister in which way?

A.   Like she has a different dad, and he's my dad.

Q.   Okay.   And are you familiar with what name Blanca's dad was?

A.   No.

Q.   And do you ever -- and so are you -- did you learn of Blanca having a different grandmother?

A.   I've never really asked about her.

Q.   Did you ever --

A.   I don't know.

Q.   Did you ever meet an Antonia Lerma?

A.   No, huh-uh.

Q.   Did you ever meet a Felipe Araujo?

A.   No, sir.

Q.   Oh, and sorry.   What do you do for a living?

A.   I work at Social Security.

Q.   And you were born in the U.S.?

A.   Yes, sir.

Q.   One moment.

And your -- who are your brothers, if you have any?

A.   Like their names?

Q.   Yes.

A.   Gustavo Araujo, Blanca Araujo, Mario Araujo.

142

Q.   And are any of them half brothers?

A.   My -- everyone is my half brother and sister.

Q.   And is that half brother as to -- you have the same mother?

A.   Same mother, yes.

Q.   Okay.  And so based on -- now obviously you don't have direct personal knowledge of who the parents are.

A.   Right.

Q.   But based on family history, your understanding was who -- which of your brothers and sisters were the child of your dad Hiram Velez?

A.   I'm the only one.  That's my understanding is that I'm the only one.

Q.   Okay.  And has -- have you ever heard anyone -- have you ever heard Hiram Velez say that any of your other brothers or sisters are his natural child?

          MS. LYDON:  Objection.  Hearsay.

          THE COURT:  Sustained.

          MR. BEEVERS:  Statement of family history.

          MS. LYDON:  Objection.

          THE COURT:  She's not unavailable.

          MR. BEEVERS:  That's true.  We'll wait.  Thank you.  No other questions.

          THE COURT:  Cross-examination.

///

CROSS-EXAMINATION

BY MS. LYDON:

Q.   You were born in 1993; is that right?

A.   Yes, ma'am.

Q.   So all your memories are necessarily after 1993, correct?

A.   Right.

        MS. LYDON:  No further questions.

        THE COURT:  Anything further, Mr. Beevers?

        MR. BEEVERS:  No, your Honor.

        THE COURT:  Thank you for being here.  You can step down.

        THE WITNESS:  Thank you.

        THE COURT:  You may call your next witness.

        (Whereupon the oath was administered.)

                        JOAN ARAUJO

was called as a witness, and having been duly sworn, was examined and testified as follows:

        THE WITNESS:  Yes.

        THE CLERK:  Okay state your full name and spell your names for us please.

        THE WITNESS:  Joan Lammone Araujo, J-o-a-n, middle name, L-a-m-m-o-n-e, and Araujo, A-r-a-u-j-o.

        THE CLERK:  Thank you.

///

DIRECT EXAMINATION

BY MR. BEEVERS:

Q.   Do you know the defendant in this case?

A.   Yes.

Q.   And by what name do you know him?

A.   I usually calm him Bah, but I know him by Hiram or Enrique.

Q.   Right.  And the last name -- oh, how long have you known him?

A.   For about 15 years.

Q.   And have you known him as Hiram Enrique Velez for all that time?

A.   Yes.

Q.   Have you ever known of him using other names?

A.   No.

Q.   And who is your husband?

A.   Mario Araujo.

Q.   And during the time that you've known Mario, have you ever lived with this defendant?

A.   Yes.

Q.   How long did you live together?

A.   For about five years, four to five years.

Q.   And during that time, did you ever see this defendant socialize?

A.   No.

Q.   Okay.  Did you -- was he present at your wedding?

A.   Yes.

Q.   Did you ever introduce him to your parents?

A.   Yeah, to my mom and my grandmother.

Q.   And what name did you introduce this person to your parents?

MS. LYDON:  Objection.  Relevance.

THE COURT:  Sustained.  She's already testified she's only known him as Hiram.

THE WITNESS:  Yeah.

BY MR. BEEVERS:

Q.   Did you introduce him to any other family members?

MS. LYDON:  Objection.  Relevance.

THE COURT:  Sustained.

BY MR. BEEVERS:

Q.   And where do you work?

A.   I work for Sac City Unified School District.

Q.   And have you ever met anyone you know as Gustavo Araujo Lerma?

A.   No.

Q.   Have you ever meet anyone named Felipe Araujo Lerma?

A.   No.

Q.   You ever meet Antonia Lerma?

A.   No.

MR. BEEVERS:  That's all.

THE COURT:  Cross-examination.

MS. LYDON:  No cross.

THE COURT:  No questions?

MS. LYDON:  (Shakes head.)

THE COURT;  Thank you for being here.  You may step down.  You may call your next witness.

MR. BEEVERS:  Your Honor, could we have a sidebar for a moment?

THE COURT:  Sure.

(Sidebar between the Court and counsel.)

THE COURT:  All right.  We are moving at warp speed, so we're going to break for the evening.  I'm going to work on the verdict form and jury instructions.  We'll finish with all the evidence tomorrow morning.  You will hear closing arguments most likely tomorrow morning, and you will begin your deliberations tomorrow afternoon.  So obviously the case went much faster than I anticipated.

So what will happen is I'll have you come in.  We'll start at around 9:15 tomorrow morning.  We'll finish the evidence.  Then there may be a break.  Then I'll have to go over jury instructions with the attorneys.  Once we finalize those -- it shouldn't take too long -- then we'll have the attorneys do closing arguments for you.  My guess is that will take us up into lunch, maybe finish closings after lunch.  Then I'll instruct you.  We'll have you begin deliberations tomorrow

afternoon.

Okay.  So do not discuss the case with anyone.  Don't let anyone discuss the case with you.  Do not do any independent investigation, research, read anything, watch TV, and get a good night's sleep, and then we'll see all of you here tomorrow around 9:15, okay?  All right.  Thank you.

(Jury excused.)

THE COURT:  On the verdict form, do you want me to put superseding indictment?  It just says indictment.

MS. LYDON:  That's fine, yes.

MR. BEEVERS:  Yes.

THE COURT:  Okay.  And then I'm going to rephrase the special interrogatory in number 2, because the way it's phrased, I think it will confuse the jury.  So you'll see the change I made, and we can discuss it tomorrow.  And then we'll go over jury instructions again.  I don't think it will take very long.  We'll go over those tomorrow as well.

Then, Mr. Beevers, if you are going to call your client, we'll have him testify tomorrow at 9:15, okay?

MR. BEEVERS:  Okay.

THE COURT:  See everybody tomorrow.

MR. BEEVERS:  Thank you.

(The proceedings adjourned at 3:53 p.m.)

--oOo--

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Kacy Parker Barajas

_____
KACY PARKER BARAJAS
CSR No. 10915, RMR, CRR, CRC